UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF IOWA

UNITED STATES OF AMERICA,

                    Plaintiff,

          v.                                    Case No.   3:11-CR-47

MARC ROBERT ENGELMANN,

                    Defendant.

## GOVERNMENT'S TRIAL BRIEF

DON ALLEGRO, AUSA
JOHN D. KELLER, AUSA

Attorneys for the Government

United States Courthouse
131 East 4th St., Suite 310
Davenport, IA 52801
(563) 449-5432

1

# TABLE OF CONTENTS

**Page**

SUMMARY OF THE FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

I.     Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.    Real Estate Lending Procedures and HUD-1 Settlement Statements . . . . . 2

III.   The Conspirators . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

IV.    The Mortgage Fraud Scheme . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

       A.    Dual Contracts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

       B.    Laures Approached by Hanneken . . . . . . . . . . . . . . . . . . . . . . . . . 7

       C.    Engelmann's Role . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

       D.    Impact on the Lender's . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

V.     The Counts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

VI.    Scheme Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

LEGAL ANALYSIS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

I.     Applicable Statutes and Offense Elements . . . . . . . . . . . . . . . . . . . . . . . 12

II.    Legal Issues . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

       A.    Lender Agents'/Employees' Knowledge . . . . . . . . . . . . . . . . . . . . 15

       B.    Blaming the Victim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

       C.    Deliberate Ignorance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

       D.    Aiding and Abetting . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

       E.    Character Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

The United States submits this brief to assist the Court in its review of the facts and evidentiary issues that the government anticipates may arise during the trial.

## SUMMARY OF THE FACTS

## I.    Introduction

Between approximately June, 2005, and continuing to on or about July 27, 2006, Marc ENGELMANN and others conspired to commit bank fraud and wire fraud. ENGELMANN agreed to falsify purchase prices and to omit over $275,000 of kickback payments on loan documents in connection with the sales of nine residential, rental income investment properties. ENGELMANN misrepresented the true purchase prices and the actual amounts exchanged between the buyer and the seller in order to defraud lenders into approving and funding inflated mortgage loans for each of the nine properties.

Count One charges ENGELMANN with conspiracy to commit wire fraud and bank fraud in violation of 18 U.S.C. § 371. The conspiracy alleged in Count One involves the nine ENGELMANN transactions and also encompasses similar real property transactions that do not directly involve ENGELMANN. Counts Two and Three charge ENGELMANN  with bank fraud based on his misrepresentations to Wells Fargo Bank, a federally insured financial institution, in relation to two real estate transactions involving the sales of properties at 6224 Appomattox Rd. and 6232 Appomattox Rd. Counts Four through Nine charge ENGELMANN with wire fraud based on ENGELMANN's misrepresentations to New Century Mortgage regarding the sales of seven other properties. ENGELMANN faxed documents from Iowa to Illinois that contained falsified purchase prices and that omitted cash back payments to the

buyer in relation to these transactions.

## II.    Real Estate Lending Procedures and HUD-1 Settlement Statements

The Real Estate Settlement Practices Act of 1974 (RESPA) applies to any federally related mortgage loan secured by a lien on residential real property. 12 U.S.C. §§ 2602(1)(A) & 2603(a). It also applies to loans made "in whole or in part by any lender the deposits or accounts of which are insured by any agency of the Federal Government, or [] made in whole or in part by any lender which is regulated by any agency of the Federal Government." 12 U.S.C. § 2602(1)(B)(i). RESPA requires lenders to use a uniform settlement statement for all federally related mortgage loans as prescribed by the Secretary of the U.S. Department of Housing and Urban Development. 12 U.S.C. § 2603(a). The form developed by HUD is the U.S. Department of Housing and Urban Development Settlement Statement, more commonly known as the HUD-1.

