1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
DAVENPORT DIVISION

- - - - - - - - - - - - - -X
UNITED STATES OF AMERICA,   :
                            :
          Plaintiff,        :        Criminal No. 3:11-47
                            :
     vs.                    :
                            :
MARC ROBERT ENGELMANN,      :         PARTIAL TRANSCRIPT
                            :     (Testimony of Marc Engelmann)
          Defendant.        :
- - - - - - - - - - - - - -X


                              West Courtroom, First Floor
                              United States Courthouse
                              131 East Fourth Street
                              Davenport, Iowa  52801
                              Friday, September 9, 2011
                              1:38 p.m.



BEFORE:  THE HONORABLE JAMES E. GRITZNER, Judge,
         and a Jury.


APPEARANCES:

For the Plaintiff:          DONALD B. ALLEGRO, ESQ.
                            JOHN D. KELLER, ESQ.
                            Assistant U.S. Attorneys
                            U.S. Courthouse
                            131 East Fourth Street, Suite 310
                            Davenport, Iowa  52801


For the Defendant:          DAVID R. TREIMER, ESQ.
                            601 Brady Street, Suite 311
                            Davenport, Iowa  52803



            Terri L. Martin, CSR, RPR, CRR
             United States Court Reporter
              Room 189, U.S. Courthouse
               123 East Walnut Street
              Des Moines, Iowa  50309

GOVERNMENT
EXHIBIT

1

I N D E X

| WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| For the Defendant: | | | | |
| Marc Engelmann | 3 | 29 | 58 | |

E X H I B I T S

| GOVERNMENT'S EXHIBIT NUMBERS: | OFFERED | RECEIVED |
|---|---|---|

```
1                    P R O C E E D I N G S

2                           *   *   *

3            (In open court, in the presence of the jury.)

4            THE COURT:  Take a seat, please.

5            Mr. Treimer, what's next?

6            MR. TREIMER:  Marc Engelmann.

7            THE CLERK:  Please raise your right hand.

8            MARC ENGELMANN, DEFENDANT'S WITNESS, SWORN

9            THE COURT:  Take a seat, sir.

10                      DIRECT EXAMINATION

11   BY MR. TREIMER:

12   Q.  As you've heard, please state your name and spell your last

13   name for the court reporter.

14   A.  My name is Marc Engelmann.  I know you didn't ask for it, my

15   first name is Marc, M-A-R-C, last name is Engelmann,

16   E-N-G-E-L-M-A-N-N.

17   Q.  How old are you, sir?

18   A.  Sixty.

19   Q.  When were you born?

20   A.  When?

21   Q.  Where were you born, I mean?

22   A.  I'm sorry, I was born in Davenport, Iowa.

23   Q.  And where did you go to school?

24   A.  Went to school at local schools here throughout my high

25   school and even went through St. Ambrose, what is now a
```

1  university but at that point it was just a college.

2  Q.  What year did you graduate from high school?

3  A.  High school, 1969.

4  Q.  And what year did you graduate from college?

5  A.  1973.

6  Q.  What were your degrees, college degrees?

7  A.  I had degrees -- my actual degree is a B.A. in business

8  administration.  I had hours enough to have an accounting degree

9  as a major.  My minor was in economics.

10  Q.  Did you decide to go to law school immediately after

11  college?

12  A.  Long before then; but yes, I did.  I went right through and

13  into law school if that was your question.

14  Q.  Yes.  And what law school was that?

15  A.  Creighton University, Omaha.

16  Q.  And when did you graduate from Creighton?

17  A.  1976.

18  Q.  What did you do after graduation?

19  A.  Well, at the end of my law school time, I went to work for a

20  natural gas utility company in Hastings, Nebraska, called Kansas

21  Nebraska Natural Gas Company.

22  Q.  And how long did you work there?

23  A.  Just about a year.

24  Q.  And then where did you move to?

25  A.  To the Quad Cities -- or back to the Quad Cities.

1  Q.  Did you have any family at that time?

2  A.  All of my family is from the Quad Cities.

3  Q.  I mean, were you married at that time?

4  A.  Oh, I'm sorry.  Yes, I was married and I had at that time

5  one child.  I now have three.

6  Q.  All grown?

7  A.  Yes, sir.

8  Q.  And what are their names?

9  A.  My oldest is named Eric.  My middle one is named Katie,

10  Kathryn, and my youngest is named Sara.

11  Q.  You moved back to the Davenport area again in approximately

12  what year?

13  A.  1977.

14  Q.  And what did you do?  Where did you start?

15  A.  Well, I was lucky enough to come in -- not employed, but

16  associated with an attorney in north central Davenport named

17  John Collins, so I was an associate with that firm.

18  Q.  What kind of legal work did you do there?

19  A.  I did anything that came in the door in those first few

20  years.  I did criminal work, I did civil work, did some real

21  estate, divorce, bankruptcy, general practice.

22  Q.  And you were there how many years, approximately?

23  A.  I believe two to three.

24  Q.  And then what did you do or where did you go?

25  A.  In the late seventies, approximately, I moved my office onto

1  my own office -- or into my own office, and I practiced for

2  approximately ten years in Eldridge or the Park View Area.

3  Q.  Doing what kind of work?

4  A.  Um, again, the same type of practice overall at the

5  beginning in the sense that I would do wills and criminal work,

6  civil litigation, criminal litigation; but it became over time

7  more and more oriented towards the real estate arena.

8  Q.  Did you do abstracting?

9  A.  Yes.  I've always done abstracting.  Abstracting is a -- in

10  Iowa, the predicate for a real estate matter is the history of

11  the real estate parcel that you're dealing with, and it is a

12  certification by an attorney or a company as to the condition of

13  the title as of a certain date.  Until 1986, I believe, it was

14  not heavily regulated in Iowa.  About in 1986 the Iowa Title

15  Guaranty Division was created and formed, and I became certified

16  by that organization, a state organization, to write title

17  guarantees as an attorney and to be able to do abstracts.

18  Q.  Your office still does that today?

19  A.  Yes, sir.

20  Q.  Has your role as an attorney in the real estate closing

21  area -- let me start over.

22          What percentage of your work in the real estate -- or

23  your business was in the real estate area back in the early

24  eighties?

25  A.  Early eighties?

1  Q.  Yes.

2  A.  A minority, in the sense it would be 30 or 40 percent in the

3  early eighties.

4  Q.  Then let's go to the late eighties.

5  A.  It continued to grow and develop.  It became greater and

6  greater, so you might be half or 40 percent, something in that

7  range.

8  Q.  And by the late eighties were you representing lenders?

9  A.  Oh, yes.

10  Q.  Can you tell the jury some of the lenders you were

11  representing then?

12  A.  Well, the first lender that I represented at that time was

13  the First -- was known as First Federal Savings & Loan here in

14  Davenport.  They were the largest S & L, if you will, in the

15  eighties and for a number of years, and I was lucky enough to be

16  contacted by the bank vice president and the attorney who at

17  that time they were having trouble with the volume, and so they

18  wanted to bring a younger guy on, and they were nice enough to

19  bring me into that process, and so that was about 1988.

20  Q.  And you continued to work for them until that bank was sold

21  to another bank?

22  A.  First Federal went through a number of permutations; but

23  yes, I represented what became ultimately now is U.S. Bank and

24  they went through various permutations over the years.  Yes, I

25  have, I represented them and a number of other banks.

1  Q.  Do you belong to some professional organizations?

2  A.  Yes, I do, sir.  I belong to the Iowa Bar Association, the

3  Illinois Bar Association, both as an active member, and the

4  Nebraska Bar Association in an inactive sense.  I'm also a

5  member of the Scott County Bar Association as well.

6  Q.  Have you ever taught classes?

7  A.  Yes.  I've taught both for the state bar association -- I

8  believe there was only one class for that, but it's been a few

9  years ago -- and with the county bar association on real estate

10  matters three or four times.

11  Q.  So when you taught for the state bar association, that was

12  on real estate also?

13  A.  Yes, sir.  All of that was on real estate.

14  Q.  What did you teach?

15  A.  It was primarily an update of the case law and activity or

16  changes in the last period of time it would have been since the

17  last talk, if you will; just new cases, if you will.

18  Q.  New cases in real estate?

19  A.  Yes, sir.

20  Q.  And what do you mean by "cases"?  Do you mean cases that

21  went to a particular court?

22  A.  Well, yes, either would have gone to the Iowa Supreme Court

23  or to the Iowa Court of Appeals.

24  Q.  Do you also do work for local recorders' offices?

25  A.  Well, I work for -- well, I don't do work in any employment

1   sense; but as one of the local real estate attorneys who are

2   down in the offices, if you will, regularly I work with all of

3   the local county officials on any number of minor issues that

4   they have come through, and I've also done various committees

5   with them.

