IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
DAVENPORT DIVISION

```
- - - - - - - - - - - - - -X
UNITED STATES OF AMERICA,   :
                            :
         Plaintiff,         :      Criminal No. 3:11-47
                            :
    vs.                     :
                            :
MARC ROBERT ENGELMANN,      :      TRANSCRIPT OF SENTENCING
                            :
         Defendant.         :
- - - - - - - - - - - - - -X
```

                              Second Floor Courtroom
                              United States Courthouse
                              131 East Fourth Street
                              Davenport, Iowa  50309
                              Thursday, January 26, 2012
                              1:00 p.m.


BEFORE:  THE HONORABLE JAMES E. GRITZNER, Chief Judge.


APPEARANCES:

For the Plaintiff:            JOHN D. KELLER, ESQ.
                              DONALD B. ALLEGRO, ESQ.
                              Assistant U.S. Attorneys
                              U.S. Courthouse
                              131 East Fourth Street, Suite 310
                              Davenport, Iowa  52801

For the Defendant:            DAVID R. TREIMER, ESQ.
                              601 Brady Street, Suite 311
                              Davenport, Iowa  52803



                    Terri L. Martin, CSR, RPR, CRR
                     United States Court Reporter
                      Room 189, U.S. Courthouse
                       123 East Walnut Street
                      Des Moines, Iowa  50309

I N D E X

| WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| For the Government: | | | | |
| Jeffrey Huber | 6 | 25 | 37 | 39 |
| | | | 49 | |
| Jeffrey Huber (Rebuttal) | 99 | 101 | | |
| For the Defendant: | | | | |
| David Dunakey | 42 | 73 | 91 | |
| | | | 96 | 97 |

E X H I B I T S

| GOVERNMENT'S EXHIBIT NUMBERS: | OFFERED | RECEIVED |
|---|---|---|
| 1 - Partial trial transcript | 13 | 13 |
| 2 - 1/18/12 Browner declaration page of records<br>  2A through 2S - Photos | 12 | 12 |
| 3 - MLS listings of various properties | 9 | 10 |
| 4 - Spreadsheet on properties | 13 | 13 |
| 5 - New Century loss amount spreadsheet | 13 | 13 |
| 6 - JPMorgan Chase fax | 13 | 13 |

| DEFENDANT'S EXHIBIT NUMBERS: | | |
|---|---|---|
| ES-1 - Documents relating to 6224 Appomattox | 50 | 50 |
| ES-2 - Documents relating to 6232 Appomattox | 50 | 50 |
| ES-3 - Documents relating to 6302 Appomattox | 50 | 50 |
| ES-4 - Documents relating to 6314 Appomattox | 50 | 50 |
| ES-5 - Documents relating to 640 West 61st | 50 | 50 |
| ES-6 - Documents relating to 671 West 64th | 50 | 50 |
| ES-7 - Documents relating to 615 West 64th | 50 | 50 |
| ES-8 - Documents relating to 655 West 64th | 50 | 50 |
| ES-9 - Documents relating to 710 West 61st | 50 | 50 |
| ES-10 - Document summary spreadsheet | 50 | 50 |
| ES-11 - 2008 assesssed value spreadsheet | 50 | 50 |
| ES-12 - Appendix A to PSIR | 50 | 50 |
| ES-13 - Lehman REO-ALS loss statement | 50 | 50 |
| ES-14 - JPMorgan loss statement | 50 | 50 |
| ES-15 - New Century loss statement | 50 | 50 |
| ES-16 - New Century repurchase | 50 | 50 |
| ES-17 - Bank of America loss statement | 50 | 50 |
| ES-18 - Wells Fargo paid in full e-mail | 50 | 50 |
| ES-19 - 6222 Appomattox satisfaction | 50 | 50 |

1                    P R O C E E D I N G S

2                 (In open court, with defendant present.)

3                 THE COURT:  Take a seat, please.

4                 We are convened in the matter of the United States

5      versus Marc Robert Engelmann, Criminal No. 11-47, for purposes

6      of sentencing as a result of the guilty verdicts of the jury on

7      Count 1, conspiracy; Counts 2 and 3, bank fraud; Counts 4

8      through 9, wire fraud.

9                 Mr. Engelmann, do you understand, sir, that you're

10     here now for sentencing as a result of the verdicts in the case?

11                THE DEFENDANT:  Yes, I do, Your Honor.

12                THE COURT:  Counsel, is there any legal reason why

13     sentence could not be pronounced today?

14                MR. KELLER:  No, Your Honor.

15                MR. TREIMER:  No, Your Honor.

16                THE COURT:  I have reviewed the presentence

17     investigation report and related materials, the memorandums of

18     counsel.  I've also had the opportunity to review I think

19     somewhere near 40 letters that were written on your behalf,

20     Mr. Engelmann.  I received two letters today when I arrived this

21     morning.  They are from Jay Sommers, who testified at the trial,

22     and from Katie Sommers.

23                The government may not have seen those.  If you wish

24     to see them, basically Mr. Sommers is pretty much consistent

25     with what he's told us before.

1            MR. KELLER:  That's fine, Your Honor.

2            THE COURT:  All right.  I've read every one of them,

3    and for you folks that are here that wrote letters, thank you.

4    I appreciate receiving them.  It helps me understand more about

5    the case, and I do take them very seriously in the process of

6    consideration.

7            Has the government had the opportunity to review the

8    presentence investigation report?

9            MR. KELLER:  Yes, Your Honor.

10            THE COURT:  Do you find any factual errors in the

11    final report?

12            MR. KELLER:  No, Your Honor.

13            THE COURT:  Mr. Treimer, have you had the opportunity

14    to review the report?

15            MR. TREIMER:  Yes, I have, Your Honor, and note we

16    filed several objections, especially as to the loss amount and

17    restitution amount.

18            THE COURT:  We'll be addressing the loss amount and

19    restitution amounts it would be my understanding today, is that

20    correct, Counsel?

21            MR. KELLER:  Yes, Your Honor.

22            THE COURT:  All right.  Mr. Engelmann, did you read

23    the presentence investigation report yourself?

24            THE DEFENDANT:  Yes, Your Honor.

25            THE COURT:  Have you had a full opportunity to discuss

1  that with Mr. Treimer?

2           THE DEFENDANT:  Yes, Your Honor.

3           THE COURT:  Other than conclusions to be reached with

4  regard to the loss amount and the restitution amounts that will

5  be adjusted and addressed today, the court will accept the

6  presentence investigation report as factual findings for our

7  purposes.

8           With that in mind then, Counsel, I certainly

9  understand the government wishes to present some evidence, and

10 you've provided me with some exhibits prior to the hearing.  Do

11 you have witnesses?

12          MR. KELLER:  Yes, Your Honor.  The government calls

13 Jeff Huber to the stand.

14          THE CLERK:  Please raise your right hand.

15        JEFFREY S. HUBER, GOVERNMENT'S WITNESS, SWORN

16                    DIRECT EXAMINATION

17 BY MR. KELLER:

18 Q.  Special Agent Huber, will you state your full name for the

19 record.

20 A.  It's Jeffrey S. Huber, H-U-B-E-R.

21 Q.  And are you employed by the FBI?

22 A.  I am.

23 Q.  Were you the case agent in this case?

24 A.  Yes.

25 Q.  Are you aware that the defendant is disputing loss amounts

1  and specifically disputing the validity of the foreclosure sale

2  prices of the properties in this case?

3  A.  I am, yes.

4  Q.  Have you had a chance to review a variety of documents and

5  consult with real estate agents that were involved in the

6  foreclosure sales of these properties?

7  A.  Yes.

8  Q.  I'm showing you what's been marked previously as

9  Government's Exhibit 3.

10          Do you recognize this exhibit?  Do you need to zoom in

11  on that?

12  A.  It's not up.

13  Q.  Is it up on your monitor?

14  A.  It's not.

15          THE COURT:  Is that screen on over there?

16          MR. KELLER:  It's on at counsel table, Your Honor.

17          THE COURT:  That monitor may be turned off.  Can you

18  just take a look and see?

19          THE WITNESS:  It has a green light.

20          THE CLERK:  It says it's on on my system.

21          THE COURT:  It apparently is blocked so that the court

22  and counsel can see the document but not the witness and -- why

23  don't you contact someone.  In the meantime, why don't you hand

24  it to him.

25  BY MR. KELLER:

1  Q.  I just handed you what's previously been identified for

2  identification purposes as Government's Exhibit 3.

3           Do you recognize that?

4  A.  I do.

5  Q.  What is that?

6  A.  These are MLS, multiple listing service, printouts for, I

7  believe, five of the properties related to this case.

8  Q.  Do you know where those documents came from?

9  A.  Real estate agent Chris Holvert -- Holvoet.

10 Q.  And how was real estate agent Holvoet represented in the

11 transactions?

12 A.  He represented the buyer, Gearhead Properties, on a number

13 of the properties that were purchased in foreclosure.

14 Q.  Have you reviewed those MLS listings?

15 A.  I have.

16 Q.  And are the sales price and information in those listings

17 corroborated by other evidence in the case, such as the Scott

18 County Assessor records?

19 A.  It is, yes.

20 Q.  Looking at the first page of that exhibit, what is the list

21 price on the property listed on the first page?

22 A.  The list price is $39,900.

23 Q.  And what is the property address?

24 A.  6232 Appomattox Road, Davenport, Iowa.

25          THE COURT:  Is your monitor on at the witness stand,

1  Agent Huber?

2          THE WITNESS:  It's on.  There's just no documents on.

3          THE COURT:  Yes, try again, Mr. Keller.

4          There we go.

5          THE WITNESS:  Yes, I can see it now.

6          MR. KELLER:  May I retrieve the exhibit, Your Honor?

7          THE COURT:  Yes.

8  BY MR. KELLER:

9  Q.  Looking at Government's Exhibit 3 now on the monitor, is

10 this the exhibit you were just describing?

11 A.  Yes.

12 Q.  And is the list price that you referred to in the right-hand

13 corner of the document?

14 A.  It is, yes.

15 Q.  Now, looking at appendix A of the presentence investigation

16 report, for the same property, 6232 Appomattox, what is the

17 resold amount or foreclosure sale price listed in appendix A?

18 A.  $50,560.

19 Q.  And that's higher than the list price on the MLS listing,

20 correct?

21 A.  That's correct.

22          MR. KELLER:  Your Honor, the government moves for

23 admission of Government's Exhibit 3.

24                          (Government Exhibit 3 was

25                           offered in evidence.)

1          MR. TREIMER:  No objection.

2          THE COURT:  Exhibit 3 is admitted.

3                              (Government Exhibit 3 was

4                              received in evidence.)

5   BY MR. KELLER:

6   Q.   Looking at page 2 of the exhibit, Special Agent Huber, what

7   is the property address listed on page 2?

8   A.   6302 Appomattox Road in Davenport, Iowa.

9   Q.   And the list price for that property?

10  A.   Up at the top it says $59,900.

11  Q.   Is there a sold price down there at the bottom in the

12  left-hand corner?

13  A.   It is; 52,000.  And I would add that the original list price

14  on the property was $64,900.  If you look above the sold price,

15  it says what the original list price was.  It was reduced to

16  59,000, I don't know what date, but it was reduced from 64-nine

17  to 59.

18  Q.   And is the sale price of 52,000 for 6203 Appomattox, is that

19  consistent with the foreclosure price listed in appendix A of

20  the PSR?

21  A.   It is, yes.

22  Q.   And looking at page 4 of Government's Exhibit 3, is the

23  property listed there 6314 - 16 Appomattox?

24  A.   You may need to focus that.

25          Yes.

1  Q.   And the list price of that property?

2  A.   49,900.

3  Q.   And the sale price reflected at the bottom?

4  A.   60,000.

5  Q.   Same question for this property.  For 6314 in the PSR, is

6  the sale price listed for the loss calculation $60,000 as well?

7  A.   Yes.

8  Q.   Looking at page 5 of this exhibit, is the property there 640

9  West 61st Street?

10  A.   It is, yes.

11  Q.   And the list price is 63,000?

12  A.   Yes.

13  Q.   Does the description of this property in the MLS listing

14  indicate that the property is completed gutted?

15  A.   Yeah.  The description says completely gutted and ready to

16  finish.

17  Q.   And, finally, for 655 West 64th street, what is the list

18  price on the MLS listing?

19  A.   The list price prior to sale was 69,900.

20  Q.   Did you also discuss some of these foreclosed properties

21  involved in this case with a woman named Cynthia Browner?

22  A.   Yes.  I received documents from her, yes.

23  Q.   Who is Cynthia Browner?  What role did she play in the

24  transactions?

25  A.   She obtained, on a few of these properties, broker price

1    opinions on the properties for the seller.

2    Q.   And this was in anticipation of the foreclosure sale?

3    A.   Correct.

4    Q.   I'm showing you now what's been previously marked for

5    identification purposes as Government's Exhibit 2.

6            What is this exhibit?

7    A.   This is the declaration page of records received by Cynthia

8    Browner from a subpoena that we served her.

9    Q.   Have you reviewed the documents that she provided you?

10   A.   Yes.

11   Q.   And have you reviewed Government's Exhibit 2?

12   A.   Yes.

13   Q.   Are all of the documents in Government's Exhibit 2 documents

14   that Ms. Browner provided you pursuant to this declaration of

15   records?

16   A.   Yes.

17           MR. KELLER:  Your Honor, the government moves for

18   admission of Government's Exhibit 2.

19                              (Government Exhibit 2 was

20                              offered in evidence.)

21           MR. TREIMER:  No objection.

22           THE COURT:  Exhibit 2 is admitted.

23                              (Government Exhibit 2 was

24                              received in evidence.)

25           MR. TREIMER:  Your Honor, if I may?

1          THE COURT:  Yes.

2          MR. TREIMER:  We've exchanged exhibits back and forth.

3    Rather than to go through this with every exhibit, I think if we

4    are allowed just to put up our exhibits and testify, and if the

5    other parties has an objection, they will object at that time,

6    rather than admit them one by one.

7          THE COURT:  For our current purposes then, you're

8    suggesting that you have no objection to any of the exhibits

9    that the government has marked?

10          MR. TREIMER:  That is correct.

11          THE COURT:  Which is Exhibits 1 through 6?

12          MR. KELLER:  That's correct, Your Honor.

13          THE COURT:  Well, 1 is a transcript.  So we can just

14    receive 1 through 6?

15          MR. TREIMER:  Yes.

16          THE COURT:  So ordered.

17                              (Government Exhibits 1, 4, 5 and 6

18                              were offered and received in

19                              evidence.)

20    BY MR. KELLER:

21    Q.  Looking at page 2-A of Government's Exhibit 2, what is the

22    property address listed there?

23    A.  6302 Appomattox Road, Davenport.

24    Q.  And under the comparable sales, under the comparable

25    information, what are the sales prices of the comparable

1  properties listed on this document?

2  A.  37,900, 50,900 and 60,000, respectively.

3  Q.  And what is the value there provided by the broker for this

4  property, for the 6302 Appomattox?

5  A.  $60,000.

6  Q.  Looking at 2-B of Government's Exhibit 2, the property there

7  is 6314 Appomattox?

8  A.  That's correct, yes.

9  Q.  And the value listed by the broker on this property?

10  A.  $60,000.

11  Q.  Now, looking at Government's Exhibit 2-C, does this also

12  reference the same property, 6314 Appomattox Road?

13  A.  It does.

14  Q.  And what is the price -- or not price, but broker estimated

15  market value listed on this exhibit?

16  A.  50,000.

17  Q.  What are the notations and the comments there regarding part

18  of the basis for that estimated value?

19  A.  This was an exterior evaluation, but the broker noted that

20  based upon other units in this general location that some of

21  them had been stripped of their cabinets and furniture.

22  Q.  Looking at 2-D, which is the second page of that opinion,

23  what are the comments about the property here?

24  A.  Neighborhood is marginal.  Many units have been foreclosed

25  in this area, and the REO market is driving all sales of

1  duplexes in this area.

2  Q.  Do you know what REO market refers to?

3  A.  It's the foreclosure market, real estate -- I can't remember

4  the last part of it.

5  Q.  And then the addendum, does the broker describe units in the

6  location being stripped of all cabinets and fixtures?

7  A.  Yes.  It mentions that three, which were her listings, were

8  completely stripped of toilets, cabinets, sinks, et cetera.

9  Q.  And was one of the properties where she performed a broker

10 price opinion 6232 Appomattox Road?

11 A.  Yes.

12 Q.  And did she actually take pictures of the interior of that

13 property?

14 A.  That's correct.

15 Q.  Did she take pictures of the interior of all of the

16 properties she received?

17 A.  No.  Some were interior BPOs and some were exterior BPOs.

18 Q.  Looking at 2-L, is this a picture of the rear of the

19 exterior of that property?

20 A.  It is.

21 Q.  And does it show that the air-conditioner or heating unit

22 has been stripped out?

23 A.  It does, yes.

24 Q.  2-M, is that another picture of the interior of this

25 property?

1  A.  Yes.

2  Q.  2-P, the same property?

3  A.  Yes.

4  Q.  2-S, same property?

5  A.  Yes.

6  Q.  And this is the condition that the properties were in prior

7  to the foreclosure sale, is that right?

8  A.  Some of them, yes.

9  Q.  Or for that property?

10  A.  For that property specifically, yes.

11  Q.  Calling your attention back to Government's Exhibit 2, you

12  noted that there were comments on page 5 of that exhibit that

13  the property was completely gutted and ready to finish, is that

14  correct?

15  A.  Yes.

16  Q.  The property where those comments were made in the MLS

17  listing, is that the same property that we just saw pictures of?

18  A.  No.

19  Q.  Special Agent Huber, are you aware that the loss amounts and

20  the restitution amounts listed in the PSR are different?

21  A.  I am, yes.

22  Q.  Moving now to restitution as opposed to the condition of the

23  properties or the prices that they were sold for at foreclosure,

24  what was the first step that happened after New Century loaned

25  the buyers, Herdrich and Hanneken, the money to purchase these

1 properties?  What happened next in the process?

2 A.  They were involved in several of these properties.  I

3 believe it was six of the eight properties in this case.  Their

4 philosophy or how they did business was every mortgage loan that

5 they originated they sold to Morgan Stanley in this particular

6 case.

7 Q.  And the transactions involving Morgan Stanley, are those now

8 denoted by Bank of America in the PSR?

9 A.  They are, yes.

10 Q.  And why is that?

11 A.  Bank of America purchased Morgan Stanley a few years ago.

12 Q.  So the properties that New Century sold -- or the mortgages

13 that New Century sold to Morgan Stanley, after they sold them,

14 what happened next on these properties?

15 A.  The mortgages were placed on Morgan Stanley's warehouse

16 line, and then when there was a -- at some point New Century was

17 bleeding money at the time.  It was when the foreclosure crisis

18 was at its peak in 2007, I believe, and after these properties

19 had first payment defaults --

20 Q.  Did each of these properties have a first payment default?

21 A.  That's correct.

22 Q.  So what happened after the first payment default?

23 A.  Due to the first payment defaults, Morgan Stanley forced, as

24 per their contract, forced New Century to buy back these loans.

25 The loans reverted back to New Century.

1  Q.  And the basis for that, the rough basis is because Morgan

2  Stanley wasn't going to be able to collect any payments on the

3  mortgages?

4  A.  Typically, per contract, if there's a first payment default

5  or fraud associated with the loans, they refer them back to

6  them.

7  Q.  So if New Century was in the process of selling off all of

8  their mortgages, did they have the assets to buy these back from

9  Morgan Stanley?

10  A.  No.  At the time there were thousands of other loans like

11  these that they had to repurchase.  They didn't have the capital

12  to repurchase them, so they had to -- they negotiated with

13  Morgan Stanley, and through negotiations Morgan Stanley allowed

14  New Century to keep these loans on their warehouse line of

15  credit.

16  Q.  What was the condition that Morgan Stanley required that New

17  Century fulfill in order for Morgan Stanley to keep those

18  properties on their credit lines?

19  A.  Through negotiation they said they would allow these

20  properties to be on their warehouse line of credit but only if

21  New Century put up a certain percentage of what the unpaid loan

22  balance was.  So Morgan Stanley basically said we will keep

23  these on our warehouse line of credit but only at a certain

24  percentage of what the unpaid balance is on the loans.

25  Q.  Do you know what the approximate percentage was that New

1  Century had to pay Morgan Stanley in order to keep those loans

2  on their warehouse lines?

3  A.  I believe Morgan Stanley allowed them to be kept at 66.5

4  percent rate, meaning New Century had to pay approximately

5  33 1/2 percent of the unpaid balance on the loans in order to

6  keep them on Morgan Stanley's warehouse line of credit.

7  Q.  So, in essence, Morgan Stanley was holding onto the mortgage

8  in the event that there are any payments made; but in order to

9  protect themselves from risk, they were requiring New Century to

10  pay 30 percent, or a little bit more, of the outstanding balance

11  on the mortgage?

12  A.  They had the collateral because Morgan Stanley was forcing

13  these loans back on to New Century.  New Century didn't have the

14  capital to pay.  They were allowing them to stay on their

15  warehouse line, but only if New Century put up part of the funds

16  basically.