The HUD-1 contains all of the financial information associated with a residential real estate transaction. The HUD-1 lists the contract sales price for the property, the earnest money paid by the borrower, the principal amount of the mortgage loan, the down payment paid by the buyer, commissions, fees, title charges, seller concessions, and any other costs or payments associated with the sale. The HUD-1 is signed by the buyer, the seller, and the closing agent, all of whom must attest that the form is a true and accurate statement of all of the funds received or disbursed in connection with the sale.

The lenders in this case all required that a HUD-1 be completed for any

residential real estate transaction. The HUD-1 captured necessary information that the lenders used to analyze the risks associated with funding a particular mortgage loan. The HUD-1 was critical to the lenders because it was the one universal document that verified the financial information associated with the transaction. The lenders would not fund the loan if they learned that the financial information on the HUD-1 was inaccurate or incomplete.

The HUD-1 was also critical to the lenders because the lenders were often reselling their loans on the secondary market. If the HUD-1's were incomplete or inaccurate the lender could not sell the mortgage on the secondary market because the secondary market investor was unable to gauge the riskiness of the investment. And if fraud was uncovered regarding a specific loan, the mortgage lenders were often forced to buy back the loan from their investor. The lenders and their investors on the secondary market relied on the HUD-1 being the one document in the transaction that provided transparency for all parties involved.

It was common knowledge among persons involved in the real estate industry, including attorneys, that lenders relied on the HUD-1's to accurately describe the nature of the transactions. Likewise, it was common knowledge that omitting material information from a HUD-1 was likely to deceive the lender.

3

## III.   The Conspirators

Robert Herdrich and Darryl Hanneken are domestic partners and were the buyers in over 30 real estate transactions, including all of the transactions underlying Counts 2–9. They have pleaded guilty to conspiracy, wire fraud, mail fraud, and bank fraud and are scheduled for sentencing on August 25, 2011.

They became interested in real estate investment based on infomercials touting the use of "creative financing." Herdrich was a hairdresser and Hanneken was a solo subcontractor doing home renovations. They lacked the income to qualify for the mortgages for which they applied. They applied for inflated loans based on bogus, inflated purchase prices, and received post-closing kickback payments from sellers that reflected the difference between the bogus, inflated prices and the actual, lower prices.

Mary Pat Harper, a real estate agent, was the ramrod of the scheme in several of the initial fraudulent transactions by Herdrich and Hanneken and, prior to Herdrich and Hanneken, conducted fraudulent real estate transactions using the same price/kickback scheme but different sellers and buyers. Harper collected unearned fees and commissions out of the inflated mortgage loans. She also strong-armed buyers and sellers into closing on properties by threatening to sue them. After a disagreement between Herdrich and Hanneken and Harper over her fees and commissions, Hanneken "fired" Harper, proceeding to conduct subsequent purchases without an agent.

Although Harper was not involved in the transactions in which ENGELMANN was involved, defendant ENGELMANN has indicated that he intends to call her as a

defense witness.  Harper has pleaded guilty to conspiracy and fraud changes and is awaiting sentencing.

Winnie Elvidge was the mortgage broker in all of the transactions. Elvidge worked hand-in-hand with Harper to identify and recruit buyers and sellers who would participate in the fraudulent transactions. She falsified information on loan applications to induce lenders to extend mortgage loans to unqualified buyers. She also obtained appraisals that grossly inflated the values of the properties to be sold. She calculated the inflated prices for the properties that were necessary to "make the numbers work."  Elvidge is awaiting trial.

ENGELMANN served as the attorney for seller James Laures in nine transactions, as represented in Counts Two through Nine.. As set forth below, ENGELMANN, aware that the lenders were being deceived as to the true nature of the transactions, counseled his client, Laures, to go forward with the transactions. ENGELMANN also provided bogus HUD-1 closing figures to the closing company, Excel Title, knowing that these figures would make their way onto the HUD-1 forms and be relied upon by the lenders.  ENGELMANN appeared at each closing along with Laures and counseled him to sign the HUD-1 forms containing the bogus information. ENGELMANN also allowed Laures to use ENGELMANN's office as a location to meet Hanneken after closings so Laures could tender kickback payments, concealed from the lenders.