6   Q.   What types of committees?

7   A.   Well, just starting with the Scott County Recorder's office,

8   the most recent and I think probably the most important with the

9   Scott County Recorder's office was the redacting of the Social

10  Security numbers.  Redacting is a computerized word meaning to

11  erase or cover up, so we're all at least in English here; but

12  Social Security numbers for years were identifiers and we would

13  file documents where your Social Security number became a public

14  record and, you know, for many, many years that was not a

15  problem.  But recently, of course, with identity theft, it's

16  become quite a problem.  And I'm not sure when this was, but it

17  was five or ten years ago the local recorder became concerned

18  about the fact that our local records are now on the Internet,

19  and from 1989 and onward, all public records are accessible by

20  the Internet, and she wanted to make sure that none of those

21  Social Security numbers became available for identity theft.

22          So without any other prodding, she informed a group of

23  us to work with her on an informal basis -- this is all

24  informal -- to identify documents and other things that you

25  needed to have redaction done on them and we would identify them

1  and give her examples of things that needed to be redacted.  So

2  that was my probably largest project with the current recorder.

3  Q.  Did you also work with the assessor and auditor?

4  A.  Well, the assessor, the use I would have with them would be

5  on any documents that came through, all of those offices would

6  see the documents as they were recorded.  They would go from

7  office to office to office.  So a deed or a mortgage or a

8  contract or a release of a mortgage or an assignment or whatever

9  document you want to refer to that would move from office to

10  office, many times the assessor would have a problem with the

11  meaning of a document because we would have some people out

12  there who are not as adept at what should be filed and the

13  proper order as are others.  So the assessor would sometimes

14  come to me or workers, and we would work through what the intent

15  was or I would help them in trying to determine what the intent

16  was.

17  Q.  Could you please tell the jury about your current practice?

18  A.  My --

19  Q.  Law practice.

20  A.  My current law practice, well, my current law practice is

21  primarily in the real estate arena, I would dare say 80 percent

22  or thereabouts of it.  I represent anywhere from ten to twenty

23  local lenders in a variety of closing settings.  Most of the

24  banks that I represent are local banks, Quad City Bank, First

25  Central State, U.S. Bank, Wells Fargo, Valley.  These are all

1   off and on in various capacities, but as closing agent I would

2   represent them and conduct the closings.  I would occasionally

3   represent a broker or a banker type loan that was out of the

4   community, but that's very rare.

5   Q.   Do you also represent buyers of real estate?

6   A.   Certainly.

7   Q.   And sellers?

8   A.   Oh, certainly.

9   Q.   Tell us about your office staff.

10  A.   Well, it's grown and shrunk.  It's ebbed and flowed as the

11  time on the activity of the real estate arena has altered.  The

12  real estate market has moved significantly over the last ten to

13  fifteen years, and we've gone from a period probably in the late

14  nineties, early 2000 perhaps to about 2006 when we were, the

15  real estate lawyers -- now by that I mean ten or twenty of us

16  maybe in the Iowa side and to some extent the Illinois side

17  would be -- literally we didn't have time to eat for that

18  period, 2000 to 2006.  There were days when I would do eight and

19  ten and twelve closings, and that was normal.

20  Q.   Did you depend on your staff at that time to get your files

21  organized for the closings?

22  A.   Yes.  Staffing was crucial.

23  Q.   What was the most staffers you ever employed?

24  A.   Well, in the real estate world, I have a receptionist for

25  the building that I am in, but I have or have had up to four

1  staff members.

2  Q.  All working on real estate matters?

3  A.  Yes.  Two of them would be the, in today's words, word

4  processors.  They generate the abstracts, the letters, the

5  documents, the deeds, the word processing material.  The other

6  two are the other side of the equation, the Excel or those of us

7  familiar with Microsoft products, the Word or the number

8  crunching people.  They would do the number crunching and the

9  acquisition of all of the documents -- or the numbers for the

10  closings.

11  Q.  I'm going to put on the screen what's been admitted as

12  Defendant's Exhibit E-2.  I can't get the entire document on

13  there.

14        Did you go back through your files or your computer

15  system at my request to determine how many closings you were

16  doing in the month of May and June 2006?

17  A.  Yes, I did.  Over the years, because of the volume of

18  activity that occurred, particularly in the early 2000s,

19  computerization is crucial, so I created a database program,

20  which this is a sheet out of my computer or sheets indicating --

21  from left to right if you look at it, the file number, last

22  name, first name, close date and the specific lender that is

23  involved.  These are primarily lender closings either that I

24  have done or that the particular lender involved, First Central

25  State being an example, Valley or U.S. Bank, whoever, Wells

1  Fargo Bank, and then a specific date and all those type of

2  things.  It is a printout of documents that are in my computer.

3          The purpose of this specific database is to track

4  closing activity and then to trigger to me a report indicating

5  the oldest closing for a lender -- I'm sorry, I may have to go

6  on a little bit.  Is that all right?

7  Q.  Go ahead.

8  A.  Well, I want to explain, when a closing is done for a

9  lender, the seller sells, the buyer buys.  When the seller

10 sells, he would have -- just to be simple about it, he would

11 have his existing mortgage.  The buyer in turn would get a new

12 mortgage.  And in my sheet as an example, First Central State,

13 Valley or whoever, that's the new bank, if you will.  The old

14 bank, if I would pull up as an example, Scott Wheat on about the

15 fifth or sixth line there as an example, Mr. Wheat's closing,

16 when he purchased he would have used in this particular case

17 John Peavey who is an attorney up in Clinton County that used me

18 to do the Scott County abstract for him.  Mr. Wheat when he

19 purchased the property, the seller would have had his own loan.

20 Now, my job as the bank's attorney is to make sure that that

21 release of that old loan is cleared off and is released in some

22 manner and then to give a certificate eventually to my client,

23 which would be First Central State or whoever this person is.

24 The theory is to make sure that First Central State or Valley

25 Bank or whoever is in first position.

1    So this allows me to track by date, so the oldest is

2  brought to my attention first, of any closings which need

3  attention, releases or other items.

4  Q.  Mr. Engelmann, have you counted the number of closings in

5  Defendant's Exhibit E-2?

6  A.  Well, my finger counting was, I think, 52.

7  Q.  In the months of May and June of 2006?

8  A.  That's right.  Those would be the lender closings.

9  Q.  In addition to these closings, you did buyer and seller

10  closings?

11  A.  Yes, some -- I don't know how many, but yes.

12  Q.  So in that two-month period, you did 55 just for lenders and

13  plus additional buyer or seller closings?

14  A.  52 with -- yes, you're right.

15  Q.  So any idea how many total closings you might have done in

16  that two-month period?

17  A.  I think a hundred would be a very reasonable number.

18  Q.  And, again, you wouldn't have been able to do that without

19  your staff doing a considerable amount of the work?

20  A.  No, sir.

21  Q.  Well, did you have a client by the name of Jim Laures?

22  A.  Yes, I did.

23  Q.  Do you remember when your relationship with Mr. Laures

24  started?

25  A.  If memory serves, somewhere in the late 1990s, Mr. Laures

1  purchased and sold a number of properties.

2  Q.  I'm showing you what's been marked Defendant's Exhibit L-1.

3  Did I ask you to create this document or exhibit?

4  A.  Yes, you did.

5  Q.  So the first closing occurred when?

6  A.  August 4, 1998.

7  Q.  And then that was a refinance?

8  A.  Yes, refinance.

9  Q.  And then you closed again for Mr. Laures on --

10 A.  January 15, 2002.

11 Q.  And again on --

12 A.  May 31st of 2002.

13 Q.  And --

14 A.  And May 27, '04, three of them in there somewhere, and then

15 July 9th of '04 was the last one preceding this group that we're

16 dealing with today.

17 Q.  So you had done seven closings with Mr. Laures prior to the

18 nine transactions that are of interest here in this trial?

19 A.  That's correct.

20 Q.  How did Mr. Laures approach you for these nine closings?

21 A.  He approached me as any client does, by contacting either

22 myself or my office and asking that I represent him in whatever

23 work.

24 Q.  And on the first contact with Mr. Laures, did he have the

25 offer to purchase and side agreement with him?

1  A.  I'm sorry, are we now on the current --

2  Q.  The current nine transactions.

3  A.  When he initially contacted me, my memory is, yes, he did.

4  Q.  And did he tell you when you would be closing or give you

5  any idea when the closing date was?

6  A.  Not specifically.  I probably would have just looked at

7  whatever the documents were.  Normally in the offer to purchase,

8  that is one of the elements that you would specify, which is

9  that the closing occurs on or before a certain date.

10 Q.  Did he tell you why he was selling the properties at that

11 time?

12 A.  No, but it became apparent that he was, in today's

13 vernacular, a motivated seller.  Now, why and the wherefores I

14 don't know, but he was trying to sell.

15 Q.  And did he tell you anything about the buyers?

16 A.  Other than --

17 Q.  Who they were?

18 A.  Who they were, yes; Mr. Herdrich and Mr. Hanneken.

19 Q.  Did he tell you whether or not they were using a particular

20 lender?

21 A.  No.

22 Q.  So you were asked just to handle the closing documents for

23 Mr. Laures?

24 A.  Yes, sir.

25 Q.  Now, as part of your preparation for the closing, did you do

1  all of the work on those files or did your secretarial staff do

2  the work?