17  Q.  And when you say stay on their warehouse line, that means

18  that Morgan Stanley maintained the mortgage?

19  A.  They had the collateral, yes.  They held the collateral.

20  Q.  But then New Century also had to pay them approximately 30

21  percent of the outstanding balance on the mortgage?

22  A.  Correct.

23  Q.  Looking at Government's Exhibit 5, are these the figures

24  supplied by New Century as to the amounts they had to pay for

25  six of the involved properties?

1   A.   Yes.

2   Q.   And the New Century loss amounts then are reflected in the

3   final column?

4   A.   Yes.

5   Q.   And are those the same loss amounts reflected in the PSR?

6   A.   They're included in the PSR, yes.

7   Q.   Under the restitution amount?

8   A.   Correct.

9   Q.   At some point did New Century go into bankruptcy or default

10  on what they owed Morgan Stanley?

11  A.   Yes.

12  Q.   And what happened to the properties at that point?

13  A.   At that point Morgan Stanley took the collateral, basically

14  seized the collateral under their agreement.

15  Q.   And then do you know what Morgan Stanley did with the

16  properties?

17  A.   They foreclosed on the properties.

18  Q.   Do you know whether there was any other investor or party

19  that Morgan Stanley consulted with regard to selling the

20  properties?

21  A.   Yes.  I believe they -- when they were on the warehouse

22  line, I believe they in turn sold the mortgage to an investor

23  who then ultimately suffered loss as well.

24  Q.   So we see -- in appendix A of the PSR, the final column, we

25  see New Century's restitution amount, which you just explained

1  as the amount they had to pay Morgan Stanley on these

2  properties?

3  A.  Correct.

4  Q.  We also see a restitution amount for Bank of America, which

5  you've explained is synonymous with Morgan Stanley for our

6  purposes here?

7  A.  Yes.

8  Q.  But the restitution amount for Bank of America, when you add

9  that to the restitution amount from New Century, that doesn't

10  add up to the difference between the foreclosure sale price and

11  the outstanding loan balance?

12  A.  Correct.

13  Q.  Can you explain why that is?

14  A.  I was unable to get ahold of, locate through numerous phone

15  calls, I was trying to find out who the investor was that

16  ultimately suffered the loss.  Morgan Stanley or Bank of America

17  in this case, their loss amount is mostly from escrow balance,

18  interest, that sort of thing.  Their investor suffered a greater

19  loss than them.

20  Q.  So they were able to sell these mortgages to someone else

21  who was left, for lack of a better term, holding the bag when

22  the properties sold at foreclosure sale at such low prices?

23  A.  Correct.

24  Q.  And that information is not reflected in the appendix to the

25  PSR because we don't have that information, is that correct?

1  A.   That's correct.

2  Q.   Looking at the restitution amounts that are not Bank of

3  America or New Century properties, the top two in appendix A,

4  why is the restitution amount, for example, on the Lehman

5  Brothers' property, the 6224 Appomattox, why is their

6  restitution amount so high, close to $90,000?

7  A.   That loan was originated by Wells Fargo originally.  Lehman

8  Brothers was the purchaser of that loan.  Lehman Brothers is no

9  longer in existence.  And at the time that I discovered that

10 they're the ones who suffered the loss, they weren't in

11 existence, so I couldn't contact anyone to talk to them; but the

12 89,000, in addition to the unpaid principal balance, you have

13 various things that increase the loss amount or the restitution

14 amount.  For instance, the broker price opinion costs money.  To

15 sell the property, you're going to have real estate fees in

16 there.  If these properties sit for a year-and-a-half, two

17 years, you're going to have accrued interest.  All of those

18 amounts are rolled up into that number that was provided to me

19 by Wells Fargo.

20 Q.   Then, similarly, on 6232 Appomattox, there's a loss amount

21 listed of 116,000 dollars and change.  Did you receive documents

22 from the United States Probation office that showed how that

23 amount was arrived at?

24 A.   I did, yes.

25 Q.   I'm showing you now what's been Government's Exhibit 6.

1        Is this the document you received from the United

2   States Probation office?

3   A.   Yes.

4   Q.   And is that a fax from JPMorgan Chase?

5   A.   It is.

6   Q.   Looking at the figures, do they include interest in their

7   restitution amount?

8   A.   They did.

9   Q.   And what's the interest that they've listed there?

10  A.   If you could move it over just a little bit, I want to

11  verify that that's -- yeah; $53,280.15.

12  Q.   Do they also then list the principal balance of the loan?

13  A.   Yes; $107,840.33.

14  Q.   And do they list a sales price?

15  A.   They did.

16  Q.   And so did they arrive at their total restitution amount by

17  subtracting the sale price from the loan amount and then adding

18  the interest?

19  A.   Yes.

20  Q.   What is the sale price that they used on -- or do you know

21  where the sale price came from that they've used in this

22  document?

23  A.   This sale price is from the documents from the sheriff's

24  sale sale price.  When the property went on sheriff's sale,

25  normally if no one bids on the property or if it doesn't meet a

1   certain minimum bid, the mortgage reverts back to whoever has

2   the loan, the original lender.  In this case EMC Mortgage is the

3   person that Wells Fargo sold this loan to initially, and that is

4   the price that's listed from the sheriff's sale documents.

5   Q.   Was EMC purchased by JPMorgan Chase?

6   A.   They were, yes.

7   Q.   But EMC was the company that held the mortgage at the time

8   of the foreclosure sale?

9   A.   Yes.

10  Q.   So if at the sheriff's sale, if no one bids on the property

11  in an amount that exceeds the minimum bid set by the lender or

12  whoever holds the mortgage --

13  A.   Yes.

14  Q.   -- you're saying the property then just reverts back to the

15  lender?

16  A.   Correct.

17  Q.   And then is that minimum bid that was not exceeded, that was

18  not paid, listed as the sales price for sheriff's sale purposes?

19  A.   It is, yes.

20  Q.   So this $44,000 that's listed here and that comes from the

21  sheriff's sale price, that is money that never actually changed

22  hands, is that correct?

23  A.   That's my understanding, yes.

24  Q.   So then at foreclosure sale what did EMC actually sell this

25  property for?

1  A.   I believe it was 52,000.

2  Q.   In appendix A, it's 6232 Appomattox, is the sale amount

3  there listed as 50,560?

4  A.   Can you scoot that over a little bit?

5           Yes; 50,560.

6  Q.   So in order to come at an accurate restitution amount for

7  JPMorgan Chase, should the unpaid loan balance be reduced by

8  50,560 instead of the sheriff's sale price of 44,000 and change?

9  A.   Yes.

10  Q.   So that would come to a lower restitution amount on that

11  property by approximately $6,000?

12  A.   Yes.

13           MR. KELLER:   No further questions.

14           THE COURT:   Cross-examination, Mr. Treimer?

15           MR. TREIMER:   Thank you.

16                        CROSS-EXAMINATION

17  BY MR. TREIMER:

18  Q.   Good afternoon, Agent Huber.

19  A.   Good afternoon.

20  Q.   You testified about broker price opinions.   What is a broker

21  price opinion?

22  A.   It's not an appraisal, but it's an opinion on the value of

23  the property in its current market condition.

24  Q.   But it's not an appraisal?

25  A.   It's not an appraisal.

1  Q.   And it's done by a real estate agent?

2  A.   Some of them, yes.

3  Q.   And do some of these real estate agents then try to proceed

4  to sell these properties?

5  A.   Yes.

6  Q.   And, in fact, on some of these properties, the real estate

7  agent that did the broker price opinion sold those properties,

8  right?

9  A.   Some of them, yes.

10 Q.   And if the broker price opinion is lower than the real

11 market value and they get to sell the property, they can get a

12 commission, plus put a property worth more money in their

13 client's hands?

14 A.   Can you say that again?

15 Q.   The broker price opinion was generated by a real estate

16 agent who sold some of these properties?

17 A.   Correct.

18 Q.   And if the broker price opinion is, let's say, $50,000 --

19 A.   Okay.

20 Q.   -- and the lender says, okay, sell it for $50,000, and she

21 can find a buyer for $52,000, she gets her commission, the bank

22 gets their foreclosure.  But what if the property is actually

23 worth more and the broker price opinion is also false, just like

24 the appraisals were in this case?

25 A.   From my knowledge of interviewing real estate agents, their

1  goal in every -- almost every transaction that I know of is to

2  sell the property for the most that they can.

3  Q.  Unless they're selling a lot of properties all to one buyer?

4  A.  No.

5  Q.  Withdraw the question.

6          Now, let me see if I understand this right.  It's your

7  testimony that New Century sells every mortgage they write to

8  somebody else?

9  A.  Correct.

10  Q.  And in this particular case the New Century mortgages from

11  Herdrich and Hanneken you're saying were all sold to JPMorgan?

12  A.  The ones in this case were sold to JPMorgan.  Herdrich and

13  Hanneken had other properties not associated with Mr. Engelmann

14  that were sold to other investors or other mortgage bankers.

15  Q.  And it's your testimony that Morgan Stanley turned around

16  and resold these mortgages to Bank of America?

17  A.  No.

18  Q.  Who did they sell them to?

19  A.  An investor.

20  Q.  Who?

21  A.  Consumer Solutions, LLC, from what I gather.

22  Q.  And how is it you gather that?

23  A.  From the documents they provided.

24  Q.  From the documents I provided the government?

25  A.  From the documents that they provided me.

1   Q.   And who is Consumer Solutions?

2   A.   I don't know.  I was not able to contact them.

3   Q.   But you're claiming they lost money on this deal, on these

4   deals?

5   A.   Absolutely.

6   Q.   But you can't contact them?

7   A.   No, I cannot.

8   Q.   You've had a --

9            THE COURT:  Excuse me, Mr. Treimer.  Just so I'm

10   clear, is the government seeking restitution for those people?

11            MR. KELLER:  No, Your Honor.

12            THE COURT:  Okay.  That's what I thought.

13            Go ahead.

14   BY MR. TREIMER:

15   Q.  Well, this is where the waters start to get really muddy

16   because we go Morgan, Bank of America --

17   A.  Well, the only reason Bank of America is involved is because

18   they purchased Morgan Stanley.  So consider them one and the

19   same.  That's that part of that transaction.  They purchased

20   them during this whole process of trying to figure out loss

21   amount, you know.

22   Q.   And when did that purchase occur, do you know?

23   A.   I don't know when it was.

24   Q.   So the Herdrich-Hanneken New Century mortgages were all put

25   in a bundle and sold to Morgan Stanley?

1   A.   They were put on their warehouse line, correct.

2   Q.   And explain what a warehouse line is.

3   A.   They will -- like I said, they sold all of their loans, and

4   they might wait a month, two months, bundle as you said, or

5   actually on a monthly basis sell their loans to Morgan Stanley,

6   who will then collect them.  And they might wait a little bit

7   longer until they get a number of loans, and they'll package

8   those loans up into products, investment products to third

9   parties, things of that nature.  They might sell the loan to

10  another person or they'll sell it to an investor.

11  Q.   Now, in the spreadsheet that you received from New

12  Century --

13  A.   Yes.

14  Q.   -- I believe there were 13,278 loans in that bundle?

15  A.   I remember there being over 13,000, yes.

16  Q.   And that bundle accounted for 2.5 billion dollars?

17  A.   Yes.

18  Q.   And New Century was to buy that back after there was -- why

19  were they forced to buy it back?

20  A.   Each one is individual, so I don't know about all of those

21  13,000, other than the Herdrich and Hanneken properties.  Those

22  were the properties that sat on Morgan Stanley's warehouse line.

23  When New Century went under, there was loss amount from every

24  single one of those transactions that were sitting on Morgan

25  Stanley's warehouse line because Morgan Stanley took the

1  collateral.

2  Q.  And so what you're saying is every one of those 13,000 plus

3  loans from New Century suffered -- Morgan Stanley suffered a

4  loss on?

5  A.  New Century suffered a loss on.

6  Q.  Okay.  Did New Century ever pay Morgan Stanley?

7  A.  Yes.  They had to pay them for those loans.

8  Q.  Did New Century ever provide evidence that they actually

9  paid them?

10 A.  No.

11 Q.  You've been working trying to get information out of New

12 Century since about, what, 2008?

13 A.  On and off, yes.

14 Q.  And it wasn't until just yesterday that you were able to get

15 Government Exhibit No. 5 from New Century?

16 A.  Yes.  And I can explain why, if you want to hear.

17 Q.  Sure.

18 A.  I was in -- in preparation for this sentencing, I was

19 playing phone tag with an individual who is not part of New

20 Century but is part of New Century Liquidating Trust.  She

21 wasn't an employee of New Century, but she's there as a

22 consultant to wind down the business obviously with billions of

23 dollars in assets that they were managing.  Because they went

24 into bankruptcy, they're trying to wind down everything.  And so

25 in discussion of trying to get a further explanation on a

1    previous loss document that they provided, she went into further

2    explanation, which thus then provided this spreadsheet.

3    Q.  Because the previous loss amounts were reflected in appendix

4    A.  In the earlier presentence reports, they were half of what

5    you're claiming today?

6    A.  Yes.  What had happened was initially when we asked for loss

7    amounts, they're looking at -- you know, they have thousands of

8    loans.  Just one warehouse line that they had was over 13,000

9    loans.  So when I asked them to provide me loss amounts on these

10   particular loans, what the person initially did was use the

11   weighted average of the price that New Century -- the percentage

12   that New Century had to pay for all these 13,000 loans, which

13   the weighted average -- so if you take the weighted average of

14   the percentage on all of those loans, it comes to approximately

15   85 point some percent, I believe, or whatever the amount was.

16           In talking with her yesterday, she said she was

17   digging deeper, she was able to find the actual spreadsheet that

18   contained each detailed percentage.  And so I asked her, well,

19   can we have that spreadsheet?  Can you provide us more accurate

20   loss amounts?  And that's what she did.

21   Q.  And in reviewing those 13-some thousand loans and amounts,

22   monies paid back supposedly by New Century, the percentage that

23   you testified to, that being 66 percent -- or 66 1/2 percent

24   which is reflected here --

25   A.  It's the 33 is the loss amount.

1  Q.  The 33 which is reflected here, I notice that number varied

2  dramatically across those 13,000 loans from 5 percent to 53

3  percent to 82 percent?

4  A.  Uh-huh.

5  Q.  So how did they arrive, New Century, Morgan Stanley arrive

6  at the 66.5 percent?

7  A.  That was per their agreement.  That's what the percentage

8  was at that time for them allowing them to maintain on their

9  warehouse line of credit, that was the percentage that they came

10  up with.

11  Q.  But this whole 13,000 loan bundle got called at the same

12  time?

13  A.  No.  No, that's incorrect.  That was what was held on the

14  warehouse line at that particular date.  There may have been

15  loans put on that warehouse line of credit at various points in

16  time.  So each time there could be various percentages, and I

17  don't know the details behind their discussions.  The person

18  that provided me with the spreadsheet wasn't involved in those

19  discussions.

20  Q.  So you don't know whether this 33 percent and 66 percent,

21  whether that was part of the original agreement before Morgan

22  Stanley bought a New Century loan or whether it was the

23  agreement after the New Century loan went into default?

24  A.  It was -- the way it was is New Century needed -- they were

25  bleeding money, as I said before.  It was Morgan Stanley that

1  forced New Century to repurchase these properties, okay, and

2  this is the percentage that they came up with.

3  Q.  And that was after Morgan Stanley exercised their option to

4  make New Century buy them back?

5  A.  I believe so.

6  Q.  So that percentage would have been negotiated at that time?

7  A.  There was a -- yes, that was negotiated at that time.

8  Q.  And did Morgan Stanley tell you why there was such a

9  variance in the percentages?

10  A.  No.  And I didn't talk to Morgan Stanley.  Morgan Stanley

11  doesn't exist anymore.

12  Q.  Or excuse me, New Century?

13  A.  No.

14  Q.  So you didn't ask them how they arrived at the 33 percent?

15  A.  At the 33 percent, no, I did not.

16  Q.  Do you know how they arrived at it?

17  A.  I do not.

18  Q.  Do you know if it's even accurate?  I mean --

19  A.  Are you asking me if I believe they made it up?

20  Q.  Yes.

21  A.  No, I do not believe they made it up.

22  Q.  Excuse me.

23          (Counsel conferring with the defendant.)

24          THE COURT:  Mr. Engelmann, push the mic away from

25  yourself when you're talking to counsel.

1            Thank you.

2     BY MR. TREIMER:

3     Q.   On appendix A, the JP Chase property of 6232 Appomattox

4     Drive, previous to today I have provided the government what has

5     been marked as Exhibit ES-2.  Have you had an opportunity to

6     review these documents?

7     A.   I don't know them by ES-2.  I have to see them before I --

8     Q.   Okay.  I'll hand you what's been marked Exhibit ES-2.

9            (Pause.)

10    A.   Okay.

11    Q.   Those documents, to my understanding, represent the chain of

12    title of the mortgage here in Scott County from the records of

13    Scott County?

14    A.   Okay.

15    Q.   You've seen some of them, if not all of them?

16    A.   I haven't seen this particular exhibit that you've provided,

17    but I'm looking at it now.

18    Q.   Anywhere in that exhibit does it indicate that JPMorgan

19    Chase has an interest in the mortgage?

20    A.   Yes, by EMC Mortgage.

21    Q.   And is there any documentation that EMC is actually a part

22    of JP Chase?

23    A.   EMC doesn't exist anymore.  It's now JPMorgan.  In the

24    process of trying to find the loss amount on some of these

25    properties, I was contacting EMC Mortgage.  I believe the name

1  of the lady was Buretta Webb (phonetic).  At some point in

2  trying to obtain a loss figure, she told me you can no longer

3  contact me regarding the loss amount.  We were purchased by

4  JPMorgan Chase, which is what happened.

5  Q.  Okay.  With respect to the actual sale prices of these

6  properties, they sat on the market for quite some time, didn't

7  they?

8  A.  I don't know if they did or not.  I'm not sure on the days.

9  It's kind of misleading on the MLS listing sheets that we have.

10  Some of them did sit on the market for some time, yes.

11  Q.  The lenders didn't seem to be too concerned about recouping

12  their losses from the bad mortgages, did they?

13  A.  I can't comment on that, no, because each case is different.

14  When you get a broker price opinion, you can set the price to

15  try to have a quick sale and, obviously, then you're going to

16  set that property value at a low value to try and attract a

17  number of buyers.  You can set that price at a price that's

18  close to your unpaid balance to try to recoup that unpaid

19  balance amount.  Obviously, the longer those properties are

20  sitting, the more interest is accruing, your expenses can

21  increase that way; but each individual case is different.  In

22  this area at that time, the Americana Park properties, I mean,

23  it wasn't an attractive area to buy properties.

24  Q.  But, in any event, correct me if I'm wrong -- you have an

25  accounting degree, correct?

1  A.  I do.

2  Q.  So you know what mitigation of losses means?

3  A.  I've heard the term, yes.

4  Q.  Well, in your opinion, did these mortgage lenders try to

5  mitigate their losses?

6  A.  I can't answer that question.  I'm not qualified enough to

7  answer whether they were trying to mitigate.  I would say that

8  they were trying to do what they thought was best to recoup any

9  costs that they incurred.

10  Q.  Hypothetically, if the lenders had come to you and said,

11  Mr. Huber, we've got a first payment default, this mortgage

12  needs to be foreclosed, what should we do, what would you

13  advise?

14  A.  Well, according -- and I'm not an attorney; you are.  But in

15  the State of Iowa, I believe properties, it takes at least a

16  year for them to go through the foreclosure process.  So the

17  properties are going to sit for a year from the time of a first

18  payment default to begin with.  So it isn't going to sell right

19  away unless you do what's referred to as a short sale or

20  something, but you have to have a buyer for that, so --

21  Q.  In referring to appendix A and street address 710 61st

22  Street, that property sold for $61,000 and didn't go through

23  foreclosure?

24  A.  That's correct.

25  Q.  And if you look at that property, originally Laures agreed

1  to sell that property for 76,000, not going through foreclosure

2  brought 61,000.

3  A.   Uh-huh.

4  Q.   It seems like had the lenders elected to do short sales,

5  they could have saved themselves a lot of money?

6          MR. KELLER:  Objection, Your Honor; argumentative.

7  This whole line of questioning has been argumentative.

8          THE COURT:  Well, I'll let you finish the point,

9  Mr. Treimer.

10  A.   Well, I don't agree with that.  I mean, two of these

11  properties were completely gutted.  So are you saying that it's

12  going to go through a -- I mean, to try to say that a short sale

13  is even going to be possible, I don't know.

14  BY MR. TREIMER:

15  Q.   Okay.

16  A.   Each property is different.  Some of them were completely

17  gutted.

18          MR. TREIMER:  That's all the questions I have.

19          THE COURT:  Redirect?

20          MR. KELLER:  Yes, Your Honor.

21                        REDIRECT EXAMINATION

22  BY MR. KELLER:

23  Q.   Special Agent Huber, Mr. Treimer asked you about the broker

24  price opinion and the incentives for the broker to list it low

25  so that she could sell it.  From your knowledge of the MLS list

1  prices -- or MLS listings, who sets the list prices?