## IV.    The Mortgage Fraud Scheme

Marc ENGELMANN conspired with Winnie Elvidge, Mary Pat Harper, Darryl Hanneken, Robert Herdrich and others to execute fraudulent real estate transactions involving inflated appraisals and loans. ENGELMANN was personally involved with the sales of nine properties but the overall conspiracy involved sales of approximately 40 properties, all of which were multi-unit rental properties in depressed areas of Davenport.[1]

### A.    Dual Contracts

In each transaction, the buyers, Herdrich and Hanneken, and a seller (in the case of these nine transactions, Laures) signed two sets of contracts. One contract provided to the mortgage lender reflected that the property was sold at a bogus, higher price. The second, actual contract, not disclosed to the lender or closing company, Excel Title, provided for the actual, lower price. The second agreement also provided that the difference between the higher and lower prices would be kicked back after closing from the seller to Herdrich and Hanneken.

Based on the inflated price, Herdrich and Hanneken applied for and obtained an inflated mortgage loan, normally in an amount that exceeded the actual sales price of the property. At closing, the parties signed a HUD-1 Settlement Statement that contained the bogus inflated price and failed to note the kickback payments After closing, the seller paid Herdrich and Hanneken a kickback payment representing the difference between the inflated price and actual price.

---

[1] See Attachment A for a chart listing the majority of the properties involved, their inflated sales prices, their actual sales prices, the mortgage loan amounts, and the cash back amounts.

### B.     Laures Approached by Hanneken

After several successful executions of the scheme with other sellers, Hanneken approached Laures, who owned nine multi-unit rental properties in Americana Park, a depressed area of Davenport. Hanneken convinced Laures to sell his properties after making several offers.  After they settled on an actual sales price, Hanneken proposed that they use "creative financing," which would entail dual contracts (one providing the actual price and one providing the inflated price).  Hanneken assured Laures that such deals were legitimate by citing his prior dealings with other buyers. Hanneken showed Laures a dual contract agreement that Hanneken had used with a previous seller. Hanneken used this agreement in an effort to convince Laures that the use of inflated purchase prices and kickbacks was standard practice among savvy real estate investors.

### C.     ENGELMANN's Role

Laures was unsure of the legality of using inflated purchase prices and giving cash back to Hanneken after closing, so he contacted his attorney, Marc ENGELMANN. Laures provided ENGELMANN with the dual sets of contracts and inquired specifically about the unusual financing.  ENGELMANN advised Laures that the arrangement was acceptable and agreed to represent him in the transactions.

In order to help make the deals go through, ENGELMANN drafted two sets of HUD-1 closing figures for each property being sold. ENGELMANN's summaries mirrored the dual contracts: one version concealed the existence of the kickback payments to Herdrich and Hanneken and reflected the bogus, higher sales price.

7

ENGELMANN faxed this version of the HUD-1 closing figures from his office in Iowa to the closing company, Excel Title in Illinois, thereby causing the bogus figures to be communicated to the lenders and included on the HUD-1 forms.

ENGELMANN prepared another version of the HUD-1 closing figures that he concealed from Excel Title and the lenders, providing this version only to Laures and keeping a copy for ENGELMANN's own use.  This version contained the lower, actual sales price and reflected the kickback payment from Laures to Hanneken.

Laures was instructed by either ENGELMANN or Hanneken that he was not to discuss the side agreements, the actual prices, or the kickbacks at the closing table. Accordingly, after each closing, Laures and Hanneken left Excel title and met elsewhere, sometimes at ENGELMANN's office, to exchange the kickbacks not reflected on the HUD-1s.