3  A.  My secretaries do -- from a document generation perspective

4  of the actual physical documents will do most of that type of

5  work.  We have upgraded over the years any number of internal

6  documents, spreadsheets, databases or whatever allows us to do

7  our work or allow them to do their work, and they in turn use

8  those forms.

9  Q.  Would it be fair to say that your secretarial staff would

10 have contact with either the lender or the closing agent rather

11 than you?

12 A.  Not rather than me; with both of us.  It would be -- and

13 just to correct you just slightly, it is the closing agent.  We

14 don't normally -- in my 35 years I can't remember ever having

15 contact with the buyer's lender.

16 Q.  Okay.

17        THE COURT:  Excuse me, Mr. Treimer.  Would you bend

18 that microphone down so it's kind of straight?

19        There you go.

20        MR. TREIMER:  Yes, you were a little low in volume.

21        THE WITNESS:  It's a rare thing that I'm accused of

22 being too quiet.

23 BY MR. TREIMER:

24 Q.  Now, relating to your representation of Mr. Laures, did you

25 have any contact with the mortgage broker?

1  A.  I wouldn't know.  Again, Victoria Mortgage is a name that

2  means nothing to me or Winnie Elvidge means nothing to me, so

3  no.

4  Q.  Did you have any contact with the appraiser?

5  A.  No, no.  Not only did I not, I cannot under current law, and

6  there's no reason for me to want to do that.

7  Q.  Did you have any contact with the buyers prior to the first

8  closing?

9  A.  Yes.  The building that I have, I have a total of seven

10  offices.  We have six attorneys and one CPA.  The six attorneys

11  include not only in my office but a number of other attorneys

12  who are representing a number of people, and apparently they

13  represented or were representing or had represented or something

14  Mr. Herdrich and Mr. Hanneken.  So as I'm walking down the hall

15  one day -- you somewhat got ahead of yourself here, Mr. Treimer;

16  but I did run into one of the two buyers.

17  Q.  Do you remember which one?

18  A.  I'm sorry, Mr. Herdrich, I believe, the first one of the two

19  that came in today.

20  Q.  That would have been Mr. Hanneken that first testified.

21  A.  I'm sorry, that's right.

22  Q.  Well, you had contact with Mr. Hanneken before the first

23  closing was my point?

24  A.  Yes.  The way that that transpired is my client and I had

25  had a meeting to discuss the offers or at least look them over.

1  He brought nine of these things in, and so we looked them over,

2  and I was looking at them.  And I said, well, okay I've got a

3  couple of things here besides the documents and, one, you've got

4  an income tax issue relative to capital gains.  Make sure that

5  your accountant, CPA, whoever your tax advisor is, is aware of

6  this.  Make sure you get your 1040s done timely and in a proper,

7  legal manner.  And he assured me he would do that.

8           The second element I said, just because there are two

9  documents or multiple addendums or whatever you want to call

10  this -- we've been referring to these things as side agreements,

11  and side agreements are a term that mean nothing in the real

12  estate world.  We would call them an addendum or part of the

13  offer or modification or something like that.  In any event,

14  because there are multiple pages, I told my client, Mr. Laures,

15  to be certain that all of those things got to whoever the lender

16  was from the buyer, and he assured me that would occur.

17           Subsequent to that, that's when Mr. -- I'm sorry?

18  Q.  Hanneken.

19  A.  -- Hanneken met me in my hallway, and we had a little

20  discussion and he assured me that that would occur, and I

21  believed him.

22  Q.  So when you went to the first closing of the nine Laures

23  closings -- that was on May 2nd of '06 --

24  A.  Right.

25  Q.  -- you did two closings on that day?

1  A.   I believe that's correct.

2  Q.   Did you do them like one property address at a time and then

3  clean out that paperwork and start with a new set of paperwork?

4  A.   Yes, sir.  Given the volume of documents, the lenders that

5  are involved here, these are not your lenders that we would know

6  from the Jimmy Stewart Christmas movie that you go in and sign a

7  couple of papers and he's the guy behind the teller line that

8  you sign the papers with.  These were national organizations

9  that were using Excel Title and came with quite a stack of

10  documents, and because of that, for everyone's sake to keep

11  things straight, they occurred one after another.

12  Q.   Prior to you walking into that closing, did you know who the

13  lender was going to be on that very first loan?

14  A.   No.

15  Q.   Did you know who the lender was going to be on the second

16  loan?

17  A.   No, I didn't know.

18  Q.   When you went to that closing, did you have a good faith

19  belief that the appraiser did their job?

20  A.   With certainty.  There's absolutely no reason for me to know

21  or believe that these people were doing what apparently we've

22  been led to believe they did.

23  Q.   Did you have a good faith belief that the mortgage broker

24  did their job?

25  A.   Certainly.

1  Q.  Would there have been any reason for you to contact the

2  mortgage broker?

3  A.  No, not at all.

4  Q.  Would there have been any reason for you to contact the

5  appraiser?

6  A.  No.  Again, not only again as we mentioned would it be

7  beyond unusual but, under today's law, it would be illegal.

8  Q.  And prior to this very first closing, it's your testimony

9  that you did disclose or tell Mr. Hanneken to make sure that

10  everybody knows what's going on?

11  A.  Yes.  In our discussion in the hallway, that was the sum and

12  substance of the issue was that all of the documents were

13  everything, that's what I have, it's the standard practice that

14  my staff operates under, and as far as I can tell, that's what I

15  would do.

16  Q.  When you went to the third closing and the fourth closing,

17  before walking in the door, did you know who the mortgage lender

18  was going to be?

19  A.  Not specifically, no.

20  Q.  Would you -- and I guess this question applies to all of the

21  closings.  You had no reason to contact the mortgage lender at

22  that time, to your knowledge?

23  A.  No.  The mortgage lender through their agent or employee,

24  the closing company, in this case Excel Title, would do whatever

25  it is the banks do to determine whether a loan hits a green

 1   light or a red light.  As a seller's attorney, my activities up

 2   to that point of scheduling the closing would be to wait until

 3   the green light came on and then relying on the fact that the

 4   lender, the appraiser and all the other people had done their

 5   job, I go do my job, which is to represent my client,

 6   Mr. Laures.

 7   Q.  I'm going to show you what's been marked as Defendant's

 8   Exhibit E-1.  It's a little chart we created, and this chart

 9   concerns all nine Laures transactions?

10   A.  Yes, sir.

11   Q.  Did you negotiate any terms?

12   A.  No, sir.  The documents that are at issue here, both the

13   offer and any of the addendums, are all dated April 4, 2006.  If

14   you could put it back up -- you don't have to -- what I'm saying

15   is that spreadsheet that I created, I have another spreadsheet

16   which indicates the creation date of the file applicable to all

17   of these properties.  They all started on April 11.  So I wasn't

18   even involved for seven days following the negotiation,

19   et cetera.  So no, I did not negotiate any terms.

20   Q.  Were you present at the signing of the offer to purchase?

21   A.  No.  Again, this is -- as Mr. Gellerman was saying this

22   morning, this is one of those deals where somebody had a

23   computer and went on the Internet and got themselves some

24   paperwork somewhere and created these documents, and this all

25   occurred outside of my knowledge.

1  Q.  And did I ask you, were you present at the signing of the

2  offer to purchase?

3  A.  You may or may not have, I don't know; but the answer is no.

4  All of that occurred a week or seven days or ten days, whatever,

5  before I got started in any event.

6  Q.  Now, we've had all of this talk about the side agreement.

7  Were you present at the signing of the side agreement?

8  A.  In order to keep the paper -- so that we're all talking

9  about the same thing, I've adopted your language.  So if that's

10  what you mean, the side agreement, the addendum to my way, the

11  answer is no.  Again, it's the same day.  All nine are all dated

12  April 4th.

13  Q.  Did you have any contact with the mortgage lender in any one

14  of these nine closings?

15  A.  I did not.  I have now learned from some of the paperwork

16  that we've seen here that my secretary apparently notified what

17  I'm being led to believe was the lender about the existence of

18  these side agreements; but I did not know in answer to your

19  question, no.

20  Q.  Did you have any contact or negotiate with the mortgage

21  lender?

22  A.  No.  The appraiser; is that what you mean there?

23  Q.  Well, no.  I mean just contact or negotiate with the

24  mortgage appraiser.

25  A.  I'm sorry, yeah.  In answer to your question, no, there was

1  none of them that I had any reason -- I wouldn't even know who

2  the appraiser was.

3  Q.  Did you review or see the loan application?

4  A.  No.  Again, I represented the seller.  The buyer's

5  information, whether financial, personal, or otherwise contained

6  in this loan application, is none of my business and, again, by

7  law I don't know any of that stuff.

8  Q.  Did you schedule the closing?

9  A.  No.  Again, as I've indicated, because of the volume, the

10 staff takes care of -- well, even today, my staff has my

11 calendar and sets things up and moves my dates around.

12 Q.  We know you attended the closing, correct?

13 A.  Yes, sir.

14 Q.  At the closing, did you sign any HUD documents?

15 A.  No, sir.

16 Q.  At the closing, did you distribute any funds, sign any

17 checks?