2  A.   The list price, from what I have gathered, you get a broker

3  priced opinion, which then if it's the third party, the bank, in

4  consultation with the real estate agent, sets the list price

5  based in part on the broker price opinion.

6  Q.   I guess my question is, are the sellers involved in setting

7  the list price, the price the property is initially listed at?

8  A.   The sellers?  You mean the banks and lenders?

9  Q.   Yes, whoever holds the mortgage.

10  A.   I would assume they have some input as to what price to put

11  it at.

12  Q.   And if we're talking about incentives, the seller is

13  incentivized to list the property at as high a price as

14  possible, isn't that right?

15  A.   They want to sell the property.  They want to put an

16  accurate -- they want to put the properties on for what they

17  believe they can sell them for.

18  Q.   Maybe my question wasn't as simple as it should have been;

19  but if you're selling a property, you want to make as much on

20  the sale as you can?

21  A.   Absolutely.

22  Q.   Looking at Government Exhibit 4, in comparing the list

23  prices for the properties on which we have that information and

24  then the foreclosure sale prices, in some instances the

25  foreclosure sale prices were a little bit higher than the list

1  prices, is that right?

2  A.   That's correct.

3  Q.   And in some instances they were a little bit lower?

4  A.   Yes.

5  Q.   But they were all in the general ballpark, the same

6  ballpark, is that right?

7  A.   Yes.  Some of them, the MLS list price you're looking at

8  isn't the original list price that they went on the market.

9  Some of those were listed, like the one, for instance, 69-nine,

10  655, I believe that originally listed for an amount higher than

11  69-nine; but unless you have a buyer -- you know, if you don't

12  have any buyers or anybody interested, you're going to lower the

13  price.  So that's what occurred in that case is they lowered the

14  list price to try to attract buyers.

15  Q.   The opposite of that is if you have multiple bidders on a

16  property, then the sale price usually goes up from the list

17  price?

18  A.   Correct.

19            MR. KELLER:  Nothing further, Your Honor.

20            THE COURT:  Follow-up to that, Mr. Treimer?

21                       RECROSS-EXAMINATION

22  BY MR. TREIMER:

23  Q.   You mentioned that multiple bidders on these properties,

24  based upon prices that they're listed for, you can acquire

25  multiple bidders, is that correct?

1   A.   No, I don't believe I stated that.  I said in some cases

2   where the property increased or the final sales price increased

3   from the original list price, that could be because typically

4   there's multiple bidders on the property, which then increases

5   the amount that it sold for from the original list price, like a

6   bidding war.

7   Q.   But, in fact, Gearhead, LLC, purchased all of these

8   properties?

9   A.   In the end they purchased all of them, yes -- not all at

10  once, but in the end, yes.

11  Q.   And you don't know if there are other bidders or not, do

12  you?

13  A.   I don't.

14          MR. TREIMER:  That's all I have.

15          THE COURT:  Anything further for this witness?

16                FURTHER REDIRECT EXAMINATION

17  BY MR. KELLER:

18  Q.   You spoke to real estate agent Holvoet?

19  A.   I did, yes.

20  Q.   And who did he represent in the sales that he was involved

21  with?

22  A.   Gearhead Properties.

23  Q.   Did he recall being involved with those sales for that

24  entity, Gearhead Properties?

25  A.   He did, yes.

1 Q.  And did he have any recollection of there being anything

2 about the transactions that were not arm's length or that did

3 not reflect the market value of those properties?

4 A.  No, absolutely not.  He, in fact, said these were arm's

5 length transactions, there was no deal to Gearhead, they were

6 above board.

7           MR. KELLER:  Nothing further.

8           MR. TREIMER:  Nothing further.

9           THE COURT:  You may step down, Agent.

10          THE WITNESS:  Thank you.

11                              (Witness excused.)

12          MR. KELLER:  No other evidence, Your Honor.

13          THE COURT:  Mr. Treimer, did you wish to present some

14 evidence?

15          MR. TREIMER:  Yes, Your Honor.  At this time I would

16 call Dave Dunakey.

17          THE COURT:  Why don't you go ahead and put down your

18 gear, and then he will give you the oath.

19          THE WITNESS:  I'm a little hard of hearing in this

20 environment, Your Honor.  I didn't hear you.

21          THE COURT:  Why don't you go ahead and put your things

22 down, and then he will place you under oath.

23          THE CLERK:  Please raise your right hand.

24

25

1          DAVID DUNAKEY, DEFENDANT'S WITNESS, SWORN

2                      DIRECT EXAMINATION

3  BY MR. TREIMER:

4  Q.  Mr. Dunakey, would you please state your full name for the

5  record.

6  A.  David Dunakey.

7  Q.  And what is your profession?

8  A.  I'm an attorney and an abstractor.

9  Q.  Where did you grow up?

10  A.  Pardon me?

11  Q.  Where did you grow up?

12  A.  I grew up in Waterloo, Iowa.

13  Q.  Have you been a native of Iowa, a resident of Iowa all your

14  life?

15  A.  No.

16  Q.  Well, did you go to high school in Iowa?

17  A.  Pardon?

18  Q.  Did you go to high school in Iowa?

19  A.  Yes.  I went to high school at Columbus High in Waterloo,

20  Iowa.

21  Q.  From there you went to college I assume?

22  A.  No.  I went to the service.

23  Q.  And how long were you in the service?

24  A.  Three years.

25  Q.  What did you do after the service?

1  A.   I went back to college at the University of Northern Iowa

2  and completed my bachelor's degree at UNI.

3  Q.   And then what did you do after that?

4  A.   I attended law school at Creighton University School of Law,

5  and I received a JD in 1976.

6  Q.   And after that did you go into the practice of law?

7  A.   Yes, sir.

8  Q.   How did your practice develop over the years?

9  A.   My partner and I, Kurt Klatt, he's a boyhood friend of mine,

10 we started together, not initially.  He was a loan officer at

11 a -- a trust officer at a bank and also worked with a defense

12 firm; but I think it was about a year or so after I started

13 practice as a sole practitioner we got together and formed the

14 firm of Dunakey & Klatt, and it's been the same firm since that

15 time, since approximately 1978.

16         Initially both Mr. Klatt and I were engaged in the

17 general practice of law, handling virtually all areas, wills,

18 trusts, probate, corporations, criminal law, real estate, of

19 course, and divorces.  And as the years went by, I had focused

20 on different areas of law, but probably over the last 20 years,

21 I've focused primarily in real estate law.  And we grew over the

22 years.  We currently have, I believe it's 12 attorneys.  We have

23 three offices; two in Iowa and one in Oklahoma.

24 Q.   And does your firm specialize in some areas?

25 A.   Yes, sir.

1  Q.  And what is that?

2  A.  Well, one of them, of course, the one I'm most familiar with

3  is real estate, and we do -- we have a statewide practice for

4  real estate.  We do, for instance, title opinions for buyers

5  throughout the state.  We represent a number of lenders.

6          In addition, we have a foreclosure department.  I

7  believe we did 2,800 foreclosures.  We do foreclosures in eight

8  states.  This year we'll end up doing foreclosures in 13 states.

9  We should do about 4,500 foreclosures.

10          In addition, a number of us partners also are owners

11  of a title company called Title Services Corporation, which has

12  two offices; one in Waterloo and one in Des Moines.  The office

13  in Des Moines is called Title Services, Des Moines Corp., and

14  the Waterloo office, we have four attorneys -- three attorneys

15  and additional staff obviously, and the Waterloo office is

16  engaged in residential real estate closings such as what have

17  occurred in these transactions and --

18  Q.  Let me ask you this.  In preparation for today's testimony,

19  we had a discussion about some of the areas of expertise that

20  you have knowledge of.  Can you explain to the court some of the

21  things you've done, spoken at, meetings you have spoken at or

22  what organizations you are a member of?

23  A.  Okay.  I've authored two texts.  One was Real Estate Forms

24  Manual for Mason Publishing.  It was part of a ten volume set

25  that was intended for real estate practitioners regarding real

1  estate residential transactions.  I also authored a manual that

2  was published and distributed by the Iowa Bar Association for

3  attorneys and the treasurers throughout the state for their tax

4  sales.

5          I also taught all of the law courses that were offered

6  at the University of Northern Iowa as an adjunct professor.

7  I've testified as an expert witness regarding real estate

8  matters and have represented real estate lenders and various

9  other investors, not just here in the United States but

10  elsewhere.

11  Q.  In preparation -- let's get to the heart of your testimony

12  now.  You were contacted by me to review real estate closings

13  that occurred with the Engelmann transactions, is that correct?

14  A.  Yes, sir.

15  Q.  Do you recall what I asked you to look for?

16  A.  Yes, sir.

17  Q.  And what was that?

18  A.  Well, first of all, to look at the documents that you

19  provided that were either in your file or provided to you by the

20  prosecution involving those nine transactions, items from the

21  court files, or wherever they came from, I'm not sure, including

22  the FBI, I assume, and look at those transactions and research

23  the players involved, look at our own files, to the extent that

24  we had any, and come up with an opinion whether or not the

25  properties -- it appeared as to whether or not those properties

1  were ultimately conveyed in a reasonably commercial manner such

2  that it would have resulted in obtaining the maximum amount of

3  money and thereby mitigating the alleged victims' damages.

4          In addition, to take a look at whether or not there

5  were any victims, if those victims could be identified and, to

6  the extent they could be identified, whether or not any alleged

7  losses could be reasonably ascertained.

8  Q.  And after having reviewed Defendant's Exhibits ES-2 through

9  ES-9, we were able to develop a spreadsheet?

10  A.  Yes, sir.

11  Q.  And it's a long one, but we'll have to start from the

12  beginning and work our way across.

13  A.  Okay.

14  Q.  I believe we're going to talk about four properties today,

15  not nine properties?

16  A.  Yes, sir, that's correct.  And I think for clarity, to

17  understand the reason for that is that there are three of the

18  properties that are unique in the way that they were transferred

19  or whatnot, but the rest of the remaining properties the story

20  is all basically the same.  You have exactly the same parties

21  and they were handled in exactly the same way, so we can just

22  take one of those properties as the example for the remainder.

23  Q.  Okay.  And which property would you like to start with?

24  A.  I would like to start with property No. 3.

25  Q.  On this spreadsheet?

1  A.  Yes, sir.

2  Q.  And let's work our way across and explain what each column

3  is and what is indicated in that column.

4  A.  Well, first of all, I think if we just go across to the

5  right, we'll get an overview of what occurred with regard to

6  this transaction.  You have this on this spreadsheet identified

7  as No. 3.  For the record, Your Honor, it is Exhibit No. 9.  If

8  it would help, why don't I just go down the spreadsheet and the

9  parties can take a look and you'll have a cross reference sheet.

10 On this spreadsheet, property No. 1 is also Exhibit No. 1.  On

11 the spreadsheet No. 2 is Exhibit No. 8.  Exhibit No. -- or

12 spreadsheet No. 3 is Exhibit No. 9.  Four is Exhibit No. 7.

13 Five is Exhibit No. 3.  Six is Exhibit No. 4.  Seven is Exhibit

14 No. 5.  Eight is Exhibit No. 2, and 9 is Exhibit No. 6.

15        Going back to property No. 3, we can see that that was

16 the property at 710 West 61st Street.  The original lender was

17 New Century Mortgage and the original loan amount was 93,500.

18 And all of these properties were originated in May -- or one of

19 them in June of 2006, so in this case the note and mortgage, it

20 was executed on June 19, 2006.  That mortgage was assigned to

21 Wells Fargo Bank, and that assignment date took place on January

22 2007, and it wasn't recorded until February.

23        If you look at that, if you look at your Exhibit 18,

24 we should look at 18 --

25 Q.  And this was the short sale, the one property that didn't go

1   through foreclosure, correct?

2   A.   Yes, sir.  You will see that that document was received

3   apparently by Agent Huber, and if you look at the middle area

4   where your finger just pointed, you'll see that Carrington

5   Mortgage Servicers was the servicer on that and that they were

6   the successor to New Century Mortgage and that it states that

7   that mortgage was paid in full on 3/1/2007.

8         Now, an interesting thing about Carrington Mortgage

9   and New Century, the significance of that line is that it

10  illustrates that New Century Mortgage was the servicer on many

11  of these mortgages subsequent to their transition or sale and

12  being bundled, which we'll talk about a little later, and the

13  effect of that is that in order for New Century, when it comes

14  in and has a loss, the importance of that is that New Century

15  was making money on -- apparently on this one and probably on

16  all of them, by virtue of servicing.  New Century, the typical

17  fee for servicing is three-tenths of a point, three-tenths of

18  one percent to seven-tenths of one percent.

19        You will see that later on when you see that these

20  mortgages as they get bundled and pooled, a lot of them were

21  also sold to Fannie Mae, and New Century was a servicer for

22  Fannie Mae.  So eventually they lost that and that was taken

23  away from them by Fannie Mae, but that wasn't until several

24  years after that.  So there's been money made by New Century as

25  these mortgages are going along.

1          You also have -- I don't know which document it is,

2    but the actual satisfaction.  And you'll see from the

3    highlighted portion -- can you show the exhibit number, please?

4          That's Exhibit No. 19.  You'll see from the

5    highlighted portion that the company filed a satisfaction and

6    that they indicate that the mortgage is fully satisfied.

7          THE COURT:  Mr. Treimer, just so the record is clear,

8    all that I've accepted into evidence so far were the

9    government's exhibits, so if you want to tell me what yours are

10   so that we can make the record on that.

11         MR. TREIMER:  Yes.

12         THE COURT:  Obviously, you're showing them to me

13   without the government's objection, so I assume there's no

14   problem.

15         MR. TREIMER:  Yes.

16         THE COURT:  But we should just clarify for the record.

17         MR. TREIMER:  Exhibits ES-1 through ES-9 are also

18   documents relating to each individual property that are from the

19   recorder's office.

20         ES-10 is a document that's up on the --

21         THE COURT:  The spreadsheet?

22         MR. TREIMER:  The spreadsheet.

23         I have ES-11, which is an assessed value, a

24   spreadsheet.

25         I have ES-12, which is the appendix to the PSR,

1  appendix A, which I just put in as an exhibit even though it's

2  already in.

3          I have ES-13, the Lehman REO loss statement; ES-14,

4  JPMorgan loss statement; ES-15, New Century loss statement;

5  ES-16, New Century loss statement; ES-17, Bank of America loss

6  statement; ES-18, Wells Fargo paid in full; and ES-19, the 6224

7  Appomattox satisfaction.

8  BY MR. TREIMER:

9  Q.  You asked me about the satisfaction documents I've now

10  retrieved --

11          THE COURT:  Excuse me.  I was waiting because I

12  thought there was another exhibit that Mr. Engelmann was talking

13  to you about.

14          Does the government have any objection to ES-1 through

15  ES-19?

16          MR. KELLER:  Your Honor, if I could have a moment.

17          THE COURT:  Recognizing that Mr. Treimer was kind

18  enough to allow yours in.

19          (Pause.)

20          MR. KELLER:  Dave, can I see ES-18 and 19?

21          No objection, Your Honor.

22          THE COURT:  Exhibits ES-1 through ES-19 are admitted.

23                              (Defendant's Exhibits ES-1 through

24                              ES-19 were offered and received in

25                              evidence.)

1          THE COURT:  Go ahead, Mr. Treimer.

2          Thank you.

3          MR. TREIMER:  Thank you.

4   BY MR. TREIMER:

5   Q.  Referring to Exhibit ES-9, the 710 West 61st Street

6   property, this appears to be a satisfaction of mortgage?

7   A.  Yes, it is.  Prior to that, as part of your Exhibit No. 9,

8   also there was an assignment of the mortgage that preceded.

9   Again, as you look at the spreadsheet, you will see that New

10  Century assigned, as I indicated in my earlier testimony,

11  assigned this to Wells Fargo.  That assignment shows up and you

12  have it on the board now.

13         And then as I indicated in the prior exhibit, the

14  satisfaction shows that it was satisfied.  Interestingly, if you

15  show that satisfaction again, at the first line or second line,

16  it shows that Quantum Servicing as an attorney in fact for City

17  Group Global is who ultimately satisfies this mortgage.  They

18  show up nowhere in the chain of title.  And this is just one

19  illustration of what we're going to find throughout all of these

20  properties is that there's no chain of title.  You can't tell

21  who has ownership, when they have ownership or what ownership

22  they might have.

23         The other small point that this illustrates is that

24  this is, again, an example where Wells Fargo was using Quantum

25  Servicing, and Quantum Servicing would have made about a half a

1 point for the four years that they had this property.  So they

2 would have made about $2,000 in servicing this particular

3 transaction.

4 The servicers, since they're making money along the

5 way, they never have any incentive to see the mortgages written

6 down, the balances or short sales because, you know, when their

7 book, when their portfolio is, say, a billion dollars and you're

8 making, say, a half a point on a billion dollars for servicing,

9 if that goes down, you write the loans down to one billion or

10 ultimately you sell them too quick before they've had a chance

11 to deteriorate, your income drops in half.

12 So, you know, a half a point on a billion dollars is

13 two million a year.  So if you lose half that value, you're

14 going to lose a substantial amount of money, and that's been one

15 of the problems that have been complained about throughout this

16 whole mortgage bubble fiasco.

17 Q.  In sum, we're not sure how Quantum Central (sic) got

18 involved in this?

19 A.  Well, we know -- we can tell from that document that they

20 were acting as a servicer.  So I saw in one of the exhibits

21 provided by the prosecution that Quantum had a potential loss,

22 it was a potential victim, and I think it indicated TBD, which

23 to me would indicate to be determined; but Quantum, if they were

24 a victim, it would be to the extent that they weren't getting

25 their servicing fees, but they would have no interest at all in

1 this mortgage, the loan, or any subsequent rights in it.  They

2 were just an attorney in fact.

3 Q.  And so on this same Exhibit ES-9, looking at the

4 satisfaction, City Global Market Realty, holder of certain

5 mortgage, in your view of the documents, they don't show up

6 anywhere?

7 A.  No, sir.

8 Q.  Does that conclude discussions on this property?

9 A.  Well, there's one last point, and that is that, again, New

10 Century pushed this off to Wells Fargo.  It wasn't recorded

11 until 2/13 of 2007.  You'll see from your spreadsheet down on

12 the left-hand side that New Century filed bankruptcy on 4/2 of

13 '07 shortly after this assignment, and what a number of lenders

14 were doing was they were dumping properties in preparation for

15 bankruptcy.

16       So going back to, like, the same thing with regard to

17 the ultimate sale on these, when the bankruptcy is pending or

18 imminent, a number of brokers that handle REO property, the real

19 estate owned, that are doing default property business, they'll

20 tell you that there has been contact to find a buyer at any

21 price, no matter how low, to come in and buy that, only to find

22 out that subsequent, a month or two later, that particular

23 lender is filing bankruptcy.  So to stave off the bankruptcy or

24 get as much money in as they can, they have -- lenders have

25 traditionally sold properties for less than their fair market

1  value.

2  Q.  Are we ready to move on to the next property?

3  A.  Yes, sir.

4  Q.  And that is which one?

5  A.  We'll do No. 1.

6  Q.  Which is 6224 Appomattox?

7  A.  Yes.

8  Q.  Okay.

9  A.  Again, just going across the top, you'll see that Wells

10 Fargo originated the loan.  It was 108,000, and it was 9.125.

11 By the way, the two mortgages that were originated by Wells were

12 both 9.125.  All of the rest of the mortgages -- well, I can't

13 tell with regard to No. 3 because that one I don't have the

14 note, the mortgage note, so I can't tell the interest rate on

15 that one, but it was a New Century.  But all of the rest of them

16 that we're talking about, the New Century were all 11.025.  The

17 significance of that, of course, is that what New Century was

18 doing and not the other lenders is they were originating loans

19 at a very high interest rate because they were dumping these

20 properties through securitization and they were making their

21 money on the spread and the other fees that they were making

22 along the way.

23         The note and mortgage, again, it was in May, and

24 immediately it was assigned to FV-1.

25 Q.  Excuse me, I think we're confused here.

1  A.  I'm sorry, which one were we talking about?

2  Q.  On the spreadsheet you brought me --

3  A.  Oh, No. 1?

4  Q.  Yes.

5  A.  Let me find No. 1.  I'm sorry, that was a Wells Fargo.  That

6  was foreclosed in December of 2006.  There was the decree file.

7  The bidder at the sheriff's sale, they came in and bid actually

8  more than their mortgage, and on the sheriff deed they obtained

9  the sheriff deed and Wells Fargo immediately after, close after

10  granted the deed to Lehman Brothers on 3/21/08, and that wasn't

11  recorded until 4/30/08.  And you'll see that on that deed -- and

12  that should be a part of your Exhibit No. 1.  On that deed the

13  consideration is shown at less than $500.