During an interview with the FBI, ENGELMANN admitted that these transactions involved two different sales prices and that the inflated prices were included on the HUD-1s. He also acknowledged that his office created dual versions of a summary document for each transaction and that one version included the actual price and buyer proceeds and one version did not. ENGELMANN further admitted that the transactions should not have been done this way and that the banks were victimized because they were misled as to the true nature of the transactions. ENGELMANN insisted, however, that he advised Laures not to go through with the sales and that Laures pushed ENGELMANN to go through with the deals. ENGELMANN also stated that he told an employee at Excel Title about the cash back

going from the seller to buyer and that the employee told ENGELMANN that the money should not be reflected on the HUD-1.

### D.  Impact on the Lenders

As a result of the scheme, the lenders were deceived concerning not only the kickback payments and the true prices of the houses, they were deceived concerning the values of the collateral underlying their loans.  As a result, when Herdrich and Hanneken defaulted without ever making a payment on almost any of the loans, the lenders were unable to sell the properties to cover the amounts loaned.

The following chart reflects how the scheme cause the lenders to loan more than the actual values of the properties and how Herdrich and Hanneken profited.

| Ct. | Property | Inflated Price | Loan Amount | Actual Price | Kick Back |
|---|---|---|---|---|---|
| 2 | 6224 Appomattox | $125,000 | $108,000 | $95,000 | $29,725 |
| 3 | 6232 Appomattox | $125,000 | $108,000 | $95,000 | $29,100 |
| 4 | 6302 Appomattox | $125,000 | $108,000 | $95,000 | $30,000 |
|   | 6314 Appomattox | $125,000 | $108,000 | $95,000 | $32,866.26 |
| 5 | 615 W. 64th | $115,000 | $101,700 | $80,000 | $35,425 |
| 6 | 655 W. 64th | $115,000 | $101,700 | $80,000 | $35,925 |
| 7 | 671 W. 64th | $110,000 | $99,000 | $76,000 | $34,725 |
| 8 | 640 W. 61st | $110,000 | $99,000 | $76,000 | $34,450 |
| 9 | 710 W. 61st | $110,000 | $93,500 | $76,000 | $34,000 |

As a result of these transactions Herdrich and Hanneken received kickback payments from Laures totaling over $275,000, all unknowingly funded by the lenders.

ENGELMANN received between $450 and $500 in fees in connection with each transaction.

## V.    The Counts

Count One charges conspiracy to commit wire fraud and bank fraud.  Counts Two and Three are bank fraud counts – the victim is Wells Fargo Bank. Counts Four through Nine are wire fraud counts – the victim is New Century Mortgage. The government and the defendant have stipulated to the federally-insured-institution with respect to the bank fraud counts and use-of-the-interstate-wire-facilities with respect to the wire fraud counts.

With respect to the bank fraud counts, the date corresponding to each count reflects the date of the closing.  With respect to the wire fraud counts, the date corresponding to each count reflects the date that ENGELMANN's office in Iowa faxed the bogus HUD-1 closing figures to Excel Title in Illinois.

## VI.    Scheme Evidence

In addition to the evidence that relates directly to the specific bank fraud and wire fraud transactions charged in Counts Two through Nine, the government may introduce other evidence which establishes the existence of the overall scheme and conspiracy.  This is because, as indicated, these nine transactions were part of a run of over 30 such transactions engaged in by Herdrich and Hanneken.  Real estate agent Harper and mortgage broker Elvidge engaged in additional, similar transactions prior to colloborating with Herdrich and Hanneken.

Evidence of these other transactions is admissible despite the fact that they are not included in the indictment. In a charge of bank fraud or wire fraud, the existence of the scheme is one of the elements of the offense, and "[t]he Government need not allege the subordinate evidentiary facts by which it intends to prove the 'in furtherance' element of the crime charged." *United Sates v. Castor*, 558 F.2d 379, 385 (7th Cir. 1977). The additional transactions are admissible as evidence of the scheme to defraud. *United States v. Weiss*, 469 F. Supp. 2d 941, 947–48 (D. Colo. 2007) ("[t]he additional properties are not additional charges, but additional evidence of the scheme alleged in the Indictment.").