18 A.  No, sir.  The way this closing occurred is all of the funds

19 were under the control of Excel Title as the agent of the

20 broker, lender, whoever, and they cut all the checks.  And as is

21 the common practice in Iowa, the closing agent cuts the checks

22 and is in control of the funds and disbursed them at the table.

23 That's how Iowa does it for Iowa property, that's typical.  The

24 delay that we've heard about this morning on some of these

25 closings is an Illinois practice or a non-Iowa practice.  We are

1  a table funding state.  So in answer to your question, I signed

2  no checks.

3  Q.  Did you receive any money post closing from any one of these

4  transactions?

5  A.  Not a penny.

6  Q.  I mean, let me clarify that even further.

7          Did you receive any money from Darryl Hanneken or

8  Robert Herdrich?

9  A.  No, sir.

10  Q.  Receive any money from Jim Laures?

11  A.  No, sir.

12  Q.  Receive any money from Winnie Elvidge?

13  A.  No, sir.

14  Q.  Receive any money from Chuck Mirocha?

15  A.  No, sir.

16  Q.  After the closings were over, were you involved in any

17  post-closing activities?

18  A.  At a point of at least personal irony, yes, top one, 6224,

19  there was a title issue that occurred in 2008.  In answer to the

20  rest of them, by the way, the answer would be no.  Okay.  Now,

21  for 6224, the top one, as I was explaining, part of a seller's

22  attorney's job is to be certain that the transfer of title is

23  done in a complete and total manner.  And so when we as the

24  seller's attorney are handed the seller's money to pay off the

25  loan that he or she has, we in turn send that off by Fed Ex and

1   pay off, as an example, Wells Fargo, U.S. Bank or whoever.  In

2   turn by law, under Iowa law, they are supposed to file a release

3   within 30 days of the mortgage so that the buyer's lender gets

4   clean title.

5           In answer to your question, Mr. Treimer, because I'm

6   an Iowa Title Guaranty attorney, we can participate in a program

7   with the Iowa Title Finance Authority which, because of our

8   application process of paperwork, we can assure them that the

9   loan has, in fact, been paid off and that a release then would

10  be issued by the Iowa Finance Authority.  I had to go through

11  that process I believe in early '08 to accomplish that after

12  Excel notified me that that was needed and had not occurred and

13  that, therefore, I had to get that and I did.

14  Q.  I'm going to show you what's now been marked as Defendant's

15  Exhibit L-2.  I want to point out a couple of columns here.

16  These were all numbers that were taken out of the discovery of

17  various documents that have been previously provided to the

18  government and agreed to be admitted into evidence.

19          Going over here, Engelmann abstracting fees, what is

20  that about?

21  A.  As we've been explaining, the methodology for transferring

22  title in Iowa is to give a written record of the current state

23  of title.  An abstract is a legal, usually a legal size group of

24  papers fairly thick which tracks the condition of title from

25  Smith to Jones to Brown until current date.  Current date

1  requires the abstract to be within 30 days of the date of

2  closing.  The fee for doing that -- and, again, I'm an Iowa

3  Title Guaranty abstractor -- for Mr. Laures for each of those

4  properties was $145 to go through the process, through the

5  recorder, the clerk, the treasurer, whoever, and obtain those

6  various records, type that into a correct form, sign it,

7  certified by my signature that the condition of title is thus

8  and so and in turn deliver that to Excel Title.  So that's the

9  abstracting portion of that.

10 Q.  Now, if I wanted to sell a house but I didn't want to use

11 you as an attorney, I wanted to use someone else as an attorney,

12 would you still do the abstracting if I asked you?

13 A.  If the client asked me to?  I would do it for whoever wished

14 me to do it, I suppose.

15 Q.  Just because -- a better question is, just because you do

16 abstracting, you don't necessarily have to represent the person

17 who owns the abstract?

18 A.  No, that's correct.  I do abstracting for between 15 and 20

19 or 30, whatever, number of local lawyers that use me to do

20 abstracting for them.  Is that what you mean?

21 Q.  Yes.

22 A.  Yes, I have a small business that does that.

23 Q.  So if I as an attorney have a friend that's going to sell

24 their house and they want me to represent them in the sale of

25 their house, I could come to you with the abstract and say,

1  here, could you bring this up to date?

2  A.   Certainly.

3  Q.   We call that a continuation, don't we?

4  A.   A continuation, that's correct.

5  Q.   And you would bill me $145 or depending upon --

6  A.   Well, it depends on any variety of factors, but the time

7  covered is one factor.  The activity and then the complexity of

8  the type of work that is done, if there were divorces and

9  bankruptcy and foreclosures and various things in there, it

10  could be a short time, but it could be a lot of money anyway

11  because I'm still doing a lot of work.  It just depends on the

12  amount of work that I do.

13  Q.   Now, I'm moving over to Engelmann attorney's fees.  Did you

14  charge Mr. Laures $350 for each transaction, each closing?

15  A.   Yes, sir.

16  Q.   Was that a standard fee?

17  A.   For him and this transaction it was the actual fee.  Typical

18  at that time it would have been closer to $400, but with nine

19  closings going on, you know, I cut him a little slack.

20  Q.   And you got paid that fee?

21  A.   Yes.  Excel cut all of those checks and delivered all of

22  those monies to me at the closings.

23  Q.   Or when it was funded?

24  A.   Well, no; at the closing.

25  Q.   Okay.  Did Mr. Laures give you any additional money after

1  closings?

2  A.  No.

3  Q.  Did Mr. Herdrich or Hanneken give you any additional monies?

4  A.  No.  I have not seen Mr. Herdrich or Hanneken since the day

5  of the last -- or whatever the last closing was and today, and

6  I'm afraid with Mr. Laures it would be the same way.

7  Q.  When you were doing the closings at Excel for James Laures,

8  did you have a good faith belief that everybody in the industry

9  was doing their job and doing what they were supposed to be

10  doing?

11  A.  Certainly.

12          MR. TREIMER:  That's all the questions I have.

13          THE COURT:  Cross-examination?

14          MR. KELLER:  Thank you, Your Honor.

15                  CROSS-EXAMINATION

16  BY MR. KELLER:

17  Q.  Mr. Engelmann, you reviewed the offers to purchase that

18  Mr. Laures had for these transactions, right?

19  A.  I saw them and looked at them at the initial meetings, is

20  that what you mean, yes.

21  Q.  Do you have a different understanding of what the word

22  "review" means?

23  A.  Yes, sir.  As an attorney I would interpret review to mean I

24  analyzed, interpreted, created and modified.  Do you want me to

25  keep going?

1    Q.   So you equate review and create, those are the same?  If you

2    review something, you create it?

3    A.   It could be.

4    Q.   You also reviewed the personal financing agreements in this

5    case, right?

6    A.   I saw all of the documents, yes, sir.

7    Q.   And you went over the pertinent terms in each document,

8    right?

9    A.   No.  I'm sorry, at my initial meeting with Mr. Laures, I saw

10   the documents and, yes, sir, I went over them with him to the

11   extent of at least glancing through them at that point.  At that

12   point there was no reason for me to do an in depth review.

13   Q.   Not an in depth review, but you knew what the purchase price

14   was going to be when you sat down with Mr. Laures?

15   A.   Yes, sir.

16   Q.   You knew that there was a second purchase price referenced

17   in this addendum or side agreement, right?

18   A.   Yes, sir.

19   Q.   You knew that there was going to be money paid from

20   Mr. Laures back to the buyers based on the difference between

21   the two sales prices, right?

22   A.   Yes, sir.

23   Q.   Based on your practice in real estate law, you're familiar

24   with the HUD-1 form, right?

25   A.   Yes, sir.

1  Q.  You know that those HUD-1 forms go to the lender, right?

2  A.  Eventually, yes, sir.

3  Q.  And you know that generally at closing the lenders require a

4  HUD-1 form before they'll disburse funds, right?

5  A.  No.  That's not accurate.  A HUD-1 form, the way you're

6  analyzing this and requiring the approval of a lender, is a

7  secondary market pertinent requirement.  In the lenders that we

8  have here, your analysis is correct that these HUD-1s needed to

9  be sent off and approved by the various lenders.  As I was

10  explaining in my past practices, starting with First Federal

11  days, First Federal and all of the rest of them would basically

12  give me their checklist, would tell me to do the HUD-1, and I

13  would then in turn do it and I would not have to send it off to

14  have it approved.

15  Q.  Mr. Laures had to sign a HUD-1 in each of the closings on

16  these transactions, right?

17  A.  Certainly.

18  Q.  Those HUD-1s had to also be signed by Herdrich and Hanneken,

19  or whichever one was the buyer, right?

20  A.  That's also right.

21  Q.  And the HUD-1s had to be sent to the lender?

22  A.  That's right, eventually.

23  Q.  You represented Mr. Laures at each of these closings, right?

24  A.  Represented the seller, Mr. Laures, right.

25  Q.  Did you go over the HUD-1 at the closings?

1  A.  Yes, sir.

2  Q.  Did you know that the HUD-1 had a price that was not the

3  price reflected in the addendum or the side agreement?

4  A.  What I knew was that the HUD-1 reflected the price that was

5  in the offer to purchase that was signed by my client and the

6  buyers.