14  Q.  And what is the significance of that?

15  A.  Well, one of two things happened, Your Honor.  Either Wells

16  Fargo gave the property away or, two, we don't know really what

17  happened or what Lehman bought it for or, three, somebody was,

18  in effect, committing fraud with regard to the recorder's office

19  because when the consideration is less than $500, there's no

20  transfer tax owed.  But it was ultimately sold to Gearhead, and

21  I believe it was sold to Gearhead for -- I have to look at

22  Exhibit 11.  It was sold to Gearhead for $50,000, if I'm

23  correct.  So it would appear from what we have of record, what

24  we can rely on is that Lehman Brothers made a substantial profit

25  on the sale to Gearhead.

1  Q.  So what your -- if I understand you correctly, because the

2  consideration from Wells Fargo was bought back at foreclosure

3  sale --

4  A.  Uh-huh.

5  Q.  -- so that puts the mortgage back in their hands and title

6  to the property, correct?

7  A.  Well --

8  Q.  At the sheriff's sale, they buy and get title back to the

9  property?

10  A.  Wells Fargo actually owns a real estate interest at that

11  point, correct.

12  Q.  And they turn around and then they sell that to Lehman

13  Brothers?

14  A.  Yes, sir.

15  Q.  For, according to them, less than $500?

16  A.  Yes.

17  Q.  So they -- either basically Lehman Brothers got the property

18  given to them or somebody is trying to screw the Scott County

19  Treasurer out of taxes?  Is it one way or the other?

20  A.  Yes, sir.  I see that from the PSR, Exhibit A, that Lehman

21  is asking for $89,740.  Well, in order to have a loss of

22  $89,742, they would have had to -- first of all, they received

23  50, we know that.  Now, that's not exactly correct, Your Honor,

24  because the net sales price, I would have to look at what the

25  HUD statement showed as the net sale price, but the gross sales

1   price was $50,000.  So they received 50,000 on the sale, and if

2   their loss is 89, somehow they're alleging that they have

3   139,700 in this property; but I've yet to see -- no documents

4   have been presented to me to indicate how that would be, how

5   that could happen.

6   Q.  Is there anything more about this property that we need to

7   talk about?

8   A.  No, sir.

9   Q.  All right.  Let's move on to the third property you wanted

10  to discuss.

11  A.  And that property is found at line No. 8 of the spreadsheet,

12  which is Exhibit No. 2.  Again, going across the spreadsheet,

13  you have Wells Fargo and you have Wells Fargo actually

14  commencing the foreclosure action, but the bidder at the

15  sheriff's sale is EMC.  EMC comes in to the sheriff's sale and

16  bids $44,697.  EMC receives the deed to the property.  EMC then

17  sells to Gearhead for $51,000.

18          So according to the records and what we are confronted

19  with, it appears that, No. 1, EMC made money on the transaction,

20  and you'll see from appendix A of the PSR, that it's JPMorgan

21  Chase that is asking for $66,000.  There's no indication of

22  record of JPMorgan Chase having any interest in this property.

23  Now, I can explain when we get to the last property as to why

24  some of these lenders are coming before the court and asking for

25  damages, but it doesn't have anything to do with the fact that

1  they own the mortgage or have any interest in the property.

2  Q.  So EMC eventually sold to Gearhead?

3  A.  Yes.  EMC, by the way -- and I Googled a number of these

4  parties, also have used Westlaw, People Map.  EMC is being

5  investigated by, I believe, the FTC, and all of the complaints

6  that the FTC was soliciting --

7          THE COURT:  Mr. Treimer, I don't want stuff from

8  Google in the record here.

9          MR. TREIMER:  Okay.

10          THE WITNESS:  Okay.

11          MR. TREIMER:  That's fine.

12  BY MR. TREIMER:

13  Q.  So it's your testimony that with respect to 6232 Appomattox,

14  that Wells Fargo originated the loan that went to EMC and EMC

15  sells to Gearhead, JPMorgan Chase doesn't show up in the chain

16  of title?

17  A.  That's correct.

18  Q.  So how can they be asking for restitution?  We don't know,

19  do we?

20  A.  No.

21  Q.  It doesn't make sense from the records; would that be fair

22  to say?

23  A.  That's accurate.

24  Q.  All right.  That brings us to our last property.

25  A.  And I have used No. 4 shown on your spreadsheet as an

1  example.

2  Q.  Okay.

3  A.  And that's actually Exhibit 7.  I believe Exhibit 12 is

4  relevant.

5  Q.  Yes.

6  A.  If we could again walk through No. 4, you will see that New

7  Century initiated the loan and they assigned that loan to FV-1.

8  FV-1 -- and this is true with all of the remaining properties.

9  FV-1 is the company that did the foreclosure action, and FV-1

10  obtains the deed from the sheriff's sale --

11  Q.  Let me stop you there.  In Exhibit ES-7 there is an

12  assignment of the mortgage.  Is this what you're referring to?

13  A.  Yes.

14  Q.  To FV-1, Incorporated?

15  A.  Hold on one second.  Let me take a look.

16       It may help with regard -- since this is going to

17  represent the remainder of the properties, it may help if you --

18  if we just walk through your Exhibit 7 and go through the chain

19  on this.

20  Q.  Okay.

21  A.  And you'll see FV-1 --

22  Q.  Well, Mr. Dunakey, I've actually got Exhibit ES-7 in my

23  hand, and this is the assignment that was recorded at the Scott

24  County Recorder's office.

25  A.  If you go to the first page, I think it makes more sense by

1  the time we get to the assignment.

2  Q.  Oh, okay.

3  A.  The first page shows the mortgage.  If you flip the page of

4  this mortgage, you'll see that this was an adjustable rate

5  mortgage with an ARM rider.

6          If you flip to the next page, you'll see the

7  adjustable -- continue on, you'll see the adjustable rate note.

8  It was 101,700.  The initial rate was 11.25.  This was

9  substantially higher than what the going rate was at the time.

10  At the time the interest rates were about 5.6.  The significance

11  of the higher interest rate indicates that, again, as part of

12  what was happening by New Century Mortgage, a company that was

13  investigated by the U.S. Attorney's office as a result of these

14  mortgages, there were companies that were making money -- all of

15  the companies along the line were making money on the spread.

16  So what New Century was guilty of was putting people into higher

17  rate mortgages that they couldn't afford for the simple reason

18  that they had no interest or desire to see the mortgage paid

19  because they already had dumped the mortgage to somebody else

20  who in turn dumped it on down the line.

21  Q.  So that brings us then to the assignment of the mortgage?

22  A.  Incidentally, the acronym that existed about New Century

23  Mortgage at the time was IBGYBG; I'll be gone, you'll be gone.

24          On the next page of the note, you'll see that this is

25  really a two-year ARM, and it can range to the rate of 18

1   percent.  That new rate kicks in in June of 2008.  That's the

2   two-year part.  The interest rate can't go below 11 percent, and

3   at that time the Lieber rate, the rate at which these companies

4   were borrowing the money, was 2.47.

5           Flipping over to the assignment of the mortgage, the

6   recording date of that assignment was 2/21 of 2007, and that was

7   assigned to FV-1.  Again, that assignment took place just before

8   the April filing of the bankruptcy by New Century.

9           The next page, you'll see that New Century had one of

10  its broker signers stamp this assignment.  That's Stephen Nagy.

11  Q.  I note this instrument was signed on May 31st of 2006, so

12  this assignment occurred within a matter of days of New Century

13  writing the mortgage?

14  A.  Allegedly.

15  Q.  Okay.

16  A.  It wasn't recorded until much later.  From the Braxton

17  case -- I don't know whether or not that's been presented to the

18  court or not, but the Braxton case you can see that all of these

19  players were the same players that are involved in this set of

20  transactions were involved in that case, and the court in that

21  case talks about the backdating process and the effect that it

22  has.

23  Q.  So we don't know whether this was backdated or whether it

24  was assigned back shortly after the mortgage was --

25  A.  Yeah.  That's true with all of this.  We don't know what

1 | they did.  But if you look at that page that you're on now,
2 | you'll see the acknowledgment, and allegedly this was signed in
3 | front of this person, and based on the number of mortgages that
4 | they issued, apparently Mr. Nagy appeared before Ana Lopez
5 | 225,000 times that year.
6 | The next page is the foreclosure petition, and you'll
7 | see that this isn't by New Century or anyone that's making a
8 | claim for a loss here.  It's by FV-1.
9 | If you go to the next page of the petition, at the
10 | bottom of that petition, paragraph No. 5 at the bottom of page
11 | 2 --
12 | Q.  Oh, I'm sorry.
13 | A.  -- the plaintiff is currently the holder of record of the
14 | note and mortgage.
15 | Go to the top, paragraph 6, at the very top, the
16 | plaintiff is the sole and absolute owner of the mortgage.
17 | Now flip over to the decree and go to page 3 of the
18 | decree, the bottom line, you'll see that the court found in that
19 | foreclosure action that the plaintiff -- that's FV-1 -- is
20 | currently the holder of record of the note and mortgage.
21 | If you go to the sheriff's deed, it's page 27, your
22 | handwritten page 27, FV-1 acquired title by virtue of the
23 | sheriff's deed dated 6/24/2008.  FV-1 incidentally started
24 | filings for bankruptcy in 2007, so there's a question as to
25 | whether or not they were in bankruptcy at the time that FV-1

1   acquired title.  They're not making a claim here as a victim, as

2   I understand it, but the point is that we can't tell from these

3   transactions really what's involved other than what we have to

4   look at in the chain of record.  FV-1 filed literally hundreds

5   of bankruptcies starting in January of 2007.

6          On the next page, you will see that FV-1 -- this is

7   the warranty deed.  FV-1 sold this property to Consumer

8   Solutions.  Again, the consideration is less than $500.  FV-1

9   isn't involved, from what I can see in this case, but neither is

10  Consumer Solutions.  So Consumer Solutions then gets the

11  property for some amount.  We don't know what the amount is

12  really.  If we believe the document, it was less than $500.  And

13  Consumer Solutions in turn sells the property to Gearhead for

14  $50,680, and that deed is a special warranty deed -- in fact, go

15  back to that page, would you, please?

16         You'll see that this document, this special warranty

17  deed, was prepared by our law firm.  Our REO department handled

18  seven of nine of these transactions, so I have some personal

19  knowledge from our own files regarding these transactions.

20         Then the special warranty deed from Consumer Solutions

21  to Gearhead is your page 31, the last page of the Exhibit No. 7.

22  Again, Consumer Solutions doesn't sign.  They have an attorney,

23  in fact, sign, which is very common.

24  Q.  Now, these documents that we've just looked at and the

25  scenario that we've gone through with the public record applies

1  to all of the New Century mortgages that were assigned to FV-1?

2  A.  Yes.

3  Q.  So it would be a waste of the court's time if we went

4  through the same process that we just did?

5  A.  It was the same scenario in each one of the transactions.

6  Q.  Now, as a result of you being involved in this case and

7  knowing what you know now, what is your office doing or what

8  will your office do in the future if another one of these

9  Consumer Relations (sic) people come to you for transferring

10  property?

11  A.  I'm sorry, I don't understand the question.

12  Q.  All right.  Is there a chain of title problem in these New

13  Century Mortgage properties?

14  A.  Well, I'm not going to look behind all of New Century, but

15  as to these properties, there are.

16  Q.  And what is that problem?

17  A.  There's not marketable title now.  As a result of these --

18  at least for me or my firm, we would never issue a title

19  opinion.

20  Q.  After your review of all of these documents, in your

21  opinion, is it possible to determine, No. 1, an amount of

22  restitution and, No. 2, to whom it is owed?

23  A.  No.

24  Q.  And after going through all of these documents, is it

25  possible to determine whether or not these properties were sold

1  by lenders in mitigation of their damages or they just didn't

2  care?

3  A.  You can't tell.

4  Q.  And after going through these documents, have you been able

5  to come to a conclusion of what the total loss may be?

6  A.  Well, it's impossible to tell the total loss because, again,

7  you'll never be able to -- if all of the attorneys in this room

8  took the rest of their life, you'll never be able to tell

9  exactly who lost, who lost what and when.  And I can give a

10  basis for that if you would like.

11  Q.  Sure, please.

12  A.  Well, first of all, the information that I rely on heavily

13  for my investigation were two sources.  One is in the form of a

14  book, but it's the Final Report of the National Commission on

15  the Causes of the Financial and Economic Crisis in the United

16  States.  This is the authorized edition, but you can get it

17  online and download it.  There were ten members appointed by

18  both Democrats and Republicans to serve on this Commission, and

19  over the 18 months that they investigated this, they literally

20  interviewed hundreds of people, millions of documents

21  apparently, and had a number of hearings.

22        And as part of this report, Your Honor, it uses New

23  Century Mortgage as a case study and walks through a transaction

24  that either these mortgages were a part of -- I can't tell

25  whether these mortgages are a part of the particular

1   transactions that are mentioned in this book or not.  The other

2   source is a volume entitled How Markets Fail by John Cassidy.

3           But the reason that it is impossible, Your Honor, to

4   tell who the victims are or what the loss is is because of the

5   way the transactions were structured.  If I can go through

6   briefly how they're structured, I think the court will

7   appreciate why we can't take at face value that New Century has

8   a loss or Bank of America or Lehman or anybody else.

9   Traditionally what happens is, and as Agent Huber testified,

10  traditionally what would happen is a company would pool a

11  certain number of mortgages.  Now, I'm not certain that Agent

12  Huber was correct, through no fault of his own, that there were

13  13,000 in that particular pool that were sent off to be

14  securitized.  There were 13,000 that ended up being affected by

15  an agreement, but they may not have been in that original pool.

16          But by way of example, the example given in the book

17  is that there's -- and this is reality, not just an example

18  based on a hypothetical.  New Century had 4,499 mortgages that

19  they pooled together.  They then want to securitize and get

20  financing to get money in order to finance those mortgages and

21  pay for them.  So they go through a company like a Lehman or a

22  Bank of America.  Everybody was getting in the business, but a

23  number of people that were called repo lenders.  They're not

24  repo like we would normally think of the term, but they have --

25  they provide what amounts to bridge financing is what the term I

1   would think of.  But when you see it in the documents here, they

2   call it a warehouse line.

3          And so at some point, New Century, in the case that

4   I'm referring to and walking the court through, they needed

5   something like 975 million dollars.  So the company came

6   forward, like a Lehman, and gives them the 974 million.  First

7   of all, they get about 2 1/2 percent for just pushing the

8   package out there.  So in this example, you know, with a billion

9   dollars, they get about 26 million, something like that.

10          Now, what that company does is either themselves, the

11  repo company, either that company or they go out and find

12  another company that wants a piece of this action -- remember,

13  at this time what they would have had to pay out in interest was

14  about 5.35, but they're sitting on 11 percent mortgages.  So

15  there's a whole bunch of money to be spread around here, and so

16  either the repo company or another company now securitizes it,

17  and in order to securitize it, those are -- they call it an

18  asset back security.  And in order to do that, they go to

19  Moody's, and Moody's then gives a rating on these various

20  tranches because they're divided up into As, everything -- AAAs

21  and the Bs and then the really junky stuff down below,

22  et cetera.  And in this example, Moody's gave a AAA rating on 78

23  percent of the sub prime loans.  So they're junky loans to start

24  with, they give 78 percent.

25          Now, at this point, all that these companies out

1   there, even at this point, all they're interested in is a stream

2   of payments.  If you think of by analogy.  Imagine some children

3   that are trading baseball cards.  They're not the real players.

4   They just represent the players.  So this isn't -- when it was

5   said that they have these mortgages and this property and

6   whatnot, that's not correct.  They don't have the mortgage or

7   the property.  They have the right to a stream of payment.

8           So, okay, then what happens is that the junkier

9   mortgages that weren't in the 78 percent, those are bundled.  A

10  bunch of different players buy those, and those are bundled into

11  what are called CDOs, collateralized debt obligations, and what

12  they do then, the people that have bought a big chunk of these B

13  mortgages or A mortgages, is they issue now CDOs, collateralized

14  debt obligations.  In order to sell those, they go back to

15  Moody's and get ratings on them with the argument that, well,

16  not all of them can go bad.  By my math, approximately 94 or 95

17  percent of all of the sub prime mortgages in this New Century

18  bundle were AAA.  Then the people that buy those collateralized

19  debts, there's another group that buys some of those, not as big

20  a player.  They put them together with others, and then they

21  become a big player, and they sell it again, and they call it

22  CDO squared.

23          At that point there's no more product.  There wasn't

24  enough product to go along.  There weren't enough companies like

25  New Century to push enough mortgages into this securitization

1  process.  So the lending institutions created another level, and

2  this is completely a fictional level, and that's where

3  derivatives come into play.  A derivative --

4          THE COURT:  Mr. Dunakey, I'm familiar with this

5  general process.  I've read some of the same materials you have.

6  I don't want to go through this entire lecture.

7          THE WITNESS:  Okay.

8          THE COURT:  You make the record you want to make,

9  Mr. Treimer, but I understand the point Mr. Dunakey is making

10  with regard to the way the industry was functioning at the time.

11          THE WITNESS:  Okay.

12          THE COURT:  But let's not --

13  A.  (Continuing)  Let me summarize the effect then, why it has

14  an effect on this.  There literally then are hundreds upon

15  hundreds upon hundreds of individuals who have invested in these

16  fictitious investments.  It could be a hospital in Kentucky, for

17  instance; but the point is that when New Century -- they didn't

18  buy these mortgages back as was alleged.  They didn't buy them

19  back at all because they didn't own them at that point.  What

20  happened was there was a triggering event.  They could not make

21  and get financing, overnight financing, and once that triggering

22  event happened, these mortgages -- not the mortgages; these

23  various loan numbers were pooled and they said you have to take

24  this responsibility back, but it had nothing to do with whether

25  or not a particular loan had forfeited or not.  It had to do

1  with the fact that they couldn't get overnight financing from

2  the lender, the repo lender.

3  BY MR. TREIMER:

4  Q.   Mr. Dunakey, thank you.  I want to move on.  I have just a

5  few more questions.

6        THE COURT:  Mr. Treimer, apparently you have some that

7  you need to do here yet.  Let's take a ten-minute recess, give

8  the court reporter a break here.

9        MR. TREIMER:  Okay.

10        THE COURT:  Be in recess for ten minutes.

11        (Recess at 3:03 p.m., until 3:14 p.m.)

12        THE COURT:  Take a seat, please.

13        Mr. Treimer.

14        MR. TREIMER:  Thank you.

15  BY MR. TREIMER:

16  Q.   Mr. Dunakey, I'm showing you Defendant's Exhibit ES-17.

17  This was a statement of losses by Bank of America, I think?

18  A.   Yes.

19  Q.   After your review of all of the documents and the chain of

20  title of these mortgages, does it make any sense that Bank of

21  America should be claiming a loss?

22  A.   Not by virtue of the documents that are of record and the

23  documents that I've reviewed.

24  Q.   I'm now showing you what's been marked as Defendant's ES-13.

25  This was previously provided by the government as statement of

1   losses for Lehman REO-ALS.  I think you've seen that document

2   before?

3   A.   Yes.

4   Q.   After your review of all of the documents and these

5   properties, does that statement make any sense or can you

6   determine if Lehman is owed anything?

7   A.   Based on my testimony, again, Lehman Brothers is not a party

8   that is of record or has been of record that you would be able

9   to establish that they incurred any loss from the documents of

10  record.

11  Q.   I'm now putting up Government's Exhibit 6 -- or No. 5.  This

12  is what was prepared from the 13,000-some loans, and I asked

13  Mr. Huber how the 33 percent loss was determined.  From your

14  study of New Century, do you have any idea, any thoughts on how

15  that number was arrived at?

16  A.   No.  I have no idea how it was arrived at.

17  Q.   Could be high, could be low?

18  A.   I don't know what it means.

19  Q.   As you can see, what it means is that New Century is trying

20  to use that number to establish a loss to them.  That's what the

21  government is saying; you understand that?

22  A.   Yes.

23  Q.   But after your review of the testimony, New Century handed

24  these properties off.  They shouldn't even be in here claiming a

25  loss at all, should they?

1  A.  Well, I can't answer whether they should be or not.  I can

2  tell you that based on the record and the documents, they're not

3  in the chain of title such that any loss would normally be

4  attributed to them.

5  Q.  In summary, your review -- and I may have asked this, but

6  I'll do it again.  In your review of all of the documents and

7  records in this case, is it possible to determine who the

8  victims are?

9  A.  No.

10  Q.  Is it possible to determine an amount of victim loss?

11  A.  No.  It's impossible.

12  Q.  Is it possible to determine what the government would be

13  calling total loss, which was the difference between the loan

14  price, the loan amount, and the foreclosure sale price?  We have

15  those two prices, and the government is saying the difference

16  between the two is total loss.  But do we know whether or not

17  there was commercial reasonable sales on these foreclosure

18  sales?

19  A.  No.

20  Q.  And so that also means that this total loss that the

21  government is claiming cannot be accurately calculated?

22  A.  Correct.

23  Q.  And, therefore, the court should find or determine that

24  total loss simply cannot be found by a preponderance of the

25  evidence?