# LEGAL ANALYSIS

## I.     Applicable Statutes and Offense Elements

Count One of the Indictment charges the defendant with conspiracy to commit

bank fraud and wire fraud in violation of Title 18, United States Code, Section 371.

The statute provides:

> If two or more persons conspire either to commit any offense against
> the United States, or to defraud the United States, or any agency
> thereof in any manner or for any purpose, and one or more of such
> persons do any act to effect the object of the conspiracy, each shall be
> fined under this title or imprisoned not more than five years, or both.

The elements of a violation of Title 18, United States Code, Section 371

(conspiracy) are:

1.     Two or more persons reached an agreement or came to an
       understanding to commit mail/wire fraud;

2.     The defendant voluntarily and intentionally joined in the agreement or
       understanding either at the time it was first reached or at some later
       time while it was still in effect;

3.     At the time the defendant joined in the agreement or understanding,
       he knew the purpose of the agreement or understanding; and,

4.     While the agreement or understanding was in effect, a person or
       persons who had joined in the agreement knowingly did one or more
       overt acts for the purpose of carrying out or carrying forward the
       agreement or understanding.

Eighth Circuit Manual of Model Jury Instructions, Criminal, Instruction 5.06A

(Judicial Committee on Model Jury Instructions, 2007).

Counts Two and Three of the Indictment charge the defendant with bank fraud

in violation of Title 18, United States Code, § 1344. Section 1344 provides:

> Whoever knowingly executes, or attempts to execute, a scheme or artifice--
>
> (1) to defraud a financial institution; or
>
> (2) to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises;
>
> shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

18 U.S.C. § 1344.

> The elements of bank fraud are:
>
> 1. The defendant knowingly executed, attempted to execute, or participated in a scheme to defraud a financial institution, or to obtain monies, funds, or credits, owned by or under custody and control of a financial institution by means of material falsehoods, fraudulent pretenses, false or fraudulent representations, or false or fraudulent promises;
>
> 2. The defendant did so with intent to defraud; and
>
> 3. The financial institution was insured by the United States government.

Eighth Circuit Manual of Model Jury Instructions, Criminal, Instruction 6.18.1344

(Judicial Committee on Model Jury Instructions, 2007).

Counts Four through Nine of the Indictment charge the defendant with wire fraud in violation of 18 U.S.C. § 1343. Section 1343 provides:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both.

18 U.S.C. § 1343. The elements of a violation of Title 18, United States Code, Section 1343 (wire fraud) are:

1. The defendant voluntarily and intentionally

– devised or made up a scheme to defraud another out of money or property, or participated in a scheme to defraud with knowledge of its fraudulent nature, or

– devised or participated in a scheme to obtain money or property by means of material false representations or promises;

2. The defendant did so with intent to defraud; and,

3. The defendant used or caused to be used interstate wire facilities in furtherance of, or in an attempt to carry out, some essential step of the scheme.

Eighth Circuit Manual of Model Jury Instructions, Criminal Instruction 6.18.1341 (Judicial Committee on Model Jury Instructions, 2007).

The phrase "scheme to defraud" includes any plan or course of action intended to deceive or cheat another out of money or property by employing material falsehoods or concealing or omitting material facts. Id. It also means the obtaining of money or property from another by means of material false representations or promises. Id. A scheme to defraud need not be fraudulent on its face but must include some sort of fraudulent misrepresentation or promise reasonably calculated to deceive a reasonable person. Id.

A fact is "material" if it has a natural tendency to influence, or is capable of influencing, the decision of a reasonable person in deciding whether to engage or not to engage in a particular transaction. Id.

14

To act with "intent to defraud" means to act knowingly and with the intent to deceive someone for the purpose of causing some financial loss to another or bringing about some financial gain to oneself or another to the detriment of a third party. Id.