7  Q.  You also knew that the HUD-1 did not reflect the other price

8  referenced in the addendum to the offer to purchase, right?

9  A.  That's correct, at the insistence of the -- I'm sorry,

10 Excel, the agent.

11 Q.  So your testimony today is at the insistence of Excel, as

12 you went to those closings and sat there and watched your client

13 or advised your client to sign the HUD-1 documents, you knew

14 that the price on the HUD-1 was not the price reflected in the

15 addendum to the offer to purchase?

16 A.  No, that's not correct.  What would be correct is I was

17 following my client's wishes, first of all, all right; secondly,

18 this was being done at the insistence of and at the direction of

19 Excel Title; and, thirdly, this was based upon my belief that

20 all of the participants, including Excel, knew all of the facts.

21 The lender or agent of the lender, the Excel Title Company, had

22 the information in front of them.  They chose to proceed and, in

23 fact, instructed me on how to create the HUD-1.  The HUD-1 is

24 created by Excel Title.

25 Q.  With you being as familiar as you are with this case and

1    having listened to all of the testimony, I was hoping to spare

2    the jury from looking at these documents again, but I'm going to

3    show you Government's Exhibit 2B-1.

4              This is one of the offers to purchase that Mr. Laures

5    brought you and was in your files, right?

6    A.   Right.

7    Q.   The address listed in this offer to purchase is 6224

8    Appomattox, right?

9    A.   That's correct.  That was the first closing.

10   Q.   And the purchase price is $125,000, right?

11   A.   That's correct.

12   Q.   Now, looking at Government's Exhibit 2B-2, this is the

13   personal financing agreement for that same property, 6224

14   Appomattox, right?

15   A.   That's correct.

16   Q.   And subparagraph A says the actual agreed purchase price of

17   the property is $95,000, right?

18   A.   That's the same language that was on my spreadsheet that we

19   faxed to the agent of the lender to tell them the exact same

20   thing.  So in answer to your question, yes, sir, you're

21   accurate.

22   Q.   So you knew that the documents showed $125,000 in one spot

23   and $95,000 in another spot, right?

24   A.   I'm sorry, I don't understand your question.  What

25   document --

1   Q.   You knew -- I'll rephrase it for you.

2   A.   Please.

3   Q.   You knew that these two documents referenced two separate

4   purchase prices, right?

5   A.   Yes, sir.

6   Q.   You knew that one purchase price was $125,000?

7   A.   I've already established that.

8   Q.   And you knew that another price was $95,000?

9   A.   Well, not only did I know, so did Excel Title know, so did

10  Victoria Mortgage know.  I'm assuming that they told the

11  appraiser, I don't know, and, again, given that they are the

12  agent of the lender, that they would have told the lender.

13  Q.   I'm now showing you what's been admitted as Government's

14  Exhibit 2A-1.  That's the HUD-1 for this same property, 6224

15  Appomattox Road?

16  A.   Right.

17  Q.   The purchase price on this HUD-1 form is $125,000, not

18  $95,000, right?

19  A.   All right.  The document speaks for itself.  I would assume

20  so, yes, you're correct.

21  Q.   So you knew at the time this HUD was signed by your client

22  that it did not reflect the second purchase price that was

23  contained in the offer to purchase documents, right?

24  A.   Sir, we've already established there are two documents here,

25  one for 125, one for 95.  Everybody knew about that.  We've

1   established that.

2   Q.   The lenders didn't know, did they?

3   A.   How would I know, first of all?  But, first of all -- keep

4   going here.  Excel Title knew about all of this going on.  We've

5   established that with various conversations here.  The fact that

6   somebody didn't tell the lender is -- that's not my job.  My job

7   is to represent the seller.  That's my ethical, legal and other

8   obligation.

9   Q.   Mr. Engelmann, my question is very simple.

10  A.   Yes.

11  Q.   At the time this HUD-1 was signed by your client at the

12  closing, you knew that it did not reflect the $95,000 purchase

13  price that had been agreed to between the parties, right?

14  A.   I knew that my client -- no, you're not correct.  The

15  125,000 reflected the contractual obligation of my client, and

16  that's what that is.

17  Q.   You didn't know that there was an agreement to pay $95,000

18  for this property?

19  A.   No, I didn't say that.  I also, by way of following up on my

20  first question --

21  Q.   Please limit your answers to the questions that I pose to

22  you, Mr. Engelmann.

23          On this same HUD-1 document that reflects $64,640 cash

24  going to the seller, you also knew that the personal financing

25  agreement provided that $30,000 of that cash was going to go

1  back to the buyer, right?

2  A.  Yes.  I -- again, as far as I knew, the lender, the title

3  company, everybody knew that.

4  Q.  I'm not asking about the lender, the title company or

5  everybody.  I'm asking about you.  You knew at the time this

6  document was signed that $30,000 of that $64,000 figure

7  reflected on the HUD was going to be paid back to the buyers,

8  right?

9  A.  Yes, sir.

10  Q.  So you knew this HUD wasn't accurate as to the amount of

11  cash that the buyer was walking away from the transaction with,

12  right?

13  A.  No.

14  Q.  Is it your testimony that the buyer -- that the seller was

15  actually walking away with all $64,640.44?

16  A.  Yes.

17  Q.  So to you it's meaningful that the seller paid the $30,000

18  kickback after they walked away from the table and not at the

19  table?

20  A.  Meaningful or meaningless?

21  Q.  My question was to you, it's meaningful that the seller paid

22  the buyer the $30,000 kickback after they got up and walked away

23  from the table, not at the table?

24  A.  First of all, this wasn't a kickback.  That's your word.  I

25  don't agree with the analysis.  So if that's your word, the

1  answer is no.

2  Q.  Mr. Engelmann, wasn't --

3  A.  My client did what he was contractually obligated to do that

4  everyone knew was going on.

5  Q.  If your client has signed a contract to commit a crime, will

6  you help him do that?

7  A.  No.

8  Q.  Well, you did it in this case, didn't you?

9  A.  No.  Not only no, but definitely no.

10  Q.  Mr. Engelmann, again, the $64,640 figure on the HUD-1 was

11  inaccurate and you knew it, right?

12  A.  No.  We've already established a check was cut to my client

13  for $64,640.44 with the knowledge of Excel, me, the lender, the

14  buyer, the appraiser, Victoria Mortgage.  Do you want me to

15  continue?

16  Q.  I'm asking the questions here, Mr. Engelmann.

17        So you didn't care or you didn't think it was

18  important that $30,000 out of that $64,000 figure was going to

19  be paid back to the buyers?

20  A.  My responsibility is to represent my client within the law.

21  That's what I did.

22  Q.  Mr. Engelmann, if I'm going to sell you this watch for $50

23  and you as the buyer, you give me a 100 dollar bill and I give

24  you 50 bucks in change, are you going to sign a document saying

25  you paid $100 for this watch?

1  A.   It's between the two of us, isn't it?

2  Q.   Are you telling the jury that if you give me a hundred and I

3  give you 50 back, you paid $100 for this watch?

4  A.   Sir, assuming that you are competent to do what you wish to

5  do, as far as I'm concerned, if you've got your eyes open and

6  you knowingly enter into that, I didn't defraud you, I didn't

7  trick you, I didn't do anything to you.  You have all of your

8  marbles in your head.  You may do that.

9  Q.   Mr. Engelmann, I appreciate that you don't want to give the

10  answers to my questions that would make you appear to have

11  committed a crime in this case, but my question for you is very

12  simple.  If you've agreed to pay $50 for a watch and you give

13  someone --

14          MR. TREIMER:  Your Honor, I'm going to object.  This

15  is argumentative.

16          THE COURT:  Sustained.  Move on, please.

17  BY MR. KELLER:

18  Q.   You knew the purpose of a closing is to obtain a loan from a

19  lender and complete a purchase of a house, right?

20  A.   The closing is to finalize the arrangement between the buyer

21  and the seller and their various agents, parties or whoever,

22  yes, you're correct.

23  Q.   You knew in this case there were lenders involved?

24  A.   Yes.

25  Q.   You knew there were loans involved?

1  A.   Yes.

2  Q.   You knew the buyers were getting money from lenders?

3  A.   Yes, sir.

4  Q.   You knew that the buyers were getting money from Mr. Laures?

5  A.   Pursuant to the agreements, yes, sir.

6  Q.   You knew that the lender was giving Mr. Herdrich and

7  Mr. Hanneken a loan to pay Mr. Laures for his properties, right?

8  A.   Yes, based upon the appraised value, which was -- I'm sorry;

9  $120,000 -- first one, yes.

10  Q.   The appraised value was $120,000 on the first property, yes.

11  A.   Okay.

12  Q.   And you knew that Mr. Laures was turning around and giving

13  $30,000 of that money that he had just been given from the

14  buyers right back to them, right?

15  A.   Pursuant to the contract that we had all executed, yes, sir.

16  Q.   You've done thousands of real estate closings in your

17  career, right?

18  A.   Yes, sir.

19  Q.   You ever do other ones besides these Laures transactions

20  where the seller gave $30,000 of the lender's money back to the

21  buyer after closing?