1  A.  No, you can't determine total loss.

2          MR. TREIMER:  Thank you.

3          That's all the questions I have.

4          THE COURT:  Mr. Keller?

5          MR. TREIMER:  Do you need any of my exhibits here?

6          MR. KELLER:  No.

7                    CROSS-EXAMINATION

8  BY MR. KELLER:

9  Q.  Good afternoon, Mr. Dunakey.

10  A.  Pardon me?

11  Q.  I said good afternoon.

12  A.  Good afternoon.

13  Q.  You've seen appendix A, which is a part of the PSR in this

14  case, listing the loss amounts and restitution amounts according

15  to the U.S. Probation office?

16  A.  Yes.

17  Q.  Regardless of all of the testimony you just gave, you don't

18  dispute the loan amounts listed in this chart, do you?

19  A.  No, I do not.

20  Q.  And you don't dispute the resale, foreclosure sale amounts

21  listed in this chart, do you?

22  A.  No, I do not.  I thought that one of them was a mistake, had

23  a slight dollar mistake, but I think it was corrected; but no, I

24  do not.

25  Q.  So you don't dispute that over a hundred thousand dollars on

1  all of these properties except -- approximately a hundred

2  thousand dollars on each of these properties was loaned,

3  correct?

4  A.   Can you repeat that, I'm sorry?

5  Q.   Approximately a hundred thousand dollars on each of these

6  properties was loaned initially, correct?

7  A.   Yes.   Initially I believe that, yes.

8  Q.   And approximately between 30 and 60 thousand dollars was

9  obtained at foreclosure sale on each of these properties,

10  correct?

11  A.   I would have to look and see what the total was on

12  foreclosure sale.   Whatever it was, it is.   I think the

13  sheriff's bid equaled $679,697, yes.

14  Q.   Mr. Dunakey, you're not testifying here today that the

15  foreclosure sale prices are the prices listed as the minimum

16  bids at sheriff's sale, are you?

17  A.   I'm sorry; what?

18  Q.   You're not testifying that the foreclosure sale prices

19  reflected in appendix A, which is in front of you on the

20  monitor, you're not testifying that those came from sheriff's

21  sale minimum bids, are you?

22  A.   Whatever they bid at the sheriff's sale is what they did

23  bid.   I don't know what you mean by "minimum bid," sir.

24  Q.   Mr. Dunakey, at sheriff's sale, the lender holds -- whoever

25  the owner is of the property, they set the minimum bid for

1  sheriff's sale, correct?

2  A.  Well, what they do is usually mail it in, you mail in a bid

3  and you put in a bid, whatever that can be.

4  Q.  Mr. Dunakey, the owner of the property, the company, the

5  individual that already owns the property, they're not paying

6  money at sheriff's sale for their own property, right?

7  A.  Oh, absolutely.  You're absolutely correct.

8  Q.  So the amounts listed in this chart aren't the sheriff's

9  sale minimum bids, are they?

10 A.  Again, you're using the term "minimum bid."  They send in --

11 sometimes these companies are required to bid the amount of the

12 balance of the mortgage.  Sometimes, depending on the lender,

13 they will get instructions to bid a certain amount, but it's not

14 a minimum bid.  They just send in an amount and, you're right,

15 but you're absolutely correct, that they're not parting with any

16 money.

17 Q.  Mr. Dunakey, these properties were sold as foreclosed

18 properties after sheriff's sale to Gearhead Properties, correct?

19 A.  Yes, yes, sir.

20 Q.  Gearhead Properties didn't buy them at sheriff's sale, did

21 they?

22 A.  No.  They did not, no.

23 Q.  They didn't come in and make a bid above the minimum bid,

24 did they?

25 A.  No, they did not.

1  Q.  So the amount recorded at sheriff's sale is an amount of

2  money that was never actually paid, correct?

3  A.  Absolutely correct.

4  Q.  You referred in your direct testimony to a company named

5  Carrington and its property address 710 West 61st Street.

6          Do you remember that?

7  A.  Yes.  I remember 710 West 61st Street, yes, No. 3 on the

8  spreadsheet, yes.

9  Q.  Well, you testified that that mortgage was satisfied in

10 full, correct?

11 A.  According to the records, yes.  If that's the one, yes,

12 uh-huh.

13 Q.  You've seen Defendant's Exhibit ES-16, correct?

14 A.  Yes.

15 Q.  And looking at the line for property 710 West 61st Street --

16 A.  Let me grab my -- for the record, that's No. 3 on the

17 spreadsheet in Exhibit No. 9, yes.

18 Q.  Do you see the notation there under comments, repurchased

19 from Carr. 2/1/07?

20 A.  Yes.

21 Q.  And you see a percentage in the second-to-last column of

22 price sold or seized?

23 A.  The 78 percent?

24 Q.  Correct.

25 A.  Yes, I see it.

1  Q.  You're not disputing that New Century sold these mortgages

2  to companies like Carrington or Morgan Stanley or EMC, are you?

3  A.  Well, it probably wouldn't have been EMC; but no, I'm not

4  disputing that they sold them at all, no.

5  Q.  And you are not disputing that when there were first

6  payment defaults, New Century was required by contract to buy

7  these mortgages or these income streams, however you want to

8  describe them, back from the people they had sold them to, are

9  you?

10  A.  Well, that's not quite a correct statement on your part.

11  There were triggering events whereby they had to because they

12  couldn't keep up with their payments, and so they -- they

13  weren't buying these mortgages back.

14  Q.  Have you reviewed the contracts for these specific

15  properties between New Century and the entities that they

16  sold --

17  A.  No.

18  Q.  -- the mortgages to?

19  A.  No.

20  Q.  Is it your understanding from the industry that if there's a

21  first payment default, a company like New Century who is the

22  initial lender who has already sold it to another company has to

23  pay them some price to compensate them for the fact that they

24  sold them a bad loan?

25  A.  There's agreements.  It depends on the lenders, but there's

1 agreements, yes.

2 Q.  And you don't know the details of the specific agreements on

3 these properties, do you?

4 A.  No, sir.

5 Q.  But New Century has provided us information, according to

6 their records and their agreements that you've reviewed, isn't

7 that correct?

8 A.  I haven't reviewed those agreements.

9 Q.  Well, you -- no, you haven't reviewed the agreements, but

10 you've reviewed the information provided by New Century showing

11 their losses, haven't you?

12 A.  Yes.

13 Q.  So the only basis you have today to dispute New Century's

14 figures is your general impression of the industry and case

15 studies that do not involve these specific properties or these

16 specific contracts, isn't that right?

17 A.  The point is you can't tell exactly what happened; but,

18 again, they're not buying these mortgages back.  They've already

19 sold this mortgage to FV-1.

20 Q.  Mr. Dunakey, my point is they sold the mortgage and then

21 there was the first payment default, and you don't know what the

22 effect of that first payment default was on New Century, do you?

23 A.  Again, no, I don't.

24 Q.  So you don't know whether New Century had to turn around and

25 pay $36,000.29 to JPMorgan or to Morgan Stanley for property

1  6302 Appomattox Avenue after there was a first payment default,

2  do you?

3  A.   That I do know.   They would not have had to pay that as a

4  result of 710 West, whatever it is, 61st Street.

5  Q.   Mr. Dunakey, I referenced property 6302 Appomattox Avenue.

6  You don't know whether New Century had to pay 36,000 dollars and

7  change as a result of the first payment default, do you?

8  A.   Again, it wouldn't have been as a result of the default of

9  that particular loan.   That's what you don't understand.

10  Q.   You haven't reviewed the contract between New Century and

11  whoever they sold these to, have you?

12  A.   No.

13  Q.   So you don't know what the effect of the first payment

14  default was in these specific cases, do you?

15  A.   No.   All I know is what the report found that was published

16  by the government commission.

17  Q.   But you don't know the details on these specific cases?

18  A.   No, I do not.

19  Q.   You talked a lot about FV-1 and how they were in all of

20  these title documents and deed documents, but that they're not

21  listed in the restitution chart and the PSR.

22           Do you remember testifying about that?

23  A.   Yes.

24  Q.   Now, you see that for every property that FV-1 is involved

25  in in the documents that you talked about, on appendix A, Bank

1  of America is listed on each of those properties as a victim.

2           Do you see that?

3  A.  Point that out to me again, would you, please?

4  Q.  In the victim column --

5  A.  Let me find that.

6           Okay.  Yes, I see that.

7  Q.  And you heard testimony from Special Agent Huber that Bank

8  of America purchased Morgan Stanley.  Morgan Stanley no longer

9  exists.  It has been subsumed into Bank of America, correct?

10  A.  I heard that testimony, yes.

11  Q.  Were you aware that FV-1 was a subsidiary of Morgan Stanley?

12  A.  I may have been, but not specifically, no.

13  Q.  Well, if FV-1 was a subsidiary of Morgan Stanley, then they

14  are represented as the victims in this case because Bank of

15  America bought Morgan Stanley and all of their subsidiaries,

16  correct?

17  A.  I've never seen any documentation as to that or that they

18  would have assumed any of either the liability or the ownership

19  on any of these.

20  Q.  You have no evidence to the contrary, correct?

21  A.  No, sir, I do not.

22  Q.  You also testified about Quantum Servicing and about the

23  fact that they were merely a servicer and so they wouldn't be

24  entitled to any restitution in this case, correct?

25  A.  It wouldn't appear that they would be entitled to any

1  restitution as a servicer.

2  Q.   And I believe you noted this, but on appendix A, there is no

3  restitution amount listed as being owed to Quantum Servicing, is

4  there?

5  A.   No.   That's why I mentioned that the indication was TBD, to

6  be determined.

7  Q.   And at this point there is no loss amount or restitution

8  amount listed as being owed to them?

9  A.   No.   The point is that they were listed as a victim.

10 Q.   You also testified on direct about a general pattern in the

11 industry that lenders would sell these bad mortgages off at any

12 price, isn't that right?

13 A.   No.   They only sold them off at a profit.

14 Q.   Well, you heard --

15 A.   You talking about the properties now or the mortgages?

16 Q.   I'm talking about the properties being sold at foreclosure

17 sale.

18 A.   There is, yes.   Okay, go ahead.

19 Q.   Just to be clear, your testimony on direct was to the effect

20 of, in the industry at this time, companies were selling

21 properties off at foreclosure in anticipation of bankruptcy at

22 any price, correct?

23 A.   They had an incentive to dump them, yes.

24 Q.   Did you talk to any -- in your preparation for testifying

25 here today, did you talk to any of the brokers that were

1  involved in the foreclosure sales in this case?

2  A.  No, I did not.

3  Q.  You referenced EMC, and I believe your testimony was that

4  EMC bought one of these properties.  It would have been --

5  A.  It's property No. 8 on the spreadsheet.  It's shown in your

6  Exhibit 2, and it's property 6232 Appomattox.

7  Q.  I believe you testified on direct that EMC is listed as

8  being the holder of the mortgage and is listed in the title

9  documents, but JPMorgan Chase is nowhere to be found, correct?

10  A.  I'm saying that EMC purchased the property at the sheriff's

11  sale and was granted the sheriff's deed.  They ended up getting

12  title to the property.

13  Q.  Did you review EMC's loan file for that specific property

14  that was introduced at trial in this case?

15  A.  No, I did not.

16  Q.  So do you know whether or not EMC actually owned that

17  property going into sheriff's sale and was merely listed because

18  the property reverted back to them at sheriff's sale?

19  A.  Not according to -- I did not review anything like that.  I

20  reviewed the records, and the records don't reveal that EMC had

21  any interest.

22  Q.  Well, the only record you reviewed was the sheriff sale --

23  or the record we're talking about right now is the sheriff's

24  sale document showing that EMC received the property at

25  sheriff's sale, correct?

1  A.  I received all of the documents relating to that property

2  that are of record.

3  Q.  But you can't tell me whether or not EMC owned that property

4  going into foreclosure -- or going into sheriff's sale, can you?

5  A.  Whether they owned the property?  They didn't own the

6  property going into the sheriff's sale.  The borrower did.

7  Q.  You can't tell me whether or not EMC held the mortgage for

8  that property going into sheriff's sale, held the note?

9  A.  No.  I can't tell you something that isn't of record that I

10  haven't reviewed, no.

11  Q.  But if they did and the property reverted back to them at

12  sheriff's sale, they would be listed on the sheriff's sale

13  document as being the owners, correct?

14  A.  They would have to -- I don't know of any way to answer

15  that.  I'm sorry.

16  Q.  In every single instance in this case in which a property

17  was not actually bought at sheriff's sale --

18  A.  There's only one of those, and that was a short sale.

19  Q.  Mr. Dunakey, you testified earlier that no money changed

20  hands in these properties at sheriff's sale when no one bid

21  above the minimum bid, right?

22  A.  Again, you're using minimum bid.  They ended up with them at

23  sheriff's sale.

24  Q.  There's a difference between sheriff's sale and a

25  foreclosure sale, correct?

1   A.   Explain it to me.

2   Q.   You testified earlier that Gearhead Properties who bought --

3   or Gearhead Company who bought these properties did not buy them

4   at sheriff's sale, correct?

5   A.   That's correct.

6   Q.   So who bought them at sheriff's sale?

7   A.   In one instance, it was Wells Fargo.  In one instance, it

8   was EMC, and in the other instances, it was FV-1, and in the

9   last instance, it was sold outside of sheriff's sale.

10  Q.   So for the instances where there are sheriff's sale

11  documents, you don't know whether those companies listed on the

12  sheriff's sales documents already held the mortgages going into

13  sheriff's sale, do you?

14  A.   Again, I don't know what isn't of record, no.  They

15  didn't -- EMC has no interest in this property, held any

16  mortgage or an assignment of mortgage at all with regard to that

17  property of record.  Now, if you have other documents that are

18  outside -- unrecorded documents, I'm unaware of them and so I

19  don't know.  They may have.  I agree with you, they may have;

20  but I don't know of them.

21  Q.   And if they did, going into sheriff's sale, if the property

22  does not sell at sheriff's sale, if no one bids on the property

23  or no one puts a bid that qualifies for sale, what happens to

24  the property then?

25  A.   I guess I've never thought about that.  I've never had it

1  happen.

2  Q.  In all of your experience in the real estate industry,

3  you've never had a bank foreclose on a property, go to sheriff's

4  sale and had that property revert to the bank because no one bid

5  high enough at sheriff's sale for the property?

6  A.  Sure.

7  Q.  So what happens in that instance?

8  A.  But there's a bid that's been placed.  They placed a bid.

9  Q.  What happens in the instance where no one bids high enough

10 to buy the property at sheriff's sale?  Does it revert back to

11 the holder of the mortgage, the bank, the lender?

12 A.  In that situation, the sheriff's sale would be -- the return

13 of execution on the sheriff's sale would say that it hasn't been

14 sold, and so the bank at that point would still have its

15 foreclosure decree indicating that they have foreclosed the

16 mortgage, but at that point they wouldn't have the title.

17 Q.  So it's your testimony today that banks loan money to people

18 to buy homes, knowing that if those people default on their

19 payments, the bank is going to lose title at a sheriff's sale?

20 That's your testimony?

21 A.  I'm sorry, honestly I don't understand the question.

22 Q.  Well, you just testified that at sheriff's sale, if no one

23 bids on the property, bids enough money to buy the property --

24 let's back up.

25          You're not saying that at sheriff's sale I can go and

1  bid $10 and if I'm the only bidder, I get that property, are

2  you?

3  A.   Yeah.

4  Q.   If it's a hundred thousand dollar property?

5  A.   Yes, I am saying that.

6  Q.   So there's no minimum bid at sheriff's sale?  I can walk

7  in --

8  A.   Unless the lender has sent a letter that indicates that I

9  bid -- and it depends on the lender.  If it's a Fannie Mae, the

10  lender has to bid the full amount.  They're required to.  So

11  that sheriff sale bid in that situation doesn't reflect true

12  market value at that point.  If you don't have that situation,

13  you'll see that they bid various amounts, usually to indicate

14  what they think the value is or have some reason to think what

15  the value is.  Sometimes, of course, what they're hoping is that

16  somebody goes and bids more than what they've bid.

17  Q.   Of course --

18  A.   And they track along the same lines then.

19  Q.   Of course, you and I are on the exact same page on this.

20  The point I'm trying to make is that these lenders set these

21  minimum bids according to what they're willing to accept because

22  they're the ones that hold the mortgage, right?  Walking into a

23  sheriff sale, if the bank has foreclosed and they have the title

24  to the property, they set a price that they're willing to accept

25  at sheriff's sale, right?

1   A.   That's correct.

2   Q.   Okay.  Now, if no one bids above that minimum price, the

3   property reverts back to the bank, right?

4   A.   Revert back?  They get it for that minimum bid.  It doesn't

5   revert back anywhere.

6   Q.   I'm not trying --

7   A.   They bought it at that amount.

8   Q.   They paid an additional minimum --

9   A.   No, no.  They bought it for -- because of the money that

10   they have coming.  They don't have to part with any money.

11   Q.   So no loan changes hands at a sheriff's sale if there is no

12   bid that exceeds the minimum bid that the lender has set?

13   A.   If the lender bids a certain amount by letter and nobody

14   bids higher, then they get it for that bid, yes.

15   Q.   And they don't have to spend any money on it?

16   A.   Absolutely, you're correct.

17   Q.   So that's not really a sale of the property, is it?

18   A.   Well, I don't know what you would call it because if --

19   Q.   It never changed hands.

20   A.   Of course, it changed hands.  Of course, it changed hands.

21   They didn't own the property, sir.

22   Q.   If Wells Fargo forecloses on my house --

23   A.   Yes.

24   Q.   -- and they have the deed, the title to my house --

25   A.   They don't have the title to your house.  They have a

1  mortgage on your house.  You have the title.  When they go to

2  the sheriff's sale and they bid and nobody else comes in and

3  bids more, then the property is struck off to Wells Fargo and

4  they get a deed and the property at that point is transferred to

5  them from you, in essence, by a court order and by law.

6  Q.  Because they held the mortgage on the property?

7  A.  That was their security, yes.

8  Q.  So in all of these properties that you reviewed involving

9  Wells Fargo, EMC, FV-1, you don't know whether or not those

10  entities held the mortgage on the properties going into

11  sheriff's sale, do you?

12  A.  I only know what the record shows, and they don't show of

13  record.  I only know what the record shows.  If you have some

14  secret documents that haven't been presented or some side deals,

15  I don't have them.  I'm sorry.  I only can tell you what the

16  records reflect.

17  Q.  Well, you also said that the records reflect many of these

18  properties were transferred for less than $500?

19  A.  What I said was that that's what they said the properties --

20  Q.  That's what the records reflect that you're referencing

21  right now, isn't it?

22  A.  Yes.

23  Q.  The same records that you're doubting the accuracy of?

24  A.  I'm not doubting the accuracy of any records, but what

25  records -- I don't know what you're talking about.

1  Q.  Didn't you testify on direct that if the property was listed

2  as having been transferred for less than $500, three things

3  could have happened; there could have been fraud --

4  A.  Uh-huh.

5  Q.  And where it wasn't listed for the accurate price?

6  A.  Yes.

7  Q.  Well, isn't that doubting the accuracy of the record?

8  A.  It's doubting the accuracy not of the record but what

9  happened behind the record.  I don't know what happened at that

10  point.

11  Q.  And if the property actually was sold for less than $500,

12  isn't that an almost total loss to whoever was holding a

13  mortgage to whoever had loaned the $108,000, $99,000, $101,700

14  on these properties?

15  A.  No, because the original lender wasn't the lender anymore.

16  Q.  But they have had to have paid something to obtain a

17  mortgage, to obtain the rights to the property, right?

18  A.  FV-1?

19  Q.  Whoever transferred these properties for less than $500,

20  according to your records, they had to acquire the property

21  somehow, right?

22  A.  Well, FV-1 sold the property to Consumer Solutions in that

23  example.

24  Q.  Not for less than $500, so that's not the example that I'm

25  talking about.

1  A.  Remember, FV-1 was the purchaser of that property at the

2  sheriff's sale for $63,000.

3  Q.  Regardless of all of this dispute, Mr. Dunakey, about who

4  owned the property, who owned the mortgage, who was entitled to

5  the income stream walking into sheriff's sale, who walked out of

6  sheriff's sale with the property and then what it was sold for

7  at foreclosure sale, all of those factors deal with which

8  different companies sustained different amounts of losses along

9  the chain, correct?

10  A.  I can't answer that.  I can only tell you what the records

11  reflect, sir.

12  Q.  You've provided several opinions on direct based on

13  Mr. Treimer's questions.  You can't give me an opinion based on

14  my questions?

15  A.  Restate the question then.  I would be glad to.

16  Q.  The dispute that you and I are having over who held the

17  mortgage walking into sheriff's sale, how they acquired the

18  mortgage going into sheriff's sale, how many different times the

19  mortgage changed hands after the initial loan from New Century,

20  all of that information is only relevant to which companies paid

21  what for these mortgages and how much they sold them for and

22  what each company suffered as a loss along the way, right?

23  A.  Again, a lot of times you can't tell who suffered the loss

24  when they say consideration for less than 500.  If they weren't

25  lying and something was paid, then we don't know what that

1    amount was that was paid.

2    Q.  But you've already testified that you agree the loans on all

3    of these properties are as reflected in appendix A?