## II.   Legal Issues

### A.   Lender Agents'/Employees' Knowledge

The government anticipates that the defendant may present evidence or argument that employees of the lender or employees of the closing company, Excel Title (arguably acting as an agent for the lender), were aware of the actual purchase prices in this case and were aware of the kickbacks to the buyer. The theory of defense would proceed that any knowledge on behalf of lender employees or Excel Title employees would render the lenders aware of the misrepresentations and therefore not misled or defrauded.

But an individual employee's knowledge of material misrepresentations or deceptions is not a defense to fraud.  Rather, the question is whether the financial institution itself, not its officers or agents, was defrauded. It is the bank or lender, as an entity, that is the victim of a bank fraud. Thus, even if a bank officer or employee (or multiple officers or employees)  may have known the true nature of the questioned transactions, that is not a defense to the fraud. *See United States v. Gallant*, 537 F.3d 1202, 1224 (10th Cir. 2008) (holding in the bank fraud context that it is the institution itself that is defrauded not its officers or agents and stating "[defendants] are not absolved from bank fraud by having successfully recruited BestBank officers and directors to participate in their scheme."); *United States v. Jimenez*, 513 F.3d 62, 75 (3d

Cir. 2008) (asserting that "even if a bank officer or employee may have known the true nature of the questioned transaction, that is not a defense to bank fraud. Rather, the question is whether the financial institution itself, not its officers or agents, was defrauded."); *United States v. Hamaker*, 455 F.3d 1316, 1326 (11th Cir. 2006) ("The agent of a financial institution is never empowered to authorize a fraud on the institution.").

The government disputes that individual lender employees or employees of Excel Title were informed of the fraudulent scheme. But even if some employee was notified of the scheme or some detail of the scheme the lenders were still defrauded into lending over 10% more than these properties were worth when they were led to believe that they were lending 10% less than the value of the properties. The gravity of the misrepresentations regarding purchase prices and buyer proceeds and the deception of the lenders was apparent to ENGELMANN. If proven, the fact that ENGELMANN conspired with an employee or agent of the lenders would not absolve him of criminal liability.

The government requests that ENGELMANN be precluded from making this argument or presenting evidence in support of this argument. The government further requests that if any evidence is provided on this point, the jury be instructed that knowledge of a low-level employee or agent of a lender is not imputed to the lender itself. The jury should be further instructed that the defendant is not absolved from criminal liability simply because he shared some aspect of the scheme with an employee or agent of the lender. The government will file contemporaneously with this

16

trial brief a motion in limine on this issue and proposes the following jury instruction on this point.

> It is no defense to unlawful conduct that individual employees or agents of the lender victims were aware of the fraud and failed to remedy it. Rather, the question is whether the lender itself, not its officers or agents, was defrauded. You must consider all of the evidence received in the case bearing on the defendant's intent to defraud at the time of the alleged offense(s).

## B.     Blaming the Victim

The government also anticipates that the defendant may argue that the lenders are to blame for the fraud and losses in this case because of their own negligence or failure to detect the fraud. It is no defense to unlawful conduct that the victim was unreasonable, negligent, or gullible. *See United States v. Serfling*, 504 F.3d 672, 679 (7th Cir. 2007) ("the perpetrator of a fraud may not defend himself by blaming the victim for being duped.") (citing *United States v. Coffman*, 94 F.3d 330, 333–34 (7th Cir. 1996)); *United States v. Thomas*, 377 F.3d 232, 243 (2d Cir. 2004) (collecting cases rejecting the "unreasonable victim" argument).