22  A.   Not many, no, sir.

23  Q.   Did you ever do any other ones?

24  A.   Yes.

25  Q.   Besides these Laures transactions where the seller gave

1   $30,000 back to the buyers after closing?

2   A.   I have no memory of any specific transaction such as that,

3   no, sir; but there have been other transactions where the buyer

4   received money from the seller.

5   Q.   Well, if you do thousands of transactions and these are the

6   only ones you have any memory of where something like this

7   happened, wouldn't it stand out to you as kind of unusual?

8   A.   It's unusual because I'm sitting in court talking to you and

9   I'm having to go through all of this.   In that sense, yes, sir.

10  Q.   Well, when Mr. Huber came to interview you and mentioned the

11  Laures transactions, wasn't the very first thing you said to him

12  is, oh, yeah, that's the transactions with the two prices?

13  A.   No, sir.   No, sir, that's not the first thing out of my

14  mouth if that's your question.

15  Q.   It wasn't my question.   Wasn't one of the first things that

16  you said to Mr. Huber, oh, yeah, those were the transactions

17  with two prices?

18  A.   No.

19  Q.   Didn't you also tell Mr. Huber that you knew these

20  transactions were illegal and that's why you told your client

21  not to go through with them?

22  A.   No, sir.   Mr. Huber came to see me on May 6th of this year.

23  When he came to see me, he basically outlined the overall

24  situation or his perception of the situation; that is, that

25  these closings occurred and he at first mentioned the names

1  Herdrich and Hanneken.  They don't -- that doesn't mean anything

2  or didn't mean anything to me at the time.  The minute he

3  mentioned Mr. Laures, then I connected the dots and recognized

4  the deals that they were talking about.  So it took awhile.

5  Q.  So your testimony today is you're denying that you ever told

6  Special Agent Huber that you told James Laures he should not do

7  the real estate transaction this way, but you have no control

8  over a client if he goes out to the parking lot after closing

9  and do whatever he does?

10 A.  No, I didn't use that expression if that's the words.  The

11 way it worked with Mr. Laures, as I've already said, is that we

12 had our meeting.  We went over the offers, and he and I came to

13 an understanding that all of these documents would be revealed

14 and given to the banks and everybody else.

15 Q.  Well, you did tell Special Agent Huber that the lenders

16 didn't know, right?

17 A.  I'm sorry, I told Mr. Huber that; is that your question?

18 Q.  Yes.  You told Special Agent Huber that the lenders didn't

19 know about the second prices and the kickbacks, right?

20 A.  No, sir.  That's exactly the wrong way to analyze this.  I

21 was told that.  When Mr. Huber, who had been investigating this

22 for nearly five years, came to me the morning of September --

23 I'm sorry, May 6th, he told me that the lenders were unaware and

24 I -- that's not -- my exact response to him, that's not the way

25 I remember this.  This is not -- that's not the way I remember.

1  Now, you've got to remember that I was caught flatfooted in the

2  sense that I had no papers, I had nothing.

3  Q.  You had no time to manufacture a story, right?

4  A.  That's not correct.  I had no reason to lie.  I was telling

5  him the truth, as I am telling you the truth.

6  Q.  Well, that's interesting because what you're telling me

7  today is different from what you told Special Agent Huber, isn't

8  it?

9  A.  That's different than what he thought he heard.

10 Q.  Well, you've told me today that Excel Title directed you or

11 someone in your office not to include the cash back payments on

12 any documents, right?

13 A.  As Ms. Gockel has testified and as I have testified, we were

14 led to believe by, I'm sorry, Excel Title that these numbers

15 didn't need to be on the HUD-1.

16 Q.  And you were also told, according to you, from what you told

17 Special Agent Huber, that the reason why those numbers couldn't

18 be on the documents was because the lenders wouldn't do the

19 transactions that way, right?

20 A.  Not at all.  I would have no control over how the lenders

21 structured their financial arrangements.

22 Q.  Well, Mr. Engelmann, if everybody knows what's going on and

23 everything is out in the open, then you don't need two purchase

24 prices, do you?

25 A.  No, that's not true.  There are many offers to purchase

1  where addendums or modifications are made, changes or other

2  agreements, other costs or allocations are made, so that's not

3  true.

4  Q.  Well, if everybody in the transaction, the lender, the

5  mortgage broker, the parties, the closing agent, if everyone

6  knows that the property is really being sold for $95,000, then

7  there's no reason to put $125,000 on the HUD, is there?

8  A.  I'm sorry, that's -- is there a question in there?  I don't

9  know what --

10  Q.  There certainly is.  If everyone knows that the actual price

11  of the property is $95,000, then there's no reason to put

12  $125,000 as the price on the HUD, is there?

13  A.  I'm sorry.  The parties desired to structure this in the way

14  in which they did on April 4.  By the time I got to it, I'm

15  given the documents and told how they wanted to do things.  We

16  presented all of that to your lenders or Excel's lenders or

17  whoever's lenders they are, and they chose to proceed with it.

18  Q.  You've practiced real estate for over 20 years, right?

19  A.  Thirty-five.

20  Q.  And you've done thousands of real estate transactions?

21  A.  Yes, sir.

22  Q.  These are the only ones you can remember that were done this

23  way?

24  A.  No, I didn't say that.  What I said was this is one which

25  draws your attention to it certainly, but it is not the only one

1  with monies going back from seller to buyer.

2  Q.  And yet despite how unusual these transactions are, in your

3  30-plus year career, you're saying that you couldn't think of

4  any reason why there needed to be a different price on the HUD

5  from the actual price that the parties agreed to?

6  A.  They did agree to 125,000 as part of the contract.

7  Q.  Just like you agreed to pay me a hundred dollars for my

8  watch but I'm giving you 50 bucks in change?

9  A.  If it was a $50 watch, you would do that.

10 Q.  You've been through continuing legal education courses,

11 right?

12 A.  Yes, sir.

13 Q.  We all have to do that as attorneys?

14 A.  Yes.  Iowa has a 15-hour requirement.  Yes, sir, we do that.

15 Q.  There are ethical hour requirements in addition to the

16 regular requirements, right?

17 A.  Yes, sir.

18 Q.  And one of the most basic ethical premises that lawyers are

19 taught is that you can't help a client commit a crime, right?

20 A.  That's right.

21 Q.  You should have done exactly what Tom Moens did in this

22 transaction, shouldn't you have?

23 A.  No.

24 Q.  You should have told your client, "I'm not going to help you

25 commit a fraud," shouldn't you?

1  A.  First of all, there are a number of things wrong with your

2  question.  First of all, I did not know a fraud was being

3  committed here.  The fraud in this case occurred in the buyers,

4  lenders area in the sense of the broker, the appraiser, the

5  closing agent and all of those folks.  That's the first thing

6  wrong with your question.

7        But the second thing wrong with it is my client is a

8  good person, had a contract.  I allowed him to fulfill his

9  contract after disclosing to one and all what was going on here.

10  I relied on the expertise and knowledge of the buyers, the

11  appraisers -- the buyer's bank, excuse me, and the appraisers

12  and in good faith in their reliance of them, I proceeded with

13  this deal.

14  Q.  You didn't know a fraud was being committed?

15  A.  No, sir.

16  Q.  Well, let's go to what you did know.

17        You knew there were two prices in the documents,

18  right?

19  A.  Two figures mentioned in the documents, you're correct.

20  Q.  You knew that the higher price was going on the HUD-1,

21  right?

22  A.  Yes, sir.

23  Q.  You knew the HUD-1 was going to the lender, right?

24  A.  Eventually, that's correct, sir.

25  Q.  You knew the loan was being calculated based on a higher

1  price, right?

2  A.   I knew that the loan was based upon the appraised value.

3  Q.   You knew that the buyer was getting about $30,000 back from

4  the seller as part of the transaction, right?

5  A.   That's correct.

6  Q.   You knew that wasn't on the HUD, right?

7  A.   That's correct.

8  Q.   You didn't send anything to the lender personally to inform

9  them about that $30,000 payment, right?

10 A.   First of all, again, in answer to your question, we verbally

11 discussed this with the agent of the lender at the closing.

12 Secondly, I faxed the statement with the specific information on

13 it to the closing agent, which they received and ignored, all

14 right.  And then, thirdly, I relied upon the appraised value as

15 determined by the buyer's bank, and then in reliance on that we

16 proceeded.

17 Q.   It's hard to answer questions straightforwardly when it

18 really gets to the heart of the matter, isn't it?

19          MR. TREIMER:  Objection, Your Honor.

20          THE COURT:  Sustained.  Move on.

21 BY MR. KELLER:

22 Q.   Again, you personally never sent anything to the lender

23 informing them of this --

24          MR. TREIMER:  Objection; already been asked and

25 answered.

1    MR. KELLER:  Your Honor, the witness did not answer my

2  question --

3    THE COURT:  Hold it.  We'll not have argument on this.

4  There's been an objection.  The ruling is overruled.

5    Now go ahead.

6  BY MR. KELLER:

7  Q.  Mr. Engelmann, you did not personally send anything to the

8  lender informing them of the $30,000 payment going from the

9  seller to the buyer?