4    A.  Pardon me?

5    Q.  You agree that the loan amounts in appendix A --

6    A.  Yes.

7    Q.  And you agree that the foreclosure sale amounts in appendix

8    A are accurate?

9    A.  That's what the records would reflect, yes.

10   Q.  Well, looking at the first one as an example, 6224

11   Appomattox, if $108,000 was loaned on the property and if it was

12   later sold for $50,000, at some point someone lost $58,000,

13   right?

14   A.  It would appear that way, sure, but --

15   Q.  No further questions.

16   A.  -- you don't know who that person is.

17          MR. KELLER:  Thank you, Mr. Dunakey.

18          No further questions.

19          MR. TREIMER:  I'll be brief.

20                        REDIRECT EXAMINATION

21   BY MR. TREIMER:

22   Q.  Mr. Dunakey, Iowa has a reputation about its land records,

23   correct?

24   A.  About --

25   Q.  The land recording system.

1  A.  Yes, it does have a reputation.

2  Q.  And what is that reputation?

3  A.  For years, going back a long time, it has had the reputation

4  as having the best title and as a result of those title records

5  in the nation.  That's one of the reasons that we have a law

6  prohibiting the sale of title insurance in the state.

7  Q.  And why we have that good reputation is because we record

8  documents here in Iowa?

9  A.  Yes, they have to be recorded.  Unlike a title insurance

10 state, we can't rely on any documents that are outside the chain

11 of title.

12 Q.  And so it's very important that a company record their

13 documents if they've got property in Iowa?

14 A.  Yes.

15 Q.  And when a person wants to buy or sell property, attorneys

16 for buyers or sellers, they look to the Iowa recorded property

17 records?

18 A.  Yes.

19 Q.  And that shows up in the form of an abstract?

20 A.  Yes.  If it is -- we have a statute that if the document

21 isn't properly recorded, it's not entitled to constructive

22 notice.

23 Q.  And so with regard to your prior testimony, it's what's in

24 the recorded documents for a piece of property that count, is

25 that correct?

1  A.  That's correct, and that's all I've had to look at.  I

2  haven't been provided with any other documents by you or anyone

3  else.

4  Q.  And it's been your testimony that Lehman, REO, JPMorgan

5  Chase, Bank of America, New Century, they don't show up in these

6  record chain of titles of the property and the mortgages?

7  A.  No.  I mean, they show up -- like New Century shows up as

8  the original mortgage lender.

9  Q.  Yes, but then it's transferred --

10  A.  It's transferred out.  They have no interest after that of

11  record.

12  Q.  And is it your opinion that this court should give no

13  credence to the restitution claims made by New Century, Bank of

14  America, JPMorgan Chase, Lehman because they did not comply with

15  the Iowa recording laws?

16  A.  I could only say that if that's what the law is and what the

17  court looks at.  I mean, based on the record, they're not

18  listed -- you know, they can't -- they don't have any standing

19  to be a victim.

20          MR. TREIMER:  Thank you.

21          MR. KELLER:  Nothing further, Your Honor.

22          THE COURT:  Mr. Dunakey, I want to make sure I

23  understand your opinions, and I think I tracked what you're

24  telling me with regard to restitution.  This court also has an

25  obligation to determine the loss amount in the case, with or

1  without regard to restitution.  Are you telling me that if a

2  property has a remaining loan balance of $100,000 at the time of

3  a foreclosure and it sold for $50,000, that no one has

4  experienced a loss?  You're not telling me that, are you?

5          THE WITNESS:  Somebody --

6          THE COURT:  Somebody has?

7          THE WITNESS:  Somebody appears to have lost money, but

8  it may not be any of the people in the chain of title in that,

9  though, because of the leverage that they had and they sold it a

10 number of times.

11         THE COURT:  I understand.

12         THE WITNESS:  Okay.

13         THE COURT:  But the point of my question is that

14 someone has experienced a loss at that point in time?  We might

15 quibble about how much it is, but someone has experienced a loss

16 just because it was sold for less than the loan value?

17         THE WITNESS:  That money is now gone to somebody.  It

18 might be a retirement fund in Kentucky --

19         THE COURT:  Okay.

20         THE WITNESS:  -- that really is the victim.

21         THE COURT:  And do I also understand your testimony is

22 you're suggesting that at least with regard to some, if not all,

23 of these loss numbers, your concern is that you do not believe

24 that they were necessarily sold at a commercially reasonable

25 transaction?

1          THE WITNESS:  That would be my belief because in the

2   industry that's been the case.

3          THE COURT:  But you're not offering me an opinion as

4   to any of these properties about what would have been a

5   commercially reasonable amount?

6          THE WITNESS:  No, I am not.  I have no way of knowing,

7   sir.

8          THE COURT:  And if you have no way of knowing what

9   would be a commercially reasonable amount, how would you know

10  that this is not?

11         THE WITNESS:  Well, for one, because of the deep

12  discounts that appear to have happened.  Again, now for the

13  first time I saw pictures, the exhibits that Agent Huber talked

14  about, testified about, there were some pictures of some

15  properties.  But to the extent of the discount, when the

16  discount in the market for distressed properties on REO, the

17  lender should usually -- and I can't say specifically with

18  regard to a particular property that's one of these nine.  They

19  usually should get about 80 percent of the assessed value.

20         THE COURT:  All right.  Thank you, sir.

21         Counsel, any questions following up to mine?  We'll

22  start with David.

23         MR. TREIMER:  In light of that, Your Honor, I have one

24  exhibit.

25

1                      FURTHER REDIRECT EXAMINATION

2   BY MR. TREIMER:

3   Q.  Mr. Dunakey, I'm showing you what has been marked as

4   Defendant's Exhibit ES-11.  When we talked about -- you just

5   talked about with Judge Gritzner selling the property for 80

6   percent of the assessed value.  We had prepared this chart

7   previous based upon the foreclosure sale price to Gearhead and

8   the 2008 assessed value.

9   A.  Yes.

10   Q.  And you remember reviewing that?

11   A.  Yes, sir.

12   Q.  And I want to point out on line No. 3, which was the 710,

13   that property was sold on short sale by Wells Fargo, and the

14   variation from the assessed value was about 26 percent?

15   A.  Yes.

16   Q.  Now, look at the other values for the other eight

17   foreclosure sales.

18   A.  Yes.

19   Q.  Notice the percentage?

20   A.  Notice what, sir?

21   Q.  What is the average percentage I guess?

22   A.  Well, you've apparently included that property in the

23   average percent, but the average percent is 43.37 percent.

24   Q.  And is it your testimony that from your experience that

25   percentage should not be that high?  It should be more in the

1  neighborhood of 18 to 20 percent, is that correct?

2  A.  It should be -- I didn't mention 18.  It should be in the

3  neighborhood of 20 percent, and, you know, there would be

4  reasons, factors as to why these properties would have been

5  treated differently.

6  Q.  And just from the raw statistics that we have here, you

7  could only speak in generalities, is that correct?

8  A.  Absolutely.

9  Q.  And speaking in generalities, this appears abnormal?

10  A.  Yes, it does.

11          MR. TREIMER:  Thank you.

12          That's all I have.

13          THE COURT:  Mr. Keller.

14              FURTHER RECROSS-EXAMINATION

15  BY MR. KELLER:

16  Q.  And 80 percent of assessed value, that's an average that

17  you're citing from the industry?

18  A.  Yes.

19  Q.  So an average requires that there be some that were sold for

20  less than that, some that were sold for more than that, right?

21  A.  Yes, sir.

22  Q.  And if you have ten or more properties foreclosed upon in

23  the same neighborhood on the same block, it's going to further

24  depress prices than the average price, isn't that right?

25  A.  It sure could.

1  Q.  And if you have properties that have been stripped of all

2  cabinets, fixtures, toilets, heaters, air-conditioners, that's

3  likely to further depress prices below the average, isn't it?

4  A.  Yes.  And the reason for that is that if the seller has no

5  incentive to maintain the properties and they're stripped and

6  the value goes down, that's what happens.  That's one of the

7  reasons why these properties didn't sell for as much.  You have

8  lenders that weren't interested in maintaining the property.

9  Q.  So you're not testifying that with regard to these specific

10 properties that based on the information regarding these

11 specific properties, that the foreclosure sale prices do not

12 reflect a market transaction, are you?

13 A.  You're talking about -- when you talk about foreclosure sale

14 price, do you mean the price it was sold to Gearhead where one

15 person bought them all?

16 Q.  That's correct.

17 A.  And so what was the question about that?

18 Q.  You were testifying as to industry averages.  You're not

19 testifying that these properties were not sold for what the

20 market called for, are you?

21 A.  I don't know.  It doesn't appear that they were.

22 Q.  You don't know; that's the answer, right?

23 A.  That's correct.

24      MR. KELLER:  Nothing further.

25      MR. TREIMER:  Nothing further.

```
 1            THE COURT:  You may step down, sir.

 2                                  (Witness excused.)

 3            THE COURT:  Further evidence, Mr. Treimer?

 4            MR. TREIMER:  No, Your Honor.

 5            THE COURT:  Further evidence from the government,

 6   Mr. Keller?

 7              MR. KELLER:  May I have a moment, Your Honor?

 8            THE COURT:  Yes.

 9            (Pause.)

10            MR. KELLER:  Yes, Your Honor.  The government recalls

11   Special Agent Huber.

12   JEFFREY S. HUBER, GOVERNMENT'S WITNESS RECALLED, PREVIOUSLY

13   SWORN

14            THE COURT:  You're still under oath.

15            THE WITNESS:  Thank you.

16                         DIRECT EXAMINATION

17   BY MR. KELLER:

18   Q.  Special Agent Huber, did you review the loan files for each

19   of these properties in preparation for trial?

20   A.  I did.

21   Q.  Did you also review the Scott County documents reflecting

22   what happened at sheriff's sale and at the foreclosure sales?

23   A.  I did.

24   Q.  For the properties that were referenced by Mr. Dunakey

25   involving FV-1, at some point was FV-1 either purchased by
```

1   Morgan Stanley or were they a subsidiary of Morgan Stanley?

2   A.   Based upon the 10Q report filing, SEC filing for Morgan

3   Stanley, FV-1 was a subsidiary of Morgan Stanley, which then in

4   turn was purchased subsequent to all of this foreclosure

5   information by Bank of America.

6   Q.   So if Morgan Stanley's subsidiary was involved in the chain

7   of title for these properties and then Bank of America bought

8   Morgan Stanley long after the foreclosure sales occurred,

9   there's no reason that Bank of America would be listed in the

10  chain of title, correct?

11  A.   No, they wouldn't be in the chain of title because at the

12  time of foreclosure, they didn't own Morgan Stanley, but

13  subsequent to they did.

14  Q.   And with regard to EMC, were they purchased subsequent to

15  the foreclosure sale by JPMorgan Chase?

16  A.   That's correct.

17  Q.   So, again, there's no reason that JPMorgan Chase would be

18  listed in the chain of title?

19  A.   No reason whatsoever because at the time of foreclosure they

20  were not owned by JPMorgan.

21  Q.   And based on your review of the loan files, did EMC and the

22  other lenders in this case own these properties or hold the

23  mortgages for these properties going into sheriff's sale?

24  A.   In the particular case of EMC, regardless if there was a

25  clerical error or not, the loan documents that I obtained in

1  this investigation regarding to the property that was in

2  question with EMC, we obtained the loan documents from EMC

3  directly via subpoena, and it shows that the loan was

4  transferred to EMC.

5  Q.  Prior to the date of the sheriff's sale, correct?

6  A.  Correct.

7           MR. KELLER:  Nothing further, Your Honor.

8           THE COURT:  Mr. Treimer?

9                    CROSS-EXAMINATION

10 BY MR. TREIMER:

11 Q.  Mr. Huber, did you talk personally with anyone from FV-1?

12 A.  FV-1 doesn't exist anymore, sir, no.

13 Q.  Back when you started this investigation, back in 2008?

14 A.  In 2007.

15 Q.  Or 2007, and they existed back then?

16 A.  They did.

17 Q.  And they were in the chain of title, New Century mortgages

18 was in the chain of title in 2008?

19 A.  Correct.

20 Q.  Did you try to contact them --

21 A.  You have to realize that during the first couple of years of

22 the investigation, we were determining if there was a crime.  We

23 weren't trying to track down victims and everything.  There was

24 a lot of other -- we didn't start this process until 2010, and

25 they did not exist then.

1  Q.  And do you know how many FV-1s there were across the

2  country?

3  A.  FV-1s; what do you mean?

4  Q.  I mean, they filed bankruptcy.

5  A.  Okay.

6  Q.  Do you know how many different office locations they had?

7  A.  I do not, no.

8          MR. TREIMER:  That's all the questions I have.

9          THE COURT:  Anything further?

10          MR. KELLER:  No, Your Honor.

11          THE COURT:  You may step down, Agent.

12          THE WITNESS:  Thank you.

13                          (Witness excused.)

14          THE COURT:  Does that complete the government's

15  evidence, Mr. Keller?

16          MR. KELLER:  Yes, Your Honor.

17          THE COURT:  All right.  We have a number of issues

18  with regard to calculation of the guideline range.  Let's start

19  with the determination of the loss amount.  And do you wish to

20  provide any further argument on that at this time?

21          MR. KELLER:  Yes, Your Honor.

22          THE COURT:  Do it.

23          MR. KELLER:  Actual loss as described by the Eighth

24  Circuit case law, as well as cases from other circuits, in cases

25  involving mortgage fraud is determined by subtracting the

1  foreclosure sale price from the outstanding loan balance.  That

2  is what is reflected in appendix A to the presentence

3  investigation report, and there has been no testimony given that

4  undermines those foreclosure sale prices or that loss

5  calculation for these specific properties, regardless of general

6  testimony that was provided about the state of the industry at

7  that time.

8         As to restitution -- or should opposing counsel be

9  given a chance to respond on each issue?

10        THE COURT:  Go ahead and refer to that as well.

11        MR. KELLER:  As to restitution, Your Honor, the

12  amounts provided in appendix A are the amounts provided by New

13  Century and Bank of America, both of whom are documented in the

14  loan files as being involved with these loans.  New Century,

15  there's been no dispute about the fact that New Century was the

16  initial lender on these loans.  They loaned out $108,000, for

17  example, on several of these properties.  There was then a first

18  payment default.  They had to buy the properties back, according

19  to Special Agent Huber's testimony and according to

20  representatives of the New Century Liquidating Trust, and

21  because they couldn't afford to buy them back for the full

22  amount of the mortgage, the full $108,000, the company that they

23  had sold them to, Morgan Stanley, because they didn't want to

24  just have to write off a total loss, they said, okay, we'll

25  negotiate, you pay us 33 percent of the outstanding loan

1  balance, and we'll keep the loans on our warehouse lines instead

2  of pushing them back on you.

3          So New Century paid the 33 percent as reflected in

4  appendix A, and those are the restitution amounts listed.

5          THE COURT:  What is the basis of proof that they

6  actually made the payment?

7          MR. KELLER:  The documentation supplied by the

8  liquidating trust.  When victims submit records as to what they

9  paid involving a case, that is the evidence, Your Honor.  These

10  are documents and amounts submitted from the victim based on

11  records.  Unless the court thinks they're just completely

12  fabricated, that is the evidence for the court to rely upon.

13          In addition, on restitution, the defendant is the

14  beneficiary of the fact that many of the victims in this case

15  are not accounted for in appendix A.  The restitution amounts

16  listed on six of the -- or seven of these nine properties are

17  significantly lower than the loss amount, than the amount that

18  you arrive at by subtracting the foreclosure sales price from

19  the outstanding loan balance.  Even Mr. Dunakey admitted that

20  somebody lost that money, that difference between the

21  outstanding loan balance and the foreclosure sale price.

22          The reason why the restitution amounts don't add up to

23  that is because we weren't able to track down everybody that was

24  involved in these properties and that may have a loss.  The

25  defendant is the benefactor of that, and we're not trying to say

1  that he should pay a restitution amount to people that we can't

2  identify, but the people that we can identify who supplied

3  restitution amounts which are lower than the difference between

4  the foreclosure sale price and the outstanding loan balance are

5  entitled to restitution, and the court has been presented with

6  evidence that those are the loss amounts that those entities

7  suffered.

8       Does the court wish me to move on to abuse of trust

9  and sophisticated means?

10       THE COURT:  No.  I want to hear from Mr. Treimer

11  first.

12       MR. TREIMER:  Thank you, Your Honor.

13       You know, this case is difficult to decide both loss

14  and restitution.  I think after Mr. Dunakey's testimony, yes,

15  somebody, some people have suffered loss, clearly.  Now, was

16  that loss intended by Mr. Engelmann?  No.  Was that amount of

17  loss reasonably foreseeable at the time of these closings?  No.

18  But my argument is, as Mr. Dunakey said, that we can't really

19  put a handle on what this actual guideline loss is.  We know

20  it's in this range.  We believe -- the government believes the

21  foreclosure sale price to Gearhead Properties was -- the

22  government says it was commercially reasonable.  Our opinion is

23  it may, but it may not be, and that the government -- and that

24  this court shouldn't rely on it, which is totally different than

25  restitution.

1           Again, as the government just indicated, you know,

2    they haven't identified all of the victims, and as the

3    guidelines provide, that when it comes to restitution and under

4    the Code, 3661, when it becomes so difficult for the court to

5    assess the dollar determination and assess the victims, the

6    court doesn't have to impose restitution.

7           Now, what is so interesting in this case is that it's

8    big corporations that have manipulated the mortgage market that

9    are now coming in through the government whining, we're victims,

10   pay us money.  I say no.  The guidelines provide an alternative,

11   as I pointed out in my sentencing brief, that when it becomes

12   too difficult, the court can go assess restitution as to what

13   Mr. Engelmann gained from these nine transactions.

14   Mr. Engelmann gained $4,455.  That was his fees for closings,

15   and that was for doing the abstract work.  And, Your Honor,

16   that's what restitution should be in this case is $4,455.

17          Again, backing up to loss, I don't think the court has

18   to make a loss determination.  I would suggest that it's too

19   difficult; but in any event, what would be reasonably

20   foreseeable would be well less than $200,000, if the court can

21   even draw those conclusions.  I'll leave that up to you, Your

22   Honor.

23          THE COURT:  All right.  The court in determining the

24   loss amount looks at either the intended or the actual loss.  In

25   the process of doing that, the court is not required to make a

1  specific determination of a dollar amount but rather to obtain a

2  reasonable determination on the record in the case.  In this

3  particular case, the proposed total loss of 470,000 dollars and

4  some change is a significant number because under the guideline

5  calculation system, it just barely gets into a 14-level

6  increase.  On the record that I have before me, I think there is

7  reasonable question on the issue of the commercial

8  reasonableness of the transactions.  I think the law is clear

9  that I can look at the loan balance and compare that to the

10  amount of the sale and determine a loss amount from that.  When

11  I'm calling it this close and there are two levels of

12  enhancement based upon the call, I am absolutely comfortable

13  that it is in excess of 200,000.  I am not absolutely

14  comfortable that it is in excess of 400,000.

15          Accordingly, I'm going to find that it is between 200

16  and 400 thousand; and, therefore, that is an increase of 12

17  rather than 14 in the calculation of the guidelines.

18          I am satisfied on this record and on the law behind

19  calculating the kind of loss amount that I'm completely

20  comfortable with that range, but I think it's difficult for the

21  court to find by a preponderance of the evidence that the loss

22  amount in this case actually exceeds the $400,000 level, and I

23  won't do that.

24          With regard to restitution, I am going to defer the

25  determination of the restitution amount for one week.  Counsel

1   may provide me with supplemental briefs if they want to during

2   that period of time; but based upon the record that I have

3   before me, I am not prepared to actually order a restitution

4   figure this afternoon.  If you wish to supplement the record

5   between now and a week from now, you're free to do so at your

6   own convenience, but we will address restitution separately from

7   all of the other issues here today.

8          Now, with that, we have some other enhancements that

9   the government needs to address.

10          MR. KELLER:  Yes, Your Honor.  As we briefed --

11          THE COURT:  Okay.  Go ahead.

12          MR. KELLER:  As we briefed, sophisticated means is the

13   first enhancement to be dealt with in this case.  The case law

14   of United States versus Edelmann and United States versus

15   Halloran is clear that schemes involving multiple transactions,

16   numerous fraudulent documents, exploitation of multiple victims,

17   cases involving more than just a single fraudulent act are cases

18   where application of the sophisticated means enhancement is

19   appropriate.

20          As the court is aware from trial in this case, this

21   case involves nine different properties, nine different

22   transactions, nine different bogus contracts, nine different

23   addenda, and nine different examples where Mr. Engelmann

24   directed his secretary to conceal the kickbacks from Excel Title

25   and derivatively from the lender.  The use of those documents,

1   the execution of fraudulent HUD-1 documents required

2   participation of several professionals in order to execute this

3   scheme.  It required a mortgage broker who was in on the deal, a

4   real estate agent who was in on the deal in the initial

5   transactions, lawyers for the buyers and sellers.  This was not

6   garden variety fraud, Your Honor.  This was a fraud involving

7   industry specific knowledge, industry specific jargon, bogus

8   contracts, concealed second contracts, real estate addenda, and

9   an attorney who used his position to further facilitate and

10  conceal the fraud.