In *United States v. Thomas*, 377 F.3d 232 (2d Cir. 2004), the Second Circuit addressed a fraud case in which defense counsel attempted to cross-examine a representative of the victim entity about his purported lack of caution and diligence in dealing with the defendant.  The district court questioned the propriety of the line of questioning, noting that it was no defense to fraud that the victim was foolish or made insufficient inquiries. *Thomas,* 377 F.3d at 240. Defense counsel disclaimed any such intent and was directed to move on. *Id.* at 240–41. The Second Circuit held the ruling to be an appropriate exercise of the district court's discretion.

17

The Second Circuit also upheld the district court's mid-trial instruction to the effect that if the jury found fraud to be proved, it would be no defense that the victim might have discovered the fraud had it probed further. *See id.* at 241–42. The *Thomas* court made clear that federal anti-fraud statutes prohibit schemes to defraud and that to establish a scheme to defraud, there is no requirement that the victim act as a person of ordinary prudence would. *See id.* at 242–43. Instead, the consideration of whether a scheme is reasonably calculated to deceive persons of ordinary prudence focuses on the defendant's intent. *See id.* at 243. If the defendant developed a scheme with the intent to deceive persons of ordinary prudence, it matters not that the victims were negligent. The Second Circuit in *Thomas* stated emphatically "[w]e refuse to accept the notion that 'the legality of a defendant's conduct would depend on his fortuitous choice of a gullible victim.'" *Id.* (quoting *United States v. Benson*, 548 F.2d 42, 46 (2d Cir. 1977)).

The defendant should be precluded from arguing that the victims are to blame because of their own negligence. The defendant should also be precluded from presenting evidence or cross-examining witnesses in this vein.

## C.    Deliberate Ignorance

The defendant may argue that he did not know that the lenders were being deceived because he assumed that the side agreements were being provided to the lender by the closing agent. But ENGELMANN was experienced in real estate law and knew that the lenders relied on the HUD-1 forms to provide accurate information about the transaction. It would be pointless to list materially false information on the

HUD-1 forms if the parties intended to disclose the actual purchase prices and kickbacks to the lenders. The government therefore respectfully requests that the jury be instructed on deliberate ignorance. In accordance with the Eighth Circuit Pattern Instruction, the government requests the following instruction:

> You may find that the defendant, MARC ENGELMANN, acted knowingly if you find beyond a reasonable doubt that he was aware of a high probability that the lenders were not informed of the cash back agreements which provided the actual sale price of the properties and that he deliberately avoided learning the truth. The element of knowledge may be inferred if the defendant deliberately closed his eyes to what would otherwise have been obvious to him. You may not find the defendant acted "knowingly" if you find he was merely negligent, careless or mistaken as to whether the lenders were or were not informed of the cash back agreements which provided the actual sale price of the properties.

Eighth Circuit Manual of Model Jury Instructions, Criminal Instruction 7.04 (Judicial Committee on Model Jury Instructions, 2007).

### D.    Aiding and Abetting

Finally, the government anticipates that the defendant may argue that because of his limited role in the conspiracy and fraudulent scheme, he should be found not guilty. Because limited role is no defense to conspiracy or bank fraud or wire fraud the government requests the following Eighth Circuit Pattern Instruction on aiding and abetting:

> A person may also be found guilty of mail fraud, wire fraud, or conspiracy to commit mail fraud or wire fraud even if he personally did not do every act constituting the offense charged, if he aided and abetted the commission of the offense(s).
>
> In order to have aided and abetted the commission of a crime a person must,

(1) have known mail fraud, wire fraud, or conspiracy to commit mail fraud or wire fraud was being committed or going to be committed; and

(2) have knowingly acted in some way for the purpose of causing, encouraging, or aiding the commission of the offense(s) ; and

(3) have intended the offense.

For you to find the defendant guilty of mail fraud, wire fraud, or conspiracy to commit mail fraud or wire fraud by reason of aiding and abetting, the Government must prove beyond a reasonable doubt that all of the elements of the offense(s) were committed by some person or persons and that the defendant aided and abetted the commission of that crime.