10  A.  My staff did to answer your question.

11  Q.  You did not personally send anything to the lender informing

12  them of that $30,000 payment, did you?

13  A.  My staff did.

14  Q.  You heard Ms. Gockel testify in this case, right?

15  A.  Yes, sir.

16  Q.  You heard her say up on the stand that she doesn't remember

17  telling a loan officer anything about that kickback, didn't you?

18  A.  Perhaps we've had a misunderstanding.  The communication was

19  from my staff to Excel Title.  That's where I would analyze

20  that.  If I've misstated that, I'm sorry.

21  Q.  My question was about the lender, not the closing agent.

22  A.  I don't know who the lenders are.

23  Q.  You didn't personally send any notification to the lenders

24  about the $30,000 payment being paid from the seller to the

25  buyer, did you?

1  A.  As an attorney, I normally don't talk to nonclients.  That's

2  not my client.

3  Q.  Mr. Engelmann, my question is very simple.  You did not send

4  any notification to the lenders about the $30,000 cash back

5  payment being made from the seller to the buyer?

6  A.  No.

7  Q.  So you knew there were two separate purchase prices, you

8  knew the higher one was reflected on the HUD, you knew the loan

9  was being calculated based upon that higher amount, you knew the

10  cash back wasn't reflected on the HUD, you knew the HUD was

11  going to the lender, you didn't notify the lender about the cash

12  back payment; but you didn't know a fraud was being committed?

13  A.  I relied upon the appraised value, the disclosures that had

14  been given.  And, again, I would have no way of communicating

15  with the lender.  How would I have known that Wells Fargo in

16  Baton Rouge, Louisiana, was involved in this or that, I'm sorry,

17  New Century in Omaha was the lender?

18  Q.  So your answer is no, despite all of those factors, you

19  didn't know that a fraud was being committed?

20  A.  No, I've never known there was a fraud committed until this

21  started.

22  Q.  I'm showing you what's been admitted as Defendant's

23  Exhibit L-2.  This shows the different closing dates for the

24  Laures properties.

25          There are four different dates listed in this

1  document, right?

2  A.  Yes, sir.

3  Q.  After you went to closing on the first day, did you know who

4  the lender was in that transaction?

5  A.  I would look in my file.  I could look in my file, yes, sir.

6  Q.  After you went to the closing on the second day, did you

7  know who the lender was in that transaction?

8  A.  Certainly, at the closing.

9  Q.  And after you went to the third closing, did you know who

10  the lender was in that transaction?

11  A.  After each of the closings, as we get to the closing, that's

12  where the lender is identified.

13  Q.  So it wasn't very difficult for you to figure out who the

14  lender was, was it?

15  A.  After the fact, sir, you're correct.

16  Q.  Well, it wasn't after the fact.  When you showed up at

17  closing and went over that HUD-1 form, it had the lender's name

18  right at the top, didn't it?

19  A.  On the HUD-1, you're correct, it is listed there.

20  Q.  And you looked at the HUD-1 with your client before he

21  signed it, right?

22  A.  Yes.

23          MR. KELLER:  May I have a moment, Your Honor?

24          THE COURT:  Yes.

25          (Pause.)

1  BY MR. KELLER:

2  Q.  Back to your conversation with Mr. Huber, you told Mr. Huber

3  that the bank was the ultimate victim of this scheme, right?

4  A.  Mr. Huber came in -- and, again, this was on May 6th.  When

5  he came in to me, he laid out what he perceived to be the facts.

6  Under Mr. Huber's analysis, the way this thing came down is the

7  lenders were unaware, didn't know anything about this, Excel

8  didn't know anything, and all of the appraisers and the bankers

9  somehow committed fraud.  And in answer to your question, did

10  the lenders know, that's what his analysis was.

11  Q.  Special Agent Huber asked you questions that day, didn't he?

12  A.  Correct.

13  Q.  And you gave him answers, right?

14  A.  Yes, sir.

15  Q.  He didn't just describe a situation to you and then write it

16  down, did he?

17  A.  No, that's correct.

18  Q.  So in response to one of Special Agent Huber's questions,

19  didn't you say, the bank is the ultimate victim because the

20  transaction was not accurate as to the way it was stated?

21  A.  What I said to Mr. Huber -- again, Mr. Huber is twisting the

22  response.  The answer was to the question that he presented,

23  assuming that the banks didn't know and these loans went

24  through, were the banks the ultimate victims?  And the answer

25  would be yes.

1 Q.  In response to one of Special Agent Huber's other questions,

2 didn't you also say you told Excel about the whole deal, the

3 cash back, the higher price, the lower price and asked Excel if

4 the lender knew and Excel told you that, no, the lender did not

5 know?

6 A.  No, I never said that.

7 Q.  You told Special Agent Huber that your client, Laures, was

8 to blame, didn't you?

9 A.  Oh, no.

10 Q.  Well, you told Special Agent Huber that you didn't want to

11 go through with these transactions, didn't you?

12 A.  What I told, again, Mr. Huber, was that with proper

13 disclosure -- I emphasized to Mr. Laures that proper disclosure

14 of all of these documents needed to go to the bank.  Mr. Laures

15 assured me that that was happening.

16 Q.  You told Special Agent Huber that the problem with these

17 transactions is that they weren't compliant with the HUD-1

18 form?

19 A.  Not at all.  I never would say that.

20 Q.  You testified on direct that you told Mr. Hanneken in the

21 hallway at your office one day or in your building that you

22 wanted to make sure he was letting everyone know about

23 everything having to do with this transaction, all of the

24 relevant numbers, right?

25 A.  That's correct.

1  Q.  Mr. Hanneken testified today, didn't he?

2  A.  Yes, sir.

3  Q.  Mr. Treimer didn't ask Mr. Hanneken about that, did he?

4  A.  I can't recall.  I don't believe he did.

5  Q.  Mr. Hanneken certainly didn't mention it, did he?

6  A.  No.

7  Q.  You didn't mention that to Special Agent Huber when he

8  interviewed you either, did you?

9  A.  Yes, I did.

10  Q.  I believe you testified that you had no reason to contact

11  the lender in this case, right?

12  A.  That's right.

13  Q.  Even though the HUD-1 was grossly inaccurate, you didn't

14  think that you should contact the lender?

15  A.  My contacts with the lender would always go through their

16  agents.  Their agents would be the closing company, Excel Title

17  in this example, all right.  As a closing agent for any number

18  of banks, including Wells Fargo, all right, that's how things

19  work.

20  Q.  Mr. Engelmann, I want to get one thing straight.  There's

21  been a lot of talk about this exhibit, Government Exhibit 2B-3,

22  the very first spreadsheet that you sent over to Excel Title on

23  the Laures transactions.  That is what this is, right?

24  A.  Yes, sir.

25  Q.  And there's been a lot of talk about the fact that the

1   actual sales price on this document is included, right?

2   A.   I'm sorry, yes, sir.

3   Q.   Now, on all of the other summaries that you sent over there,

4   the actual price was not included, right?

5   A.   With that same notation, if that's what you mean, yes,

6   that's correct.

7   Q.   Well, I'm not referring to the notation.   I'm referring to

8   the fact that nowhere on the other summaries that you sent over

9   to Excel Title is the actual lower price listed, right?

10  A.   They aren't on the other sheets, that's correct.

11  Q.   And even on this first sheet, there's nothing on here about

12  $30,000 going from the seller to the buyer, is there?

13  A.   No, that's not correct.   If -- to me, as a closing agent,

14  had I seen this as the closing agent for a bank in which I

15  represented the bank, that notation would lead me to contact the

16  bank and determine what they wanted to do.

17  Q.   My question is simply that nowhere on this document is there

18  a $30,000 payment being noted going from the seller to the

19  buyer?

20  A.   Well, the answer to your question, yes, you're correct that

21  there's nothing that says $30,000 per se.   What it does say is

22  that 125,000 minus 95,000 is $30,000.

23  Q.   Same property, Government's Exhibit 2B-4, the $30,000

24  payment is reflected on that document, isn't it?

25  A.   That's correct.

1   Q.   You had your secretary prepare dual versions of these HUD-1

2   summaries in every transaction that Laures was involved in,

3   didn't you?

4   A.   No.   The notations that you're referring to came from the

5   closing statements that my secretary prepared at the insistence

6   of Mr. Laures and Mr. Hanneken and Mr. Herdrich at the end of

7   the transactions in order to allocate rents and prorates and

8   those other things and fill out the rest of their contractual

9   obligation to each other, if you will.

10  Q.   You closed -- you were the attorney for Mr. Laures on nine

11  properties, right?

12  A.   These nine, that's correct.

13  Q.   And with your abstracting fee and your normal fee, it was

14  about $500 in fees to you per closing?

15  A.   Yes, sir; 495.

16  Q.   That comes out to about $4,500?

17  A.   Yes.  I didn't do the math, but, yes, sir, that seems right.

18  Q.   Weren't originally all of these properties supposed to close

19  on the same day?

20  A.   I don't remember.  I -- I'm sorry, I don't know.  I believe

21  there were financing issues from the buying side that required

22  alteration of the scheduling.  I think that's the reason.