11          As the court is aware, the court doesn't have to find

12  Mr. Engelmann personally employed sophisticated means, and the

13  government is aware that the only documents that he drafted were

14  the transactions summary sheets that he sent to Excel Title, but

15  the court is to assess the sophisticated means enhancement based

16  on the nature of the scheme as a whole.  Every other defendant

17  who has been sentenced in this case has had the sophisticated

18  means enhancement applied.  It's appropriate in this case

19  clearly.

20          Would the court like me to move on to the next issue

21  or allow Mr. Treimer to respond?

22          THE COURT:  I think for the record it would be better

23  if we do them one by one.

24          Mr. Treimer.

25          MR. TREIMER:  Thank you, Your Honor.

1          Again, we take difference with the government.  This

2    is anything but a sophisticated means case and especially when

3    you come and look at Mr. Engelmann's participation in this.  It

4    was a licensed real estate broker, was a mortgage appraiser, two

5    buyers and a mortgage broker.  That's who got together.  That's

6    where the conspiracy started, long before Engelmann joined in.

7    And Mr. Keller refers to all of these -- in his sentencing

8    memorandum, he says numerous fraudulent documents chock-full of

9    real estate jargon and legalese were used to perpetrate and

10   conceal this fraud on a repeated basis.  All of the documents

11   that I looked at in the 30-some thousand pages, like the loan

12   applications, those are standard documents.  The mortgages,

13   they're standard documents.  The promissory notes, they're

14   standard documents.  The appraisers' reports were on standard

15   appraisal reports.

16          The only fraudulent document that I guess you could

17   call fraud would be the false HUD-1, which was a standard form,

18   and the declaration of value, two documents.  That's what this

19   case is about.  There was no legal jargon in any of these

20   documents.  I don't know exactly what Mr. Keller is referring to

21   about chock-full of real estate jargon; but the point is this is

22   about as simple of a mortgage fraud as mortgage fraud can be.  I

23   mean, everybody used their correct names, they used their

24   correct addresses, they used their correct Social Security

25   numbers, they used their correct phone numbers.  The complexity

1    is not there.  The simplicity -- and perhaps that's why it

2    worked; it's so simple, not complex.  And I believe the

3    enhancement for sophisticated means simply is not applicable in

4    this case.

5              MR. KELLER:  May I respond, Your Honor?

6              THE COURT:  No.  You've given me a brief.  I have the

7    information that I need.

8              The defendant stands convicted of conspiracy, as well

9    as the other counts, and is responsible for the relevant conduct

10   of others that was foreseeable to him.  Both because of the

11   information he had about the nature of the transaction and his

12   expertise as a real estate attorney, the defendant could

13   reasonably foresee the scope of the entire conspiracy at least

14   with regard to the properties at issue in this particular case.

15             Focusing on the entire conspiracy, the court has no

16   difficulty finding that the transactions sufficiently were

17   sophisticated enough to support the enhancement under the law of

18   this circuit.  In addition, the defendant not only provided the

19   assurances that are inherent in his role as an officer of the

20   court, but he provided the expertise to know the nature of the

21   documents that would be necessary to further the scheme.  The

22   objection is overruled and the enhancement must be applied.

23             The government's view on abuse of position of public

24   trust?

25             MR. KELLER:  Yes, Your Honor.  The case law on abuse

1   of trust is clear.  United States versus Kieffer, which is an

2   Eighth Circuit case from 2010, a licensed attorney generally

3   holds a position of public trust.  United States versus Goldman,

4   an Eighth Circuit case from 2006, a defendant acting in his

5   capacity as an attorney occupies a position of public trust.

6   And, again, from United States versus Goldman, use of knowledge

7   gained as an attorney to commit a crime subjects the defendant

8   to an enhancement for abuse of a position of trust under

9   U.S.S.G., Section 3B1.3.

10          Mr. Engelmann was an attorney.  He was acting in his

11   capacity as an attorney in this case.  Mr. Laures came to him

12   unsure of these transactions.  Mr. Engelmann had the knowledge

13   that these were fraudulent transactions, that these weren't

14   structured in a normal way, and yet instead of telling

15   Mr. Laures that he shouldn't do the transactions this way,

16   instead of putting a stop to this whole chain of real estate

17   fraud, Mr. Engelmann enabled the fraud.  He told Mr. Laures it's

18   fine to do them this way, we'll do them this way.  He showed up

19   at closings.  He counseled Mr. Laures to sign fraudulent HUD-1

20   documents in his role as a closing attorney.

21          The enhancement for abuse of position of trust should

22   apply in this case both because of the violation of the trust

23   that Mr. Laures placed in Mr. Engelmann as his attorney but also

24   because of the violation of the public trust that occurred

25   because Mr. Engelmann was licensed to practice in both Iowa and

1   Illinois, and the case law is clear on this point, Your Honor.

2            THE COURT:  Mr. Treimer, on that issue, please?

3            MR. TREIMER:  Thank you.

4            As I pointed out in the sentencing memorandum, for the

5   abuse of a position of trust, the government must prove two

6   things:  First, that the defendant did occupy a position of

7   trust; and, second, more importantly, use that position to

8   significantly facilitate the fraud.  And there's where I believe

9   the government fails.

10           I remember the testimony of Pam Schuldt where I asked

11  her, now, if Mr. Laures hadn't gone to Mr. Engelmann to assist

12  in these closings, would Excel Title have prepared the

13  documents?  And her answer was, yes, they would have and they

14  would have billed her for it -- billed Mr. Laures for those

15  documents and preparation.

16           My point being that what Mr. Engelmann did, yes, he

17  provided for his client to sign a false document; but if you

18  also remember the testimony, Mr. Engelmann testified that he had

19  told Laures that, you know, it's important that the lenders know

20  about this.

21           Now, where does this position of trust, to whom does

22  it lie?  Is it the lender?  No.  The seller's attorney when he

23  goes into a closing doesn't know who the lender is until either

24  the preliminary draft HUD-1 comes out or you get to the closing.

25  There was no privity of contract between Engelmann and the

1  lenders in this case.  There was no, what I would say -- there

2  would be no lender saying, oh, yeah, Marc Engelmann, he's

3  representing us, too, as well as Excel Title.

4           As the Septon case from '09 points out, it is fact

5  intensive because it turns on the precise relationship between

6  the defendant and his victims and, therefore, cannot be decided

7  on the basis of generalities, such as lawyers and doctors occupy

8  positions of trust but bank tellers and insurance agents do not.

9  That's a 2009 Eighth Circuit case.  And what I'm saying to you,

10 Your Honor, is that when you look at all of the facts, because

11 it's fact intensive, there isn't enough to establish an abuse of

12 a position of trust.

13          THE COURT:  Mr. Engelmann would have taken an oath as

14 an Iowa lawyer to faithfully and ethically discharge the duties

15 required by Iowa lawyers.  It is axiomatic that one of those

16 duties is to avoid violating a criminal law.  Of specific

17 relevance here the defendant was, thus, also bound to follow the

18 rule of professional conduct 32:1.2(d) to not counsel or assist

19 a client to engage in conduct that the lawyer knows is criminal

20 or fraudulent and rule 32:4.1 to not knowingly make a false

21 statement of material fact to a third person.

22          He did that.  The defendant was in a position of

23 trust.  That trust was violated.  It sufficiently facilitated

24 the fraud in this case.  That enhancement does apply.

25          The issue of role in the conspiracy, Mr. Treimer,

1  you'll go first on that one.

2          MR. TREIMER:   Thank you.

3          As you know, the guidelines provide for up to a

4  four-level decrease in the offense level if the defendant was a

5  minimal participant in the criminal activity.   The guidelines

6  also provide that participation reduction is intended for the

7  defendants who, quote, lack knowledge or understanding of the

8  scope and the structure of the conspiratorial conduct and

9  culpability, one that is substantially less culpable.   What I'm

10  saying is that Mr. Engelmann is substantially less culpable in

11  this conspiratorial ring, so to speak, because, No. 1, he didn't

12  generate the side agreement.   No. 2, he didn't participate in

13  the signing.   He didn't participate in negotiating the sale,

14  actual sales price or the inflated price.   He had no knowledge

15  of the inflated appraisals on these properties, that they were

16  inflated.   There was no trial testimony saying that

17  Mr. Engelmann knew that the appraisals were bogus.   And, of

18  course, Mr. Engelmann would have no reason to contact the

19  mortgage broker who acquired the mortgage underwriting and

20  forwarded it on.

21          So as you can see, what Engelmann did, what came in at

22  the very end of these transactions -- and there were only six

23  weeks for all nine transactions.   They were years ago.   So he

24  didn't have all of this other knowledge available to him.   So I

25  think the court can find that he played a minimum role because,

1  as Pam Schuldt testified to, they, outside of him, would have

2  prepared the documents had Laures asked them to.  So but for all

3  of these other people, it finally got to Engelmann, and all of

4  these other people were the real conspirators in this case.

5          Thank you.

6          THE COURT:  Mr. Keller.

7          MR. KELLER:  Your Honor, Mr. Engelmann is charged with

8  the nine transactions with which he was involved and then also

9  the conspiracy.  He was central to the transactions that he was

10 involved in.  Mr. Laures went to Mr. Engelmann to decide whether

11 or not to go through with these transactions, if they were good

12 transactions.  Mr. Hanneken testified that had Mr. Engelmann

13 pointed out the problems with the transactions, the fraudulent

14 nature of the transactions, he wouldn't have done them.  These

15 transactions would not have occurred but for Mr. Engelmann's

16 participation, his enabling of these transactions.

17          None of the defendants in this case have been given

18 either aggravating or mitigating roles to this point.

19 Mr. Engelmann was at every closing.  He was intimately familiar

20 with the relevant facts, which was that there was a purchase

21 price that was listed on the HUD and an actual price that was

22 actually paid, and there were kickbacks.  Mr. Treimer's argument

23 on this issue is a rehash of the issues at trial or the defense

24 at trial that Mr. Engelmann didn't know the values were

25 inflated, that Mr. Engelmann had no reason to tell the lenders;

1  but Mr. Engelmann was convicted of fraud, intent to deceive.  He

2  was convicted of conspiracy.  The conviction stands.

3  Mr. Engelmann knew what he was doing.  He engaged in conduct

4  knowingly.  He was familiar with all of the facts and he was

5  necessary to these transactions.  There's no basis for a

6  mitigating role reduction in this case.

7          THE COURT:  All right.  Thank you, Counsel.

8          I'm satisfied on this record that the court can

9  conclude that the defendant knew and appreciated the nature of

10  what was going on, therefore, the nature of the conspiracy, that

11  he understood the impact of the false statements to others, that

12  he created pivotal documents to assist in the conspiracy and to

13  mask the true facts of what was happening, was the most

14  qualified person in the scenario to appreciate the wrongfulness

15  of the conduct, and possessed a professional responsibility not

16  to engage or assist in such conduct.

17          While others could be used as more culpable, the

18  defendant's culpability in promoting the crime was too

19  substantial to warrant a minor role reduction.  Therefore, there

20  will be no reduction with regard to role.

21          Mr. Keller, the last issue is obstruction of justice.

22          MR. KELLER:  Yes, Your Honor.  On this issue the

23  government has pointed out numerous points in the trial

24  testimony where Mr. Engelmann testified falsely to a material

25  matter and his testimony was willful.  As the court is aware,

1  those are the required elements for perjury.  That's what the

2  court must find in order to find that Mr. Engelmann obstructed

3  justice.  Here he testified on numerous occasions that Excel

4  Title was aware of the kickbacks and the dual prices in this

5  case and that Excel Title instructed him not to include those

6  numbers on the HUD and the documents that he sent to Excel

7  Title.  That was in large part the defense, the good faith

8  defense, that Excel Title told him this.  That is directly

9  contradicted by the jury's finding of guilt.  It's also

10  contradicted by numerous witnesses from Excel Title and

11  Mr. Engelmann's own secretary, Cathy Gockel, who testified at

12  trial that Mr. Engelmann instructed her to leave off the

13  kickbacks and the actual lower sales prices on the documents

14  that were sent to Excel Title.

15          Mr. Engelmann also testified numerous times on cross

16  that he did not make admissions to Special Agent Huber and

17  Special Agent McMillan.  He denied telling Special Agent Huber

18  that the transactions were illegal.  He denied telling Special

19  Agent Huber that these transactions were not compliant with the

20  HUD.  He denied telling Agent Huber that the lenders didn't know

21  about the second prices because Excel Title insisted that they

22  not know about the second prices and the kickbacks.

23          Again, the jury's finding of guilt contradicts that

24  testimony.  The jury didn't believe Mr. Engelmann.  And Special

25  Agent Huber and Special Agent McMillan both testified on

1  rebuttal that Mr. Engelmann did make those admissions.  There

2  are numerous instances, as cited in the sentencing memorandum,

3  in which Mr. Engelmann testified falsely to material matters,

4  which was basically his good faith, what he knew in these

5  transactions, and those matters were the crux of the case.  The

6  obstruction enhancement should be applied.

7          THE COURT:  Mr. Treimer.

8          MR. TREIMER:  Thank you, Your Honor.

9          Again, we're resisting the obstruction enhancement.  I

10 think the starting point is pretty simple.  It's from the

11 Abdul-Aziz case where a district court cannot, however, impose

12 the departure simply because the defendant testifies on his own

13 behalf and the jury disbelieves him, and that's a 2007 case.

14         You know, I would encourage this court to make

15 specific findings as to willfulness because -- maybe starting at

16 the end first might help; that when Mr. Engelmann testified

17 about his contact with Agent Huber and Agent McMillan, they

18 first met and then Huber and McMillan left and went to talk to

19 Mr. Allegro, I believe it was, and then they come back.  At that

20 point in time, Mr. Engelmann knew that they were looking at

21 these transactions.  And so he went into his file room and he

22 pulled all nine files.  Two hours later the agents are back.

23 All nine files are there, all of the side agreements are in

24 there, all of -- the two spreadsheets with the actual price and

25 the inflated price, everything is there.  If Mr. Engelmann

1   intended to obstruct justice, my God, he had two hours to hit

2   the shredder.  At that point in time, he didn't know the

3   government already had copies of these documents, and so that

4   would be the starting point.

5            The other thing is, how simple could it have been to

6   have these guys, the agents, record this conversation which

7   ended up being a big battle during the trial of who said what?

8   And, of course, there's no recording.

9            And I think that you also have to keep in mind that

10  this jury had a very close call.  As you know, we were putting

11  on a good faith defense and this court didn't give the good

12  faith instruction that I wanted; but the first question out of

13  the jury room was, can we have more instruction on good faith?

14  That tells me, and should tell this court, they were struggling

15  whether -- you know, which way to go on this issue.  And had we

16  given them further instruction, we might not be sitting here at

17  all.  So it's my position, Your Honor, that this is too close to

18  call given the way that the jury reacted and given how the

19  government conducted its investigation and given the little word

20  "if," and that's what this was all about.  Agent Huber testified

21  that Mr. Engelmann told him this was bank fraud, and

22  Mr. Engelmann testified, I said if the lenders didn't know, it

23  would be bank fraud.

24            THE COURT:  All right.  Thank you, Counsel.

25            Well, first of all, Mr. Treimer, I think your issue

1   with regard to the jury instruction is quite collateral to what

2   we're dealing with here, but I'm going to avoid any credibility

3   assessments or potential for misunderstanding between the

4   defendant and the federal agents regarding his interviews with

5   them.  I'm not going to make a determination for purposes of

6   this enhancement on that basis.

7          The court cannot crawl into Mr. Engelmann's mind to

8   know what he was thinking at the time.  I must simply look at

9   the record that was before me.  The defendant testified that he

10  had disclosed the true nature of the transactions to Excel Title

11  and expected that information would be provided to any lender.

12  This is flatly contradicted by other evidence in the case.  It's

13  fundamentally inconsistent with the preparation of two sets of

14  documents.  Clearly, the defendant recognized the importance of

15  this factual issue.  It was the central issue in the case.

16  Continuing even now to argue that he was acting in good faith,

17  understanding that all parties to the transaction were aware of

18  its nature, the court must conclude on this record that the

19  defendant gave false testimony on a material matter with the

20  intent to provide false testimony and not as a result of

21  inadvertence or mistake.  Accordingly, the enhancement on this

22  record applies.

23         That I believe concludes the issues with regard to the

24  enhancements, does it not, Counsel?

25         MR. KELLER:  Yes, Your Honor.

1          MR. TREIMER:  Yes, Your Honor.

2          THE COURT:  All right.  This case presents under the

3    federal sentencing guideline system at an offense level 25,

4    based upon the court's conclusion with regard to the loss

5    amount.  This has a criminal history category of I.  That

6    provides the court with a guideline sentencing range of 57 to 71

7    months.

8          Mr. Treimer, I'm ready to hear from you then as to

9    what would be an appropriate sentence under the circumstances.

10         MR. TREIMER:  Thank you, Your Honor.

11         I don't know where to begin and where to end, but when

12   you look at these guidelines, 57 to 71 months, they're out of

13   whack in this case.  This doesn't make sense that Mr. Engelmann

14   should have a sentence of imprisonment of -- any sentence of

15   imprisonment.

16         So the first thing I want to talk about is sentencing

17   disparity.  You have Mr. Herdrich and Mr. Hanneken who were each

18   sentenced to 40 months by Judge Pratt.  You have Mary Pat

19   Harper, the real estate agent, instigator of all of this,

20   finding the buyers in this case, Herdrich and Hanneken,

21   sentenced to 24 months by Judge Jarvey.  Then we have attorney

22   Paul Bieber, one of two attorneys, Mr. Engelmann and Mr. Bieber,

23   that were indicted out of many, many attorneys here in the Quad

24   Cities that had participated in equally similar transactions.

25   Mr. Bieber goes to trial and gets a hung jury and then pleads to

```
 1  misprision of a felony and the government offers him probation.
 2  He's done the same transactions, but Judge Pratt --
 3            THE COURT:  Well, that's not quite correct,
 4  Mr. Treimer.  We're not necessarily dealing with the same
 5  transactions.
 6            MR. TREIMER:  Similar; four.
 7            THE COURT:  All right.
 8            MR. TREIMER:  Then we have Mary Rankin, who was, I
 9  believe, a mortgage broker who participated in two transactions
10  and got five years probation.  And Natalie Long, who was a
11  mortgage broker, also participated I believe in two transactions
12  and got probation.
13            Clearly, Your Honor, I am arguing for probation in
14  this case, and the reason is, when we look at the factors of
15  deterrence, punishment and rehabilitation, those are the factors
16  you're going to have to consider under 3553(a).
17            Deterrence, the deterrence is already done.
18  Mr. Engelmann has lost his license to practice law in Iowa and
19  Illinois and anywhere in the nation.  He's lost the respect of
20  his community.  He's lost his 36-year law practice.  And if you
21  give Mr. Engelmann a sentence of incarceration, as far as
22  deterrence is concerned, do you think anyone in Wall Street,
23  JPMorgan Chase, Bank of America, Wells Fargo, do you think
24  they're going to pay any attention to this?  No, Your Honor, I
25  posit to you they're not.  Matter of fact, they're probably --
```

1 some of those entities are being sued right now by Freddie Mac

2 and Fannie Mae.

3          And, again, on the issue of punishment, how can you

4 punish Mr. Engelmann any more than he's punished himself by

5 doing these nine transactions five years ago, never had done one

6 like it before, never had done one like it afterwards?  The

7 punishment, again, is the same as the deterrent effect.  He's

8 lost his practice, his income.  He has the humiliation.

9          Rehabilitation, well, what's there to rehabilitate?

10 There isn't any.  Incarceration doesn't serve to rehabilitate.

11 He'll never practice law.  He'll never be a closing agent again.

12          I think Judge Pratt said it best in Gall where

13 sometimes a sentence of incarceration does more to hinder the

14 law than to help the law.  And I believe Mr. Engelmann is

15 sitting in those shoes of what Mr. Gall was and that we're not

16 really showing true respect for what all went on in this whole

17 scenario by sending Mr. Engelmann to prison, especially given

18 what the other co-defendants -- or defendants in this fraud case

19 have received for sentences.

20          So, you know, a sentence of imprisonment may work to

21 promote not respect but derision of the law as it is viewed

22 merely as a means to dispense harsh punishment without taking

23 into account the real actions.

24          Your Honor, all I can say is that I truly believe that

25 a sentence of probation would be appropriate in this case.

1        Thank you.

2        THE COURT:  Thank you, Counsel.

3        Mr. Engelmann, you have the right to speak to the

4   court yourself if you wish.  It is entirely up to you whether

5   you do so; but if you have something you would like to say, I

6   would be glad to hear from you.

7        THE DEFENDANT:  I will -- thank you, Your Honor, first

8   of all.  I will do my best to get through this.  It's difficult

9   to stand here after 36 years as an attorney and realize what has

10  gone on here; but I will do my best.

11       I recognize what has occurred here.  I've been blessed

12  not only to practice law in this very courtroom but in this

13  community, to have friends and family, to have colleagues and

14  supporters, all of these wonderful people, many of them that

15  have literally been my lifeline for the last nine months.