You should understand that merely being present at the scene of an event, or merely acting in the same way as others or merely associating with others, does not prove that a person has become an aider and abettor. A person who has no knowledge that a crime is being committed or about to be committed, but who happens to act in a way which advances some offense, does not thereby become an aider and abettor.

Eighth Circuit Manual of Model Jury Instructions, Criminal, Instruction 5.01

(Judicial Committee on Model Jury Instructions, 2007).

### E.    Character Evidence

Rule 404(a) provides the general rule that character evidence is not admissible to prove action in conformity therewith. Fed. Rule. Evid. 404(a). Rule 404(b) restates this general rule in the context of other "crimes, wrongs, or acts." Fed. R. Evid. 404(b). The government expects that ENGELMANN may offer evidence of his prior good acts in an effort to prove his good character. ENGELMANN should not be permitted to offer evidence of his prior lawful acts in an effort to establish that his conduct in this case was lawful. Fed. R. Evid. 404(a) & (b); *United States v. Cole*, 537 F.3d 923, 928 (8th Cir. 2008) ("Character or propensity evidence is inadmissible to prove that the

defendant acted in conformity with his prior actions . . . . "); *See Also United States v. Burke*, 781 F.2d 1234, 1243 (7th Cir. 1985) ("Evidence that the defendant frequently performs lawful or laudable acts does not often establish that some subsequent act is also lawful or laudable.").

Further, character evidence is generally not admissible on direct examination in the form of specific instances of conduct. Fed. R. Evid. 405(a). Proof of character may only be made by "testimony as to reputation or by testimony in the form of an opinion." *Id.* Any evidence of specific instances of conduct offered to prove Engelmann's good character should therefore be excluded. Character evidence may be appropriately presented in this case as to ENGELMANN's reputation, but even that evidence should be limited by Federal Rule 403. Fed. R. Evid. 403 ("Although relevant, evidence may be excluded it its probative value is substantially outweighed by . . . considerations of undue delay, waste of time, or needless presentation of cumulative evidence.").

Finally, the government intends to introduce evidence pursuant to Rule 404(b) that ENGELMANN previously advised a client to exchange money under the table at a real estate closing against a lender's instructions. Rule 404(b) allows presentation of such evidence as it is relevant to ENGELMANN's knowledge of real estate closings and lender instructions regarding the accuracy of the information on the HUD-1 Settlement Statement. This evidence is also admissible on the issue of modus operandi. *See United States v. Stenger*, 605 F.3d 492, 499 (8th Cir. 2010) (upholding the admission of the evidence under 404(b) on modus operandi grounds). Counseling a client to exchange money at a real estate closing without lender knowledge or approval is a distinct set

21

of facts. That same set of facts appears in this case and ENGELMANN's advice to exchange the money outside of closing, without the lender's knowledge, is a distinct method of defrauding the lender. The evidence of ENGELMANN's prior bad act also bears on ENGELMANN's intent in this case. ENGELMANN's prior act shows that he was aware that lenders require strict compliance with the numbers listed on the HUD-1 in real estate closings and his act indicates a willingness to serve his client's interests over the interests of the lender. His prior act shows that he intentionally acted against a lender's instructions at a real estate closing. This evidence is probative of whether ENGELMANN acted with intent to defraud under the same circumstances in this case.

WHEREFORE, the government respectfully submits its trial brief.


Respectfully Submitted,


Nicholas A. Klinefeldt
United States Attorney
By:  /s/John D. Keller_____
John D. Keller
Assistant United States Attorney
U.S. Courthouse, Suite 310
131 East 4th Street
Davenport, Iowa 52801
Tel: (563) 449-5432
Fax: (563) 449-5433
Email: John.Keller@usdoj.gov

CERTIFICATE OF SERVICE

I hereby certify that I
electronically filed the foregoing with the Clerk
of Court using the ECF system which
will send notification of such filing to defense counsel.

UNITED STATES ATTORNEY

By:   /s/ John D. Keller
         John D. Keller