23  Again, sir, I did the abstracts and I sent them over, and

24  scheduling is at the closing agent and bank's discretion.

25  Q.   You never told Special Agent Huber that initially all of

1  these transactions were supposed to close on the same day?

2  A.   That could have been.  I don't remember.  Again, the

3  scheduling part of it I don't know, I don't remember.

4  Q.   Was it typical for you to make $4,500 in fees, closing fees

5  in one day?

6  A.   No.  For the work that I did?  Yes, that's not unusual at

7  all.

8  Q.   So making $4,500 for multiple closings in one day is fairly

9  normal in your practice?

10  A.   Again, normally, we don't have clients doing nine deals, if

11  that's what you mean, in one fell swoop.  So in answer to your

12  question, no, it's not normal that I would earn that much money

13  in one day from one client.

14  Q.   $4,500 in a day would have been pretty good money, right?

15  A.   Well, yes, sir, I suppose.  Yes, that's very good.

16  Q.   You completed the declarations of value in this case, too,

17  right?

18  A.   Yes, sir.

19  Q.   And you listed the higher purchase price, the HUD-1 purchase

20  price on those documents?

21  A.   Yes.

22  Q.   Even though you knew that the actual price that had been

23  paid was $30,000 lower?

24  A.   Yes, sir, I did.  In reliance upon the HUDs and the other

25  documents that were given me, that is the sales price.

1  Q.  Except that one of the documents that was given to you, the

2  personal financing agreement, says that the actual sales price

3  is $95,000?

4  A.  I'm sorry, there's -- yes, in answer to your question,

5  there's the $30,000 coming back to the buyer.

6          MR. KELLER:  May I have a moment, Your Honor?

7          THE COURT:  Yes.

8          (Pause.)

9  BY MR. KELLER:

10  Q.  Mr. Engelmann, you also testified that Excel Title insisted

11  on you not including both sale prices and the cash back amounts

12  on documents you sent them?

13  A.  Again, if you want, my secretary or staff with me, yes,

14  that's correct, we were told not to place that monies on the

15  HUD-1.

16  Q.  You were talking about your computerization system that's

17  essential for keeping track of all of your different

18  transactions and everything that's going on?

19  A.  Yes.

20  Q.  You require that your staff document things so that when you

21  review the file, you know what's transpired, right?

22  A.  I require them to make notes of things they consider to be

23  important, that would be correct.

24  Q.  Well, there were no notes in this file or any of these files

25  to reflect that Excel had said anything like, don't give us both

1  prices or don't tell us about the cash back?

2  A.  No, that's not correct.  After we faxed the first closing

3  statement to them, my computer sheet, the response from them was

4  don't put this on the HUD, and so we didn't after that.

5  Q.  That response, don't put this on the HUD, wasn't in your

6  files?

7  A.  Well, I'm sorry, the -- I guess there's nothing that says

8  from them to me, that's true; but the idea is we informed them.

9  The closing went through after they knew it.  How else would you

10 interpret that?

11 Q.  Despite the fact that the way these deals were being done

12 was maybe the only time they were done like this in your entire

13 real estate career, you wouldn't put a note in the file that the

14 closing agent, the lender's agent in your mind told you thanks

15 for the notice about these unusual numbers, about this creative

16 financing, but we don't want to know?

17 A.  No.

18 Q.  You wouldn't note that in your file?

19 A.  Again, I would never receive that information personally if

20 that's the question.

21 Q.  Your staff wouldn't note that?

22 A.  They did.  They noted that, again, they had been told that

23 by Excel following the fax that went to them.

24 Q.  But there was no such notation in your files, was there?

25 A.  As far as the handwritten note from Cathy?

1   Q.  As far as any kind of note?

2   A.  Well, she put on the HUD, "Can't be on HUD."  That

3   information came from Excel.

4   Q.  Again, you heard Ms. Gockel testify, didn't you?

5   A.  Yes, sir.

6   Q.  She testified that you told her not to include that

7   information for the HUD, didn't she?

8   A.  First, I would never tell her to do that.  And then if I had

9   done that, why would I send a fax to Excel Title?

10  Q.  You heard her testify to that, though, didn't you?

11  A.  Yes, I did.

12          MR. KELLER:  Nothing further, Your Honor.

13          THE COURT:  Mr. Treimer, do you expect to be long

14  and --

15          MR. TREIMER:  No, Your Honor.

16          THE COURT:  All right.  Go ahead and then we'll take a

17  break.

18                      REDIRECT EXAMINATION

19  BY MR. TREIMER:

20  Q.  Mr. Engelmann, I'm showing you Government's Exhibit 4A-4.

21          Drawing your attention to cash to seller, now, in

22  every one of the Laures closings, did Mr. Laures get a check in

23  that amount?

24  A.  Yes, sir.

25  Q.  And in every one of the Laures closings, did you create the

1  declaration of value?

2  A.   Yes, sir.

3  Q.   And the declaration of value was the sales price that's

4  shown on the HUD?

5  A.   Yes, sir.

6  Q.   The HUD is consistent with the declaration of value.

7  Mr. Laures left the closing with his money.  You never

8  participated in that side agreement.

9        Now, what if Mr. Laures said, no, we're not going to

10  kick the money back?

11  A.   Well, then he would be in breach of his agreement, I

12  suppose, of the, quote, side agreement.  Is that your question?

13  Q.   Yes.

14  A.   Yes.

15  Q.   And during these -- or after these closings, I believe there

16  was one time Mr. Hanneken testified you brought some paperwork

17  in the room.  You were asked by your client to create a second

18  sheet showing the rents and the deposits?

19  A.   Correct.  There were -- these were nine investment

20  properties with two to four rental units in them, and given that

21  the closings occurred on multiple days, there would be

22  mathematics that would require proper allocation of not only --

23  well, the rents basically.  The security deposits would be a

24  fixed number, if you will, so the mathematics for that would be

25  relatively simple; but the rental amount would require that you

1  prorate by day the number of days that would be allocated to the

2  seller versus the buyer.

3  Q.  So it's not unusual for you to create two spreadsheets in a

4  rental real estate transaction?

5  A.  No, not at all.

6  Q.  More common than not, wouldn't it be?

7  A.  Not a hundred percent, but it would be fairly common, yes.

8  Q.  So simply because you created two spreadsheets, essentially

9  at the request of your client, means nothing other than you're

10  helping your client?

11  A.  Correct.

12  Q.  Let's talk a little bit about May 6th when Agent Huber came

13  to talk to you.  I know there was a lot of discussion on

14  cross-examination here about what was said and what wasn't said,

15  but Mr. Huber left and came back later and got the documents?

16  A.  Right.

17  Q.  And when he came back later, the side agreement, addendum,

18  whatever we're going to be calling it, was right in your file?

19  A.  Yes, sir.  I anticipated this question.  The nine files

20  right over here by the water jugs on that side table, the

21  documents that are in there today are the same that are in

22  there -- or were there in there in May of 2006 or June of 2006.

23  Q.  So when Mr. Huber was there the first time, did you get the

24  idea you were under investigation?

25  A.  Initially, my impression and the way he was phrasing the

1   questions was that he was investigating the transaction as a

2   totality in the sense of the participants, the sellers and the

3   buyers and the brokers and the bankers and everybody.  So in

4   answer to your question, I thought I was being asked questions

5   about these other participants, not me.

6   Q.  Okay.  So if you had thought that you had assisted in

7   committing a fraud, could you have done something about what was

8   in your files?

9   A.  Oh, certainly, sir.  I could have destroyed them, there's no

10  question.  I could have shredded them or whatever, any number of

11  times.  I have, I think, in my office something in the order of

12  60-some thousand files that I've accumulated over the 35 years

13  of my practice, and I have a shredding machine and all those

14  things.  If I wanted to, I could have done all of that, no

15  question.

16  Q.  You didn't do that, did you?

17  A.  I had no reason to.

18  Q.  Because you didn't think you had assisted in the commission

19  of a crime, did you?

20  A.  No, sir.

21          MR. TREIMER:  Thank you.

22          MR. KELLER:  No questions, Your Honor.

23          THE COURT:  The witness may step down.

24          We'll take our afternoon recess at this time.  We'll

25  be in recess for 15 minutes.

1            Folks, continue to heed the admonition not to talk

2    about the case.

3            (Recess at 3:04 p.m., until 3:21 p.m.)

4                         *   *   *

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2            I, the undersigned, a Certified Shorthand Reporter of

3    the State of Iowa, do hereby certify that I acted as the

4    official court reporter at the hearing in the above-entitled

5    matter at the time and place indicated.

6            That I took in shorthand all of the proceedings had at

7    the said time and place and that said shorthand notes were

8    reduced to computer transcription under my direction and

9    supervision, and that the foregoing computer transcription pages

10   are a full and complete transcript of the shorthand notes so

11   taken.

12           Dated at Des Moines, Iowa, this 23rd day of September,

13   2011.

14

15

16

17                            /s/ Terri L. Martin
                              CERTIFIED SHORTHAND REPORTER
18

19

20

21

22

23

24

25