16       I have come from a family that -- well, I use the

17  expression Beaver Cleaver for those of us with gray hair,

18  remembering the old television show.  My mother cooked cookies

19  and my father went off to work, and he blessed me with a life

20  and a family that I've honored and respected and have done the

21  same to me.  We have supported each other for the last few

22  months, recognizing the terrible nature of all of these things,

23  and I am not in any way trying to avoid my responsibility here

24  as an attorney or as a human.  There is no one that detests

25  crime more than attorneys and specifically those of us involved

1    in the industry are well aware of criminal behavior.

2           This case, however, presents some interesting items

3    for me.  My family has left me in a situation that they've given

4    me much support, but my life has been such, after my parents

5    brought me into the world, we lived and loved each other very

6    much.  And from my 16th birthday, Your Honor, I've worked in

7    this community.  I've lived and loved the Quad Cities.  I've

8    worked literally from my 16th birthday, and I put myself through

9    school.

10          My wife is of the same -- or my then wife, I guess,

11   did the same.  I got to the point of law school and, of course,

12   the very wise question from her lips was, what happens, gee, if

13   you don't get into law school?  And the life I've led and I

14   think her logic was such that I don't know how to answer that

15   other than to say there was never a plan B.  My life has been

16   such that I've been honored by my time as an attorney, and I've

17   earned may way through to the point of law school.  And while I

18   wasn't the best student in law school, I worked my way through.

19   I worked in a myriad of a number of jobs, everything from

20   loading fruit trucks at night to get my tuition done, to Boys

21   Town and other things in Omaha in my law school days.

22          I graduated in 1976 and came back to the Quad Cities a

23   year later after having spent a year at a utility company, and

24   over the years I've been blessed with, again, wonderful

25   colleagues and friends.  I've done many things in this community

1   which I would like to point out to the court and try to give you

2   an idea of 60 days of my life, Your Honor, are not equal to 60

3   years of my life.

4          I have a criminal record of exactly zero.  My criminal

5   record to this point has involved only speeding tickets or up to

6   a heavy foot that I may have.  But once I started practice in

7   the Quad Cities, I've come to know and love the community here,

8   including Mr. Treimer and other attorneys.  I've known many

9   people in this community and have benefitted from their goodness

10  and decency, many of the clients that have given you letters,

11  many of them who are in the courtroom today.  They have

12  supported me through thick and thin.

13         During my career as an attorney, I eventually came to

14  the point where I focused on the real estate arena.  So when

15  Mr. Dunakey came here and testified, I can relate to much of

16  what he talked about because I can understand the foreclosure

17  process much greater than perhaps many.

18         But, in any event, I've worked with many, many people,

19  and I've tried to enhance the law.  I've always been proud of

20  the fact that I've been an attorney and I've never denied anyone

21  anything.  And other than these 60 days, Your Honor, I have

22  never had an ethical, criminal, civil or other complaint of my

23  activity.

24         I would like to point out a few other things to you,

25  Your Honor, some things that bring to my mind the obvious

1  question of why would I do this.  And specifically real estate

2  in a community such as the Quad Cities is a relatively small

3  area.  The selling agent is in many cases, in most cases an

4  attorney.  I've earned that trust from almost every bank in this

5  community at one time or another and been lucky enough to act as

6  the selling agent in the sense that you're the middleman and all

7  the money flows in and out of your trust account.  I have earned

8  the respect of Valley Bank, Quad City Bank, Wells Fargo, all of

9  these lenders that have given me guidance over the years, many,

10  including First Central State, whom we've heard testimony from.

11  The net effect of that status, however, is important for the

12  court to consider, specifically that at any point during the

13  hectic days of the early 2000s, I would have in my account

14  anywhere from three, five, six, seven million dollars just

15  sitting there.  I could write a check at any point, walk away, I

16  would be done.  Those lenders, however, trusted me, and they did

17  so with good reason.  No one has ever questioned any of those

18  activities.

19          I've also worked with all of the government agencies

20  in this community, the auditor through their attempt to increase

21  their GI system, which for our purposes is the Google Earth that

22  exists on the computers.  There's a local agency which I've

23  worked with, the county auditor.  I've worked with the assessor

24  through many questionable transactions and guided them through

25  the participants and the lenders and the people involved,

1  assisted the auditor in that practice, the assessor and the

2  treasurer in their activities, but the recorder has been my

3  specific bone of help.  Rita Vargas, our current recorder, and a

4  number of us have worked with her over a couple of areas,

5  specifically with regard to redacting Social Security numbers,

6  and I think all of us are aware of the problem with the Internet

7  and the use of Social Security numbers, and for years those were

8  in the system.  A number of years ago she asked a number of us

9  attorneys to get together and work with her in that regard, and

10  we did it.  She worked very hard.  She's done a wonderful job.

11  But through the bar association, members that I worked with and

12  Ms. Vargas, those Social Security numbers are no longer in the

13  system, they're not available.  That's a wonderful benefit to

14  all of us in the Scott County area have.

15         I've also worked with Rita Vargas, the recorder, with

16  regard to the transformation of our records into the Internet

17  world.  She shifted a number of software products and has worked

18  with my real estate committee that I have chaired and the bar

19  association in an attempt to guide her through that.

20         I also, on a personal note, worked with the bar

21  association through mock trials for the bar association with

22  high schools, grade schools, my own children many times.  Again,

23  I've worked with the real estate committee, just wonderful

24  people that have been my fellow compatriots in the law.  Many

25  times we collegially will get together and decide title issues

1   on what happens if this occurs, what should we do, what

2   documents should be accepted.  We worked through that when I was

3   chairman of the committees and did all of that.

4        But probably my proudest moment, Your Honor, is the

5   last activity, which is the promotion of young attorneys to be

6   engaged in the practice of law.  As the chairman in the real

7   estate committee, it didn't take me long to figure out that my

8   hair was turning gray and that most of the other members of the

9   committee also had hair that was turning that color, and so we

10  saw an immediate need in the next few years to promote the use

11  of good, qualified, honest attorneys in this area.  And I worked

12  with the Iowa Title Guaranty people to promote, and we've now

13  given three or four young attorneys in the community a license

14  through Iowa Title Guaranty to be an abstractor, and I've been

15  proud of that fact, Your Honor, to promote the continuation of

16  this system, that my mentors gave to me over the years and that

17  I wanted to be in my final years but now will be denied.

18        Finally, Your Honor, on a personal note, my family, as

19  I've said, has been wonderful to me.  I've done any number of

20  things on a personal level, but one that I guess I was just

21  reminded of this morning that I had forgotten is my wife and I

22  at that time have had a number of friends, the local attorney

23  who handles adoptions were nice enough -- or was nice enough to

24  allow the infants which were born to be placed in our home, and

25  she and I handled them for a few weeks.  The beauty of life is

1    an amazing thing, Your Honor.  I have to tell you my children

2    and grandchildren are what have kept me going.

3           So, in summary, Your Honor, I can only tell you that

4    I've lived 60 years of my life, and I stand here today in awe of

5    the decisions that all of you are making, that my life is now

6    outside of my control.  It certainly is in your hands.  I

7    recognize that.  I accept that.  I'm not trying to belittle

8    anyone.  I understand the severity of what's going on here.  But

9    I would ask Your Honor to take note of the fact that I'm now

10   stopped from practicing law, something I've loved and worked on

11   so hard.  I can no longer do what I love.  I can't act in the

12   manner that I have been honored to have good friends and good

13   family and supporters over the years.  I've been honored to have

14   60 years of good life.  I would hope the court would take into

15   mind -- remember in your mind that I've had 60 good years.

16   Don't take away my freedom because of these 60 days.

17          Thank you.

18          THE COURT:  Thank you, sir.

19          Mr. Keller, the government's position, please.

20          MR. KELLER:  Thank you, Your Honor.

21          Mr. Treimer started off by saying the guideline

22   sentence in this case is out of whack.  It's out of whack in

23   Mr. Treimer's view because he disagrees with the loss amount

24   that the court has assessed and with every enhancement that has

25   been assessed here today at sentencing.  If the court were to

1   find that there was zero loss or just the gain to Mr. Engelmann,

2   the $4,500, and had found that none of the enhancements applied,

3   Mr. Engelmann would likely be facing a sentence of probation;

4   but those aren't the facts and that is not what the court has

5   found.  So the guideline sentence isn't out of whack with what

6   was done here.  It reflects what was done here.  It reflects the

7   sophisticated nature of the scheme, the fact that Mr. Engelmann

8   was an attorney, in a position to stop this thing but instead

9   enabled it, the fact that he lied on the stand, and the fact

10  that this case involved hundreds of thousands of dollars of loss

11  to the industry.

12          Mr. Treimer and the defense at trial, and to some

13  extent the testimony today, has been to blame the industry, to

14  blame Wall Street, to blame New Century and the lenders.  There

15  seems to be plenty of blame to go around, but the conduct that

16  Mr. Engelmann engaged in contributed to the problem.  It

17  exacerbated the problem.  He's not blameless here.

18          Mr. Treimer also talked about the sentencing disparity

19  with the other defendants in this case.  Mr. Engelmann's

20  sentence reflects the fact that he went to trial and that he's

21  been found to have obstructed justice.  None of the other

22  defendants were sentenced for a crime that they went to trial

23  on.  Mr. Bieber went to trial but then he pled to a completely

24  different offense.  He pled to misprision of a felony, which I

25  believe has a three-year statutory maximum.  He was sentenced

1  for misprision of a felony, not for wire fraud and conspiracy

2  that Mr. Engelmann is being sentenced for today.  Herdrich and

3  Hanneken were sentenced to 40 months, but they pled guilty.

4  They didn't -- their sentence doesn't reflect the additional

5  penalty for obstruction of justice and the lack of acceptance of

6  responsibility that Mr. Engelmann displayed at trial and through

7  counsel, to some extent, still today.

8          Deterrence, Your Honor, the deterrence, the value here

9  under the deterrence factor under 3553(a) is that people in

10  Mr. Engelmann's situation will be deterred from this kind of

11  conduct.  People in this community will be deterred from this

12  type of conduct.  Professionals like Mr. Engelmann who have no

13  blemishes on their record but who are confronted with an

14  opportunity to engage in white collar crime will be deterred

15  based in part on the sentence that this court gives.

16          The government agrees that New Century and Wall

17  Street, those lenders aren't going to be deterred by this

18  sentence but people that find themselves in a similar situation

19  to that of Mr. Engelmann, people in this community, people in

20  Iowa, will be deterred, Your Honor, and the need for deterrence

21  is present here.  White collar crime is often viewed by the

22  community as minor crime that doesn't deserve harsh punishment,

23  but the guidelines say otherwise, and the need for deterrence is

24  a strong factor here.

25          The sentence should reflect the seriousness of the

1  offense under 3553(a).  Again, the seriousness of the offense is

2  driven by the loss amount, by the hundreds of thousands of

3  dollars at issue here, that's what drives the sentence under the

4  guidelines.  And there is no dispute about the fact that

5  Mr. Engelmann knew that on all nine of these properties there

6  were tens of thousands of dollars on each property being kicked

7  back from the seller to the buyer without the lender's

8  knowledge.

9          In the sentencing brief, the argument has been that he

10 played a very minor role in this case, but there's no doubt that

11 he was aware of the significant amount of money that was being

12 taken from the lenders, that the lenders were being defrauded

13 from, and that's what drives the sentence.  That's what the

14 sentence should reflect.  That is the measure of the seriousness

15 of the offense.

16         All that said, the government recognizes that this

17 does appear to be an aberration in an otherwise law-abiding life

18 as Mr. Treimer and Mr. Engelmann and the PSR describe.  That is

19 taken into account by the criminal history category of I that

20 the guidelines provide.  It's also taken into account by the

21 lower base offense level for a fraud crime like this, a six or a

22 seven under the guidelines, and then again the loss amount

23 drives the sentence.  But white collar crimes are generally

24 punished less harshly than other crimes, but this specific crime

25 is treated more harshly, more seriously by the guidelines

1  because of all of the factors we've been hashing out here today,

2  the loss amount, the sophistication, the abuse of trust, the

3  obstruction, and those things shouldn't be disregarded by the

4  court.

5          The history and characteristics of the defendant,

6  again, the lack of criminal history, the letters -- the numerous

7  letters, in my brief career, more letters than I've ever seen at

8  a sentencing, some of them compelling, do deserve consideration

9  by the court, do deserve consideration under the history and

10  characteristics of the defendant.  And, for that reason, the

11  government is advocating for a sentence at the low end of the

12  guidelines under the court's findings of a 57- to 71-month

13  range.  The government is advocating for a 57- or 60-month

14  sentence to reflect the history and characteristics of the

15  defendant; but on balance, the 3553(a) factors do not weigh in

16  favor of varying from the guidelines.  On balance, they suggest

17  that a guideline sentence is appropriate, Your Honor.

18          THE COURT:  All right.  Thank you, Counsel.

19          Pursuant to the provisions of Title 18, United States

20  Code, Section 3553, in determining the sentence that is

21  appropriate, the court considers the nature and circumstances of

22  the offense and the history and characteristics of the

23  defendant.  I have considered all of the factors under Section

24  3553(a), although I may not mention them all in the process of

25  explaining the sentence here today.

1          In considering the nature and circumstances of the

2    offense, I recognize that there are a lot of things about this

3    case that are troubling and that the offense is serious because

4    fraud is always a serious matter, and it does have a ripple

5    effect in costing a lot of money for a lot of other people.

6    Ironically, in this case, Mr. Engelmann himself made very little

7    in this deal, and if he weren't working for these people, based

8    upon what I know about his practice, he would have been working

9    for somebody else.  So he, in a sense, made nothing.

10          It is bizarre to me, based upon what I've learned

11   about you, sir, that you did this.  It is, however, equally

12   bizarre to me that you didn't throw up your hands and say, I

13   won't be a part of it.  And then in addition to being a part of

14   it, you did proceed to prepare materials that had the effect and

15   the intent, I believe, of misleading.  And it is not sufficient

16   under either your rules of responsibility or under criminal law

17   to say it's what my client wanted to do.  So the offense is very

18   serious.

19          In terms of deterrence to criminal conduct, that's

20   really not about you.  It's about other people who might be

21   contemplating something like this, and I recognize that in this

22   case you have already paid a substantial price based upon the

23   loss of your professional standing.

24          I don't need to worry about protecting the public from

25   further crimes of yourself because I believe this was

1    aberrational conduct.  I have no concern about that.

2         I do give the guidelines some consideration.  They're

3    no longer mandatory, but nor are they unimportant because they

4    do assist us in trying to reach some level of consistency in

5    sentencing and avoiding unwarranted sentencing disparity among

6    defendants with similar records who have been found guilty of

7    similar conduct.

8         I've really given this case a lot of thought.  I

9    thought a great deal about Mr. Treimer's invitation that I look

10   at what happened to the other people.  There are a lot of

11   problems with that, however, because they're sentenced under

12   different offenses, their circumstances are different because

13   they obtained the benefit of acceptance of responsibility, which

14   lowers the sentencing range they would have been looking at, and

15   in the case of the two primary actors in this whole process, not

16   only did they plead guilty and gain the benefit of acceptance of

17   responsibility, but they also had some other adjustments because

18   of health issues.  So it ends up being difficult to compare

19   them.

20        And while I certainly recognize that you have paid

21   dearly for what are professional misdeeds here, there are other

22   issues that the court has to consider.  Sentencing is not about

23   what the court wants to do but what the court believes it has to

24   do.  Ultimately, I need to fashion a sentence that is sufficient

25   but not greater than necessary to meet the necessary sentencing

1  considerations.  I have before me a guideline range of 57 to 71

2  months.

3          While I recognize that some of these other people

4  cannot be compared to your situation well, at the same time,

5  recognizing the price you have already paid, recognizing the

6  unique situation that you present to the court in terms of your

7  past history and the nature and circumstances of what you did

8  here and comparing that to the punishment that has been meted

9  out in the remainder of these cases, I believe that a variance

10  from the guideline range is supported.  I don't believe that I

11  can do my duty and vary to probation.  I believe that I have to

12  do my duty and find that some period of custody is necessary

13  under the circumstances, but I think 57 months is too high and,

14  therefore, I am going to vary from the guideline range.  I'm

15  going to vary below the sentence that Mr. Herdrich and Hanneken

16  are serving because I think it's just more than is necessary to

17  sentence you under these circumstances to more time than they're

18  doing.

19          Will the defendant please rise.

20          Based upon the court's review of the criteria set

21  forth in Title 18, United States Code, Section 3553 and the

22  unique circumstances of this case, it is the judgment of the

23  court that the defendant Marc Robert Engelmann is hereby

24  sentenced to the custody of the Bureau of Prisons for a term of

25  36 months on Counts 1 through 9 of the indictment, to be served

1  concurrently.

2           Upon release from imprisonment, you'll be placed on

3  supervised release for a term of three years on each of Counts 1

4  and 4 through 9 and five years on each of Counts 2 and 3, to be

5  served concurrently.

6           Within 72 hours of release from the custody of the

7  Bureau of Prisons, you are to report in person to the probation

8  office in the district in which you've been released.  While

9  you're on supervised release, you're not to commit another

10  federal, state, or local crime.  You'll be prohibited from

11  possessing a firearm or other destructive device, and you shall

12  not possess any illegal controlled substances.

13          You will have to abide by the standard conditions of

14  supervised release, plus the following special conditions.  You

15  shall provide complete access to financial information,

16  including disclosure of all business and personal finances to

17  the U.S. probation officer.  You shall not apply for, solicit or

18  incur any further debt, included, but not limited to, loans,

19  lines of credit or credit card charges either as a principal or

20  co-signor, as an individual, or through any corporate entity

21  without first obtaining written permission from the U.S.

22  probation officer.

23          You shall pay restitution in an amount that the court

24  will determine subsequently.  You shall cooperate with the

25  probation officer in developing a monthly payment plan

1  consistent with a schedule of allowable expenses provided by the

2  probation office.

3        You may be required to participate in an IRS offset

4  program, which may include the garnishment of wages or seizure

5  of all or part of any income tax refund to be applied toward the

6  restitution balance.  You may be required to participate in the

7  treasury offset program, which would include the seizure of any

8  government payment to be applied toward the restitution balance.

9        And you shall submit to a search of your person,

10  residence, adjacent structures, office or vehicle conducted by a

11  U.S. probation officer at a reasonable time and in a reasonable

12  manner based upon reasonable suspicion of contraband or evidence

13  of a violation of a condition of release.  A failure to submit

14  to a search may be grounds for revocation.  You shall warn any

15  other residents that the residence or vehicle may be subject to

16  searches pursuant to this condition.  This condition may be

17  invoked with or without the assistance of law enforcement,

18  including the United States Marshals Service.

19        The court finds you do not have the ability to pay a

20  fine.  It would be inconsistent with the restitution obligation.

21  You are ordered to pay a $100 special assessment on each count

22  for a total of $900 to the Victims Assistance Fund, which will

23  be due immediately and payable without interest to the U.S.

24  Clerk of Court for the Southern District of Iowa.

25        You may be seated, sir.

1                  Mr. Engelmann, you will have the right to appeal from

2     this sentence.  You'll need to do so within 14 days of the entry

3     of judgment, and as I indicated earlier, I'm going to delay a

4     week in entering the full judgment with regard to restitution

5     and, again, will invite counsel, if they wish, to provide any

6     further memorandum.  If they do not, I'll simply make a

7     determination upon the record that I have in that regard.

8                  Does the government seek detention?

9                  MR. KELLER:  No, Your Honor.

10                 THE COURT:  The court is confident that Mr. Engelmann

11    is not likely to flee and he's not likely to be a danger to any

12    other person or to the community.  One concern I always have,

13    Mr. Engelmann, in situations like this is that you might not be

14    okay.  Are you going to be okay?

15                 THE DEFENDANT:  Yes, Your Honor.

16                 THE COURT:  You will remain on the same release status

17    that you've been under up until now.  You will be provided with

18    information by the United States Marshals Service of when and

19    where to report.  When they do that, please make sure that you

20    do exactly what they tell you so that there's no

21    misunderstanding of what your intentions are.

22                 Is there anything else to come before the court?

23                 MR. KELLER:  No, Your Honor.

24                 THE COURT:  Mr. Treimer?

25                 MR. TREIMER:  No, Your Honor.

1            THE COURT:  All right.  Court is in recess.

2            (Proceedings concluded at 5:08 p.m.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                     C E R T I F I C A T E

2              I, the undersigned, a Certified Shorthand Reporter of

3     the State of Iowa, do hereby certify that I acted as the

4     official court reporter at the hearing in the above-entitled

5     matter at the time and place indicated.

6              That I took in shorthand all of the proceedings had at

7     the said time and place and that said shorthand notes were

8     reduced to computer transcription under my direction and

9     supervision, and that the foregoing computer transcription pages

10    are a full and complete transcript of the shorthand notes so

11    taken.

12             Dated at Des Moines, Iowa, this 26th day of February,

13    2012.

14

15

16

17                             /s/ Terri L. Martin
                               CERTIFIED SHORTHAND REPORTER
18

19

20

21

22

23

24